| | |
|---|---|
| 1 | Laurence M. Rosen, Esq. (SBN 219683) |
| 2 | **THE ROSEN LAW FIRM, P.A.**<br>355 South Grand Avenue, Suite 2450 |
| 3 | Los Angeles, CA 90071<br>Telephone: (213) 785-2610 |
| 4 | Facsimile: (213) 226-4684 |
| 5 | Email: lrosen@rosenlegal.com |
| 6 | Counsel for Plaintiff |

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BENJAMIN STIRRATT, Individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>UBER TECHNOLOGIES, INC., DARA KHOSROWSHAHI, NELSON CHAI, GLEN CEREMONY, RONALD SUGAR, URSULA BURNS, GARRETT CAMP, MATT COHLER, RYAN GRAVES, ARIANNA HUFFINGTON, TRAVIS KALANICK, WAN LING MARTELLO, H.E. YASIR AL-RUMAYYAN, JOHN THAIN, DAVID TRUJILLO, MORGAN STANLEY & CO. LLC, GOLDMAN SACHS & CO. LLC, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, BARCLAYS CAPITAL MARKETS, LLC, SUNTRUST ROBINSON HUMPHREY, INC., DEUTSCHE BANK SECURITIES INC., HSBC SECURITIES (USA) INC., SMBC NIKKO SECURITIES AMERICA, INC., MIZUHO SECURITIES USA LLC, NEEDHAM & COMPANY, LLC, LOOP CAPITAL MARKETS LLC, SIEBERT CISNEROS SHANK & CO., L.L.C., ACADEMY SECURITIES, INC., BTIG, LLC, CANACCORD GENUITY LLC, CASTLEOAK SECURITIES, L.P.,<br><br>(Additional Defendants on Next Page) | Case No:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

- 1 -

Class Action Complaint for Violation of the Federal Securities Laws

COWEN AND COMPANY, LLC,
MACQUARIE CAPITAL (USA) INC.,
MISCHLER FINANCIAL GROUP, INC.,
OPPENHEIMER & CO. INC., RAYMOND
JAMES & ASSOCIATES, INC., WILLIAM
BLAIR & COMPANY, L.L.C., THE
WILLIAMS CAPITAL GROUP, L.P., AND
TPG CAPITAL BD, LLC,

  Defendants.

Plaintiff Benjamin Stirratt ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorney, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Uber Technologies, Inc. ("Uber" or the "Company"), as well as media and analyst reports about the Company and Company press releases. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired Uber securities pursuant and/or traceable to Uber's Registration Statement (defined below) issued in connection with Uber's May 10, 2019 initial public stock offering (the "IPO" or "Offering"), seeking to recover compensable damages caused by Defendants' violations of the Securities Act of 1933 (the "Securities Act").

2. In May 2019, Defendants held the IPO, issuing approximately 180 million shares of common stock to the investing public at $45.00 per share, pursuant to the Registration Statement.

3. By the commencement of this action, Uber's shares trade significantly below its IPO price. As a result, investors were damaged.

## JURISDICTION AND VENUE

4. The claims alleged herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77k, 77l(a)(2) and 77o.

5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 22 of the Securities Act (15 U.S.C. §77v).

6. Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Defendants conduct business and the Company is headquartered in this Judicial District.

7. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

8. Plaintiff, as set forth in the accompanying certification incorporated by reference herein, purchased Uber shares pursuant and/or traceable to the IPO and was damaged thereby.

9. Defendant Uber, based in San Francisco, California, purports to be a technology company that primarily facilitates access to rides and meals on demand. Uber's shares are listed and traded on the New York Stock Exchange ("NYSE") under the ticker "UBER." The Company is incorporated in Delaware and its principal executive offices are located at 1455 Market Street, 4th Floor, San Francisco, CA 94103.

10. At the time of the Offering, Defendant Dara Khosrowshahi ("Khosrowshahi") was serving as Chief Executive Officer and a member of Uber's Board of Directors (the "Board") Defendant Khosrowshahi participated in the preparation of and signed the Registration Statement.

11. At the time of the Offering, Defendant Nelson Chai ("Chai") was serving as Chief Financial Officer. Defendant Chai participated in the preparation of and signed the Registration Statement.

12. At the time of the Offering, Defendant Glen Ceremony ("Ceremony") was serving as Chief Accounting Officer and Global Corporate Controller. Defendant Ceremony participated in the preparation of and signed the Registration Statement.

13. At the time of the Offering, Defendant Ronald Sugar ("Sugar") was serving as Chairperson of the Board. Defendant Sugar participated in the preparation of and signed the Registration Statement.

14. At the time of the Offering, Defendant Ursula Burns ("Burns") was serving as a director on the Board. Defendant Burns participated in the preparation of and signed the Registration Statement.

15. At the time of the Offering, Defendant Garrett Camp ("Camp"), a co-founder of the Company, was serving as a director on the Board. Defendant Camp participated in the preparation of and signed the Registration Statement.

16. At the time of the Offering, Defendant Matt Cohler ("Cohler") was serving as a director on the Board. Defendant Cohler participated in the preparation of and signed the Registration Statement.

17. At the time of the Offering, Defendant Ryan Graves ("Graves") was serving as a director on the Board. Defendant Graves participated in the preparation of and signed the Registration Statement

18. At the time of the Offering, Defendant Arianna Huffington ("Huffington") was serving as a director of the Board. Defendant Huffington participated in the preparation of and signed the Registration Statement

19. At the time of the Offering, Defendant Travis Kalanick ("Kalanick"), a co-founder of the Company, was serving as a director of the Board. Defendant Kalanick participated in the preparation of and signed the Registration Statement

20. At the time of the Offering, Defendant Wan Ling Martello ("Martello") was serving as a director of the Board. Defendant Martello participated in the preparation of and signed the Registration Statement.

21. At the time of the Offering, Defendant H.E. Yasir Al-Rumayyan ("Al-Rumayyan") was serving as a director of the Board. Defendant Al-Rumayyan participated in the preparation of and signed the Registration Statement.

22. At the time of the Offering, Defendant John Thain ("Thain") was serving as a director of the Board. Defendant Thain participated in the preparation of and signed the Registration Statement.

23. At the time of the Offering, Defendant David Trujillo ("Trujillo") was serving as a director of the Board. Defendant Trujillo participated in the preparation of and signed the Registration Statement.

Class Action Complaint for Violation of the Federal Securities Laws

24. The Defendants named in ¶¶10-23 are referred to herein as the "Individual Defendants." The Individual Defendants each signed the Registration Statement, solicited the investing public to purchase securities issued pursuant thereto, hired and assisted the underwriters, planned and contributed to the IPO and Registration Statement, and attended road shows and other promotions to meet with and present favorable information to potential Uber investors, all motivated by their own and the Company's financial interests.

25. The following underwriters were also instrumental in soliciting and making the stock offered in the IPO available to the investing public:

26. Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. Morgan Stanley acted as a representative of all the underwriters. Morgan Stanley also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Morgan Stanley's participation in the solicitation of the Offering was motivated by its financial interests.

27. Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. Goldman Sachs acted as a representative of all the underwriters. Goldman Sachs also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Goldman Sachs' participation in the solicitation of the Offering was motivated by its financial interests.

28. Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. Merrill Lynch also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Merrill Lynch's participation in the solicitation of the Offering was motivated by its financial interests.

Class Action Complaint for Violation of the Federal Securities Laws

29. Defendant Barclays Capital Inc. ("Barclays") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. Barclays also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Barclays' participation in the solicitation of the Offering was motivated by its financial interests.

30. Defendant Citigroup Global Markets Inc. ("Citigroup") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. Citigroup also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Citigroup's participation in the solicitation of the Offering was motivated by its financial interests.

31. Defendant Allen & Company LLC ("Allen & Company") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. Allen & Company also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Allen & Company's participation in the solicitation of the Offering was motivated by its financial interests.

32. Defendant RBC Capital Markets, LLC ("RBC Capital") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. RBC Capital also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. RBC Capital's participation in the solicitation of the Offering was motivated by its financial interests.

33. Defendant SunTrust Robinson Humphrey, Inc. ("SunTrust") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering

Class Action Complaint for Violation of the Federal Securities Laws

Documents. SunTrust also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. SunTrust's participation in the solicitation of the Offering was motivated by its financial interests.

34. Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. Deutsche Bank also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Deutsche Bank's participation in the solicitation of the Offering was motivated by its financial interests.

35. Defendant HSBC Securities (USA) Inc. ("HSBC") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. HSBC also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. HSBC's participation in the solicitation of the Offering was motivated by its financial interests.

36. Defendant SMBC Nikko Securities America, Inc. ("SMBC") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. SMBC also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. SMBC's participation in the solicitation of the Offering was motivated by its financial interests.

37. Defendant Mizuho Securities USA LLC ("Mizuho") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. Mizuho also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and

travel, among other expenses. Mizuho's participation in the solicitation of the Offering was motivated by its financial interests.

38.     Defendant Needham & Company, LLC ("Needham") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. Needham also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Needham's participation in the solicitation of the Offering was motivated by its financial interests.

39.     Defendant Loop Capital Markets LLC ("Loop") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. Loop also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Loop's participation in the solicitation of the Offering was motivated by its financial interests.

40.     Defendant Siebert Cisneros Shank & Co., L.L.C. ("Siebert Cisneros") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. Siebert Cisneros also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Siebert Cisneros participation in the solicitation of the Offering was motivated by its financial interests.

41.     Defendant Academy Securities, Inc. ("Academy Securities") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. Academy Securities also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Academy Securities' participation in the solicitation of the Offering was motivated by its financial interests.

42. Defendant BTIG, LLC ("BTIG") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. BTIG also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. BTTG's participation in the solicitation of the Offering was motivated by its financial interests.

43. Defendant Canaccord Genuity LLC ("Canaccord Genuity") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. Canaccord Genuity also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Canaccord Genuity's participation in the solicitation of the Offering was motivated by its financial interests.

44. Defendant CastleOak Securities, L.P. ("CastleOak") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of Company's false and misleading Offering Documents. CastleOak also participated in conducting and the promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. CastleOak's participation in the solicitation of the Offering was motivated by its financial interests.

45. Defendant Cowen and Company, LLC ("Cowen") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. Cowen also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Cowen's participation in the solicitation of the Offering was motivated by its financial interests.

46. Defendant Evercore Group L.L.C. ("Evercore") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. Evercore also

participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Evercore's participation in the solicitation of the Offering was motivated by its financial interests.

47.     Defendant JMP Securities LLC ("JMP Securities") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. JMP Securities also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. JMP Securities' participation in the solicitation of the Offering was motivated by its financial interests.

48.     Defendant Macquarie Capital (USA) Inc. ("Macquarie") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents.  Macquarie also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Macquarie's participation in the solicitation of the Offering was motivated by its financial interests.

49.     Defendant Mischler Financial Group, Inc. ("Mischler") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. Mischler also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Mischler's participation in the solicitation of the Offering was motivated by its financial interests.

50.     Defendant Oppenheimer & Co. Inc. ("Oppenheimer") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. Oppenheimer also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and

Class Action Complaint for Violation of the Federal Securities Laws

travel, among other expenses. Oppenheimer's participation in the solicitation of the Offering was motivated by its financial interest.

51. Defendant Raymond James & Associates, Inc. ("Raymond James") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. Raymond James also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Raymond James' participation in the solicitation of the Offering was motivated by its financial interests.

52. Defendant William Blair & Company, L.L.C. ("William Blair") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. William Blair also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. William Blair's participation in the solicitation of the Offering was motivated by its financial interests.

53. Defendant The Williams Capital Group, L.P. ("Williams Capital") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. Williams Capital also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Williams Capital's participation in the solicitation of the Offering was motivated by its financial interests.

54. Defendant TPG Capital BD, LLC ("TPG Capital") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Offering Documents. TPG Capital also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. TPG Capital's participation in the solicitation of the Offering was motivated by its financial interests.

Class Action Complaint for Violation of the Federal Securities Laws

55.    Defendants listed in ¶¶26-54 are collectively referred to herein as the "Underwriter Defendants."

56.    Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a)    The Underwriter Defendants are investment banking houses that specialize in, among other things, underwriting public offerings of securities. They served as the underwriters of the IPO and shared millions of dollars in fees collectively. The Underwriter Defendants arranged a roadshow prior to the IPO during which they, and representatives from Uber, met with potential investors and presented highly favorable information about the Company, its operations and its financial prospects.

(b)    Representatives of the Underwriter Defendants also assisted Uber and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Uber, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to internal, confidential, current corporate information concerning Uber's most up-to-date operational and financial results and prospects.

(c)    In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with Uber's lawyers, management and top executives and engaged in "drafting sessions." During these sessions, understandings were reached as to: (1) the strategy to best accomplish the IPO; (2) the terms of the IPO, including the price at which Uber securities would be sold; (3) the language to be used in the Registration Statement; what disclosures about Uber would be made in the Registration Statement; and (4) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Uber's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, Uber's existing problems as detailed herein.

(d)    The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those to Plaintiff and the other members of the Class.

57. Uber, the Individual Defendants, and the Underwriter Defendants are referred to collectively as "Defendants."

**SUBSTANTIVE ALLEGATIONS**

58. The Registration Statement and Prospectus used by Defendants to effectuate Uber's Offering was false and misleading in that it misled investors with regard to the Company's ballooning losses, stagnating growth rate, and cost-cutting measures that undercut its key growth initiatives, all of which were known to, but concealed by, Defendants at the time of the Offering.

59. The Offering Documents claimed that Uber had a number of significant opportunities to continue to grow its business, including "increasing Ridesharing and Uber Eats category penetration in existing markets, expanding Ridesharing and Uber Eats into new markets, increasing MAPCs and Trips per MAPC, investing in and expanding our New Mobility products, including dockless e-bikes and e-scooters, and investing in and expanding Uber Freight." Defendants also promised to continue to "invest in consumer and Driver rewards programs across our offerings."

60. Central to these growth initiatives was Uber's desire and commitment (and need) to motivate drivers and consumers to use its platform at the expense of well-funded alternatives in both the ridesharing and food delivery markets. The Offering Documents go on to say:

> "Generally, for a given geographic market, we believe that the operator with the larger network will have a higher margin than the operator with the smaller network.
>
> \*\*\*
>
> In addition to competing against ridesharing category participants, we also expect to continue to use Driver incentives and consumer discounts and promotions to grow our business relative to lower-priced alternatives, such as personal vehicle ownership, to increase engagement, and to maintain balance between Driver supply and consumer demand.
>
> \*\*\*
>
> We offer Driver incentives to encourage Driver activity on our Platform. For example, we may offer incentives to Drivers based on the number of trips they complete in a week. We believe that Drivers consider both earnings and incentives when choosing to

use our platform. In some cases, the aggregate amount of earnings and incentives received by a given Driver exceeds the Gross Bookings attributable to the Driver's trips, which results in excess Driver incentives. We offer Driver incentives and Driver referrals for both Ridesharing and Uber Eats.

***

Excess Driver incentives are recorded in cost of revenue, exclusive of depreciation and amortization, and Driver referrals are recorded in sales and marketing expenses. These amounts largely depend on our business decisions based on market conditions. We include the impact of these amounts in Core Platform Adjusted Net Revenue to evaluate how increasing or decreasing incentives would impact our Core Platform top line performance and the overall net financial activity between us and our customers, which ultimately impacts our Take Rate."

61.     The Offering Documents added:

"When we enter a new city or launch a new Ridesharing product in a city, we aim to reach sufficient scale and liquidity rapidly to attract consumers to use our platform as an alternative to personal vehicle ownership and usage of other modes of transportation and to achieve leadership in the ridesharing category. We can choose to use incentives, such as promotions for Drivers and consumers, to attract platform users on both sides of our network and increase engagement, which can result in a negative margin until we reach sufficient scale to reduce incentives. Even after we reach efficient scale in a given market, we may need to continue to use incentives to compete. In certain markets, other operators may use incentives to attempt to mitigate the advantages of our more liquid network, and we will generally choose to match these incentives, even if it results in a negative margin, to compete effectively and grow our business."

62.     The foregoing statements were materially inaccurate, misleading, and/or incomplete because they failed to disclose, *inter alia,* that (1) at the time of the Offering, Uber was rapidly increasing subsidies for customer's rides and meals in a bid for market share, which caused the Company's sales and marketing expenses to swell; and (2) Defendants were cutting (or planned to cut) costs in key areas that undermined the Company's central growth opportunities.

63.     Defendants were also required to disclose this material information in the

Offering Documents. SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), required disclosure of any known events or uncertainties that at the time of the Offering had caused, or were reasonably likely to cause, material impact on Uber's future operating results and prospects.

64. Nevertheless, Defendants went forward with the Offering with the foregoing misrepresentations and omissions in the Offering Documents. With these misrepresentations and omissions, the Offering was extremely lucrative for Defendants, who raised more than $8 billion in gross proceeds.

65. This influx of new capital, however, was insufficient to overcome the then-known, yet concealed, losses Uber was (and had already been) facing. Thus, on or about July 29, 2019, Defendants sought to reduce the Company's losses by announcing the termination of 400 workers on Uber's marketing team, representing about a third of the marketing team's global workforce of 1,200 people. This action stood in stark contrast to the Offering Documents' claim that Uber was, at the time of the Offering, "focused on optimizing our performance marketing spend."

66. On this news, the Company's stock fell from $43.88 per share on July 29, 2019, to $42.59 per share on July 30, 2019, before dropping further to close at $39.05 per share on August 5, representing a 13.2% decline from the Offering Price.

67. Then, to make matters worse, on August 8 and 9, 2019, respectively, Uber filed a Form 8-K with press release and Form 10-Q, announcing its second quarter results for fiscal 2019, which revealed revenues of $3.16 billion and *losses of $5.2 billion.* Further, Uber revealed that its ridesharing revenue only grew 2% and, significantly, that its sales and marketing expenses for the three and six months ended June 30, 2019, increased by $507 million, or 70.9%, and $870 million, or 62.5%, respectively.

68. Defendants revealed that "the increase in our sales and marketing expenses were driven by increased Driver incentives and consumer discounts, promotions, refunds, and credits as we invest in our platform." Indeed, consumer discounts, promotions, refunds, and credits increased from $226 million and $495 million for the three and six months ended June 30, 2018, respectively, to $528 million and $1.1 billion for the three and six months ended June 30, 2019, respectively, compared to $302 million and $621 million, in the same periods in 2018.

Class Action Complaint for Violation of the Federal Securities Laws

69. The media was quick to point out the $5.2 billion in net losses. For example, in an article published on TechCrunch, entitled "Uber lost more than $5B last quarter," the reporter made the following observation:

> "$5.2 billion in net losses *represents the company's largest-ever quarterly loss*. Revenue, for its part, is up only 14% year-over-year, agitating concerns over slower-than-ever growth. The company says a majority of 2Q losses are a result of stock-based compensation expenses for employees following its May [Offering]. Stock compensation aside, Uber still lost $1.3 billion, up 30% from Ql.
> 
> Analysts had expected losses per share of $3.12 versus Uber's $4.72."
> 
> (Emphasis added.)

70. Likewise, analysts voiced concern about how revenue in the quarter rose just 14% to $3.17 billion, "badly missing estimates at $3.36 billion," and how the Company's "**adjusted EBITDA loss more than doubled in the period, increasing 125%** to $625 million," which was a "sign that profitability is only getting further away." (Emphasis added.)

71. Then, in early September 2019, the Company announced that it would be laying off 435 employees within its product and engineering divisions, representing around 8% of its global workforce.

72. Since the IPO, and as a result of the disclosure of material adverse facts omitted from Uber's Registration Statement, Uber's stock price has fallen substantially below its IPO price, damaging Plaintiff and Class members.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

73. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Uber pursuant and/or traceable to Uber's Registration Statement (defined below) issued in connection with Uber's May 10, 2019 IPO (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

Class Action Complaint for Violation of the Federal Securities Laws

74. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Uber or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

75. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

76. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

77. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether Defendants violated the Securities Act;
- whether the Registration Statement contained false or misleading statements of material fact and omitted material information required to be stated therein; and,
- to what extent the members of the Class have sustained damages and the proper measure of damages.

78. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violations of Section 11 of the Securities Act Against All Defendants

79. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

80. This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

81. The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

82. Defendants are strictly liable to Plaintiff and the Class for the misstatements and omissions.

83. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

84. By reason of the conduct herein alleged, each Defendant violated or controlled a person who violated §11 of the Securities Act.

85. Plaintiff acquired Uber securities pursuant to the Registration Statement.

86. At the time of their purchases of Uber securities, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

87. This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against All Individual Defendants

88. Plaintiff incorporates all the foregoing by reference.

89. By means of the defective Prospectus, Defendants promoted, solicited, and sold Uber securities to Plaintiff and other members of the Class.

90. The Prospectus for the IPO contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants owed Plaintiff and the other members of the Class who purchased Uber securities pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure

that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

91. Plaintiff did not know, nor in the exercise of reasonable diligence could Plaintiff have known, of the untruths and omissions contained in the Prospectus at the time Plaintiff acquired Uber securities.

92. By reason of the conduct alleged herein, Defendants violated §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2). As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased Uber securities pursuant to the Prospectus sustained substantial damages in connection with their purchases of the shares. Accordingly, Plaintiff and the other members of the Class who hold the securities issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their securities to Defendants sued herein. Class members who have sold their securities seek damages to the extent permitted by law.

93. This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

## COUNT III

### Violations of Section 15 of the Securities Act Against the Individual Defendants

94. Plaintiff incorporates all the foregoing by reference.

95. This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against all Defendants except the Underwriter Defendants.

96. The Individual Defendants were controlling persons of Uber by virtue of their positions as directors or senior officers of Uber. The Individual Defendants each had a series of direct and indirect business and personal relationships with other directors and officers and major shareholders of Uber. The Company controlled the Individual Defendants and all of Uber's employees.

97.     Uber and the Individual Defendants were culpable participants in the violations of §§11 and 12(a)(2) of the Securities Act as alleged above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

98.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: October 4, 2019                               Respectfully submitted,

                                         **THE ROSEN LAW FIRM, P.A.**

                                         By: /s/ Laurence M. Rosen
                                         Laurence M. Rosen, Esq. (SBN 219683)
                                         355 S. Grand Avenue, Suite 2450
                                         Los Angeles, CA 90071
                                         Telephone: (213) 785-2610
                                         Facsimile: (213) 226-4684
                                         Email: lrosen@rosenlegal.com

                                         Counsel for Plaintiff