Jonathan Gardner (admitted *pro hac vice*)
Alfred L. Fatale III (admitted *pro hac vice*)
Marco A. Dueñas (admitted *pro hac vice*)
Lisa Strejlau (admitted *pro hac vice*)
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: jgardner@labaton.com
       afatale@labaton.com
       mduenas@labaton.com
       lstrejlau@labaton.com

*Lead Counsel for Lead Plaintiff Boston*
  *Retirement System*

[*Additional Counsel on Signature Page*]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| BOSTON RETIREMENT SYSTEM, | ) Case No. 19-cv-06361-RS |
| Plaintiff, | ) ECF CASE |
| v. | ) **SECOND AMENDED CLASS ACTION** |
| | ) **COMPLAINT FOR VIOLATIONS OF** |
| UBER TECHNOLOGIES, INC., et al., | ) **THE FEDERAL SECURITIES LAWS** |
| Defendants | ) DEMAND FOR JURY TRIAL |
| | ) |
| | ) Dept:  Courtroom 3, 17th Floor |
| | ) Judge:  Honorable Richard G. Seeborg |
| | ) |

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ................................................................................. 1

II.     JURISDICTION AND VENUE ......................................................................... 13

III.    PARTIES ........................................................................................................... 14

        A.      Lead Plaintiff ......................................................................................... 14

        B.      Proposed Class Representatives ............................................................. 14

        C.      Defendants ............................................................................................. 15

                1.      The Corporate Defendant ........................................................... 15

                2.      The Individual, Executive, and Selling Stockholder Defendants ............. 16

                3.      The Underwriter Defendants ....................................................... 19

IV.     FORMER UBER EMPLOYEES WHO SUBSTANTIATE THE ALLEGATIONS ....... 27

V.      SUBSTANTIVE ALLEGATIONS .................................................................... 28

        A.      Uber's History as a Transportation Business ........................................ 28

        B.      Uber's Toxic Culture and its Purported Attempts to Change .............. 32

        C.      The Offering Documents Contained Materially False and Misleading
                Statements of Fact and Omitted Material Information ......................... 35

                1.      The Offering Documents Contained Misstatements and Omissions
                        About Uber's Illegal Business Model and Growth Strategy ................ 35

                2.      The Offering Documents Contained Misstatements and Omissions
                        About Uber Passenger Safety ..................................................... 44

                3.      The Offering Documents Contained Misstatements and Omissions
                        About Uber's Financial Condition .............................................. 48

                4.      The Offering Documents Failed to Disclose and Misrepresented
                        Significant Risks That Made the Offering More Speculative and
                        Risky ...................................................................................... 51

                        (a)     Materially Misleading Business Model Risk Factors ................. 51

                        (b)     Materially Misleading Passenger Safety Risk Factors ................ 58

                        (c)     Materially Misleading Financial Condition Risk Factors ............ 64

                5.      The Offering Documents Failed to Disclose Adverse Trends,
                        Passenger Safety Uncertainties, and Significant Risks Regarding
                        Uber's Business Model ............................................................. 68

D.    Additional Facts Demonstrating That the Offering Documents Were False and Misleading at the Time of the Offering............................................................. 68

    1.    Post-IPO Events Demonstrating That Uber's Illegal Business Model and the Risks It Posed Existed Prior to the Offering.................... 69

        (a)    Uber's Domestic and International Illegal Operations ................. 69

        (b)    Uber's Illegal Misclassification of Workers ................................. 76

    2.    Post-IPO Events Demonstrating That Uber's Rampant Passenger Safety Issues Existed Prior to the Offering................................................ 81

    3.    Post-IPO Events Demonstrating That Uber's Financial Condition Was Worse Than the Offering Documents Led Investors to Believe....... 99

VI.    CLASS ALLEGATIONS ........................................................................................... 107

VII.    CAUSES OF ACTION ............................................................................................. 109

    COUNT I FOR VIOLATION OF SECTION 11 OF THE SECURITIES ACT ................................................................................................ 109

    COUNT II FOR VIOLATION OF SECTION 12(a)(2) OF THE SECURITIES ACT ................................................................................................ 111

    COUNT III FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT ................................................................................................ 113

VIII.    PRAYER FOR RELIEF ........................................................................................... 114

IX.    JURY TRIAL DEMANDED.................................................................................... 115

Lead Plaintiff Boston Retirement System ("Lead Plaintiff"), and proposed class representatives David Messinger, Sal Toronto on behalf of Ellie Marie Toronto ESA, Joseph Cianci, and Irving S. and Judith Braun ("Proposed Class Representatives"), individually and on behalf of a class of similarly situated persons and entities, alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based upon, among other things, the investigation undertaken by Court-appointed Lead Counsel, Labaton Sucharow LLP, which included a review and analysis of: (i) regulatory filings made by Uber Technologies, Inc. ("Uber," "Uber Technologies," or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (ii) Company press releases, transcripts of earnings calls, and other public statements issued and disseminated by the Company; (iii) Company website and marketing materials; (iv) price and volume data for Uber common stock; (v) research reports from securities and financial analysts; (vi) news and media reports concerning the Company and other facts related to this action; (vii) interviews with former Uber employees; and (viii) other publicly available materials and data. Lead Counsel's investigation into the factual matters alleged herein continues and many of the relevant facts are known only by the Defendants (as defined herein) or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.     The claims asserted herein are strict liability claims for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") relating to Uber's initial public offering (the "IPO" or "Offering"), commenced on or about May 10, 2019, of over 180,000,000 shares of common stock at a price of $45.00 per share. This federal securities class action is brought on behalf of a Class (as defined herein) of all persons or entities who purchased or otherwise acquired Uber common stock pursuant and/or traceable to the Offering Documents (as defined herein) issued in connection with the IPO, and who were damaged thereby.

2.     Congress passed the Securities Act in the hopes of restoring investor confidence after corporate scandals and the stock market crash of 1929. The Securities Act requires that those who sell securities to the investing public do so on the basis of accurate and fulsome disclosure. The Securities Act creates liability for false, misleading, and incomplete statements made in connection with public securities offerings in order to protect investors and maintain confidence in our public markets.

3.     On or about May 10, 2019, Uber Technologies—founded and originally incorporated as transportation company Ubercab, Inc. ("Ubercab")—conducted one of the largest and most hotly anticipated IPOs in American history.

4.     For years, investors debated Uber's dubious path to profitability and whether and at what price Uber should go public, but the Company lured investors into the IPO with a simple rationale: growth now, profits later. Uber committed as a public company to deliver unparalleled and rapid growth and scale, under the premise that the largest player dominates the market, winning both market share and profits. Investors took the bait.

5.     Uber was also a Company scarred by scandal. In 2017, for example, Uber was caught utilizing proprietary software tools, called "Greyball," to evade authorities seeking to enforce laws, rules, and regulations applicable to the Company's ridesharing operations. In another example, a former Uber software engineer came forward with allegations that she and fellow colleagues had been sexually harassed by superiors at Uber. After the software engineer reported such misconduct to Uber's human resources ("H.R.") department, she was berated by managers and retaliated against for reporting such incidents to H.R. According to the software engineer, Uber's H.R. department conspired with senior executives to protect abusive managers because they were "high performers."

6.     The software engineer's story, which spread like wildfire, helped catalyze the viral #MeToo movement. These scandals led to Defendant Travis Kalanick's ousting as Uber's Chief Executive Officer ("CEO"), as well as a viral #DeleteUber campaign that prompted hundreds of thousands of Uber users to stop using Uber's platform within days. Uber purports to have reformed its culture "fundamentally" by, among other things, replacing Defendant Kalanick

1    as CEO with Defendant Dara Khosrowshahi and developing a new set of "cultural norms,"

2    which includes: "**Do the right thing.** Period." Indeed, the Offering Documents trumpet: "**It is a**

3    **new day at Uber**."

4            7.      Through the IPO, Uber raised more than **$8.1 billion** by offering and selling over

5    180 million shares of its common stock to the public at a price of $45.00 per share. The Offering

6    was an incredible financial windfall for Defendants. The banks that underwrote the Offering

7    collected over **$106 million in fees**. The Offering valued the Company at a whopping **$75.5**

8    **billion** and catapulted the value of Uber stock held by corporate insiders, including many of the

9    Individual Defendants (as defined herein).

10           8.      While the Offering was a success for the Company, and indeed for all Defendants,

11   it became what one prominent venture capitalist dubbed a "train wreck" for investors, and it

12   turned "what should have been a climactic moment for a transportation colossus instead [into] an

13   embarrassment."

14           9.      Headquartered in San Francisco, California, Uber is a multinational ride-hailing

15   company that offers its passengers peer-to-peer ("P2P") ridesharing ("UberX"), shared peer-to-

16   peer ridesharing ("UberPOOL"), and black car transportation ("UberBLACK" and collectively

17   with UberX and UberPOOL, "Uber Rides" or "Rides"). UberBLACK drivers have commercial

18   registration and commercial insurance. By contrast, the Company does not require its P2P

19   ridesharing drivers to have commercial licenses or commercial registration. Uber also offers on-

20   demand food delivery ("Uber Eats" or "Eats") as well as on-demand shipping that matches

21   freight shippers with truckers ("Uber Freight" or "Freight"), among other "Personal Mobility"

22   and on-demand services. Each of Uber's platforms can be accessed via its website or through one

23   of the Company's mobile applications ("apps").

24           10.     Uber depends on incentives—*e.g.*, $10 per trip for each of a driver's first 100

25   trips—and brand advertising and direct marketing—*e.g.*, promotional campaigns such as

26   television advertisements, discounts, promotions, and referrals—to attract both drivers and

27   customers and to grow Uber Rides and Uber Eats.

28

11.     Unbeknownst to investors, Uber and its executives premised the Company's growth on an undisclosed, unsustainable, and often illegal "growth at any cost" business model, putting growth first above profits, the law, and even its own passengers' safety.

12.     As disclosed post-IPO in recent civil litigation, criminal indictments and plea agreements, governmental and regulatory press releases, and countless news and media reports, and as evidenced by former Uber employee statements, Uber systematically violated local laws by launching and operating its Rides services in new domestic and international jurisdictions— *irrespective of whether the Company was licensed or lawfully permitted to operate there*. Uber Rides became popular harnessing the trendy power of mobile app-based consumerism, and Uber secretly bet that it could grow and continue to operate in those jurisdictions above or outside the law, sanctioned by mass consumer approval if not by local authorities.

13.     Along with the growing number of Rides bookings and trips came an increasing number of passengers reporting violent and often criminal instances of physical and sexual assault and harassment, including non-consensual kissing, touching, and even rape. In 2018 alone (the calendar year immediately preceding the Offering), there were *more than 3,000 reported instances of sexual assault—an average of eight sexual assaults a day*.

14.     For years and through the Offering, Uber concealed these reports from the public and investors, even as the number of instances of physical and sexual assault reported to the Company continued to grow. Uber upheld its growth at any cost business model to such a degree that it adopted and maintained investigative and safety enforcement policies designed to put the Company's interests ahead of passenger safety.

15.     According to more than 20 current and former investigators in Uber's passenger call center, for example, the Company uses a "three-strikes" system that allows bad actors to continue using the Uber Rides app until three allegations are made, but executives can overrule investigators. In one such case, a male driver was allowed to continue picking up passengers until a fourth incident, where a rider reported she had been raped by that driver.

16.     In 2018, 92% of Uber Rides rape victims were passengers and 89% of Uber Rides rape victims were female. Yet Uber's policies were designed to silence rather than protect these

1   victims: Company investigators could be reprimanded or even terminated if they contacted the

2   police or advised victims to do so. At most, Uber would notify victims that they would not be

3   matched with the accused driver again—and they might receive a refund.

4          17.     Uber also concealed that its growth at any cost business model was negatively

5   impacting its financial condition, resulting in slowing (not accelerating) growth and billions of

6   dollars in losses. Statements from a former Uber employee support these allegations.

7          18.     For the quarter ended June 30, 2019 ("Q2 2019"), the same quarter as the

8   Offering, for example, Uber reported, after the IPO closed, a staggering ***$5.2 billion loss***—the

9   largest loss in the Company's history. Uber blamed the loss on stock-based compensation paid to

10   early investors ($3.9 billion), but even excluding that figure, the Company's $1.3 billion loss was

11   still its largest loss ever.

12          19.     Perhaps even more shocking, Uber's Q2 2019 financial results showed it was not

13   growing as the Company had represented in the Offering Documents. In fact, Uber recorded its

14   ***slowest growth ever***, on both a Generally Accepted Accounting Principles ("GAAP") Revenue

15   (14%) and Adjusted Net Revenue (12%) basis. Underlying these figures, Uber also concealed

16   that the Company was experiencing its slowest ever growth in terms of trips ("Trips," the

17   number of completed rides and food deliveries) as well as monthly active platform consumers

18   ("MAPCs," the number of unique consumers who completed a ride or received food at least once

19   in a given month)—two key measures of Uber's financial condition. For Q2 2019, Uber's Trips

20   and MAPCs grew by only 35% and 30%, respectively—the slowest growth in Trips and MAPCs

21   in Company history.

22          20.     As a result, the Offering Documents—which Uber and the other Defendants used

23   to secure more than $8.1 billion from investors—concealed serious, disturbing, and deeply

24   material problems plaguing the Company behind its "new day at Uber" facade. As further

25   alleged below, the Offering Documents contained materially false and misleading statements of

26   fact and omitted material facts required to be disclosed in order to make the statements in the

27   Offering Documents not misleading. There are three categories of misstatements: (i) illegal

28   business model; (ii) passenger safety; and (iii) financial condition.

21.   ***First***, Uber's past and present "success" was premised on an undisclosed, unsustainable, and often illegal growth at any cost business model.

22.   Uber's growth at any cost business model was principally manifested in a deceptive and patently illegal business model: knowingly breaking and thwarting existing laws, rules, and regulations in many of the jurisdictions in which the Company operates, and betting that the weight of consumer support will reach a critical mass before governmental authorities and regulators are able to act on or enforce such laws and regulations.

23.   In Boston, Massachusetts, for example, internal Company emails dating back to 2013 (disclosed in a late-July and early-August 2019 bench trial) revealed that Uber executives knew the Company was breaking the law by launching and continuing operations without required licenses. This was not a "grey" area. In one email, a Company executive expressly acknowledged that Uber was "launch[ing] P2P ride-sharing in a market where we do not have formal or tacit approval from regulators." On June 4, 2013, the Company illegally launched Uber Rides in Boston, and over the next several years, Uber paid approximately $200,000 in tickets its drivers received for violating a Boston ordinance and Massachusetts State regulations.

24.   On November 14, 2019, Bloomberg Law reported that the New Jersey Department of Labor and Workforce Development was seeking $642 million in unpaid unemployment and disability insurances taxes, because Uber had been misclassifying its drivers as independent contractors rather than as employees. Uber was assessed $523 million in past-due taxes for the four preceding years (2015-2018), as well as $119 million in interest and penalties on the unpaid amounts, after Uber refused to comply with existing employment laws during each of those four years. According to records obtained by Bloomberg Law, the State of New Jersey obtained a court judgment in 2015 ordering Uber to pay about $54 million in overdue unemployment and temporary disability insurance contributions, but as of November 2019, it remained unclear whether Uber ever complied with that court order.

25.   In Tallahassee, Florida, the U.S. Department of Justice ("DOJ") reached a plea agreement on August 6, 2019 with a former Tallahassee mayor and his business associate, a former head of the Downtown Improvement Authority, stemming from charges that the pair

1    accepted cash bribes from Uber in 2015 in exchange for a favorable result on a local ride-share

2    ordinance that would affect the Company's future profitability.

3          26.    In Colombia—where drivers caught working for Uber face a 25-year driver

4    license suspension—the *Superintendencia de Industria y Comercio* (the "Colombian SIC," or

5    Superintendency of Industry and Commerce, akin to the U.S. Federal Trade Commission

6    ("FTC")) announced on August 12, 2019 that it was fining Uber COL$2.1 billion (more than

7    US$625,000) for blocking administrators' access to information and obstructing a 2017

8    regulatory site visit. A few months later, the Colombian SIC ordered Uber to cease operations,

9    effective February 1, 2020.

10         27.    A former Uber employee ("FE") also substantiates the allegations concerning

11   Uber's illegal business model and growth strategy.[1]

12         28.    According to Former Employee 1 ("FE-1"), for example, Uber had a

13   "playbook"—that came from Defendant Ryan Graves and the whole operations team that he

14   ran—for how to launch UberX peer-to-peer ridesharing in new territories. Specifically, FE-1

15   stated that Uber had a team of "launchers," or a group of people tasked with helping a new city

16   go "live." FE-1 explained that launchers move quickly from city to city and follow Uber's

17   playbook globally: move into a new territory, secure office space, hire local staff, launch the

18   business, and then let the people on the ground deal with issues such as skirting local regulations.

19         29.    FE-1 explained that from 2017 to 2019, Uber knowingly allowed its drivers to

20   operate without commercial licenses and without commercial vehicle registrations in his

21   territory, which is illegal and a crime in Tanzania. FE-1 recalled one instance when the police

22   came to Uber's Tanzania office, arrested four or five of his employees, and held those employees

23   in detention for a weekend for operating illegally. FE-1 stated that, in Tanzania, detention is

24   worse than jail. According to FE-1, nothing changed after his employees were arrested and put in

25   detention by Tanzanian authorities.

26

27

28         [1] For ease of comprehension and readability, the Amended Complaint uses the pronoun "he" and possessive "his" in connection with former Uber employees. This convention, however, is not meant to identify the actual gender of any of the former employees.

1    30.    FE-1 described how this was typical of Uber globally: the Company enters

2    markets and disregards local regulations in order to launch and operate in those markets. FE-1

3    stated that countries have their own laws, and companies cannot just disregard them in order to

4    do business, but that was Uber's playbook for launching in new cities: getting drivers and cars on

5    the road, even if that violated local laws.

6    31.    FE-1 advised that Uber wanted "growth at all costs." FE-1 explained that in

7    Tanzania, there is a clear distinction between cars registered for personal versus commercial use.

8    FE-1 stated that Tanzanian law requires commercial drivers to have a specific commercial

9    license that takes one month to get. Tanzanian law also requires commercial drivers to have their

10   private vehicles registered as commercial vehicles, and after a vehicle has been registered for

11   commercial use, the driver must upgrade their license to a commercial license in order to be

12   compliant. According to FE-1, however, Uber's drivers in Tanzania had neither proper

13   commercial licenses nor commercially-registered vehicles.

14   32.    FE-1 warned and expressed his concerns about Uber's illegal operations to the

15   launcher, the launcher's manager, and Alon Lits, the top General Manager for Sub-Saharan

16   Africa. FE-1 explained that he participated in local Policy Communications Legal ("PCL") call

17   on a monthly or bi-monthly basis, where they discussed concerns related to Uber drivers

18   operating without properly registered commercial vehicles.

19   33.    Although Defendant Kalanick and Defendant Graves did not attend the PCL

20   meetings that FE-1 attended, there were higher level calls attended by all the general managers—

21   who reported to Defendant Graves—during which the same concerns regarding Uber's illegal

22   operations were addressed. These higher levels meetings were held at the same frequency as the

23   local level PCL meetings that FE-1 attended, as often as twice a month. FE-1 stated that Uber

24   exposed itself to such issues and risks that these higher level calls sometimes had to happen more

25   frequently. For example, FE-1 explained, other countries had similar issues with commercial

26   license and commercial vehicle registration non-compliance, specifically Greece and Croatia.

27   FE-1 added that Uber's lack of compliance in those countries led to alarming consequences,

28   including Uber employees having to flee those countries with private security.

34.     In addition, FE-1 explained that Uber followed the same playbook of operating illegally in a lot of markets, including all the high growth regions. FE-1 advised that similar situations occurred in India, Latin America, Brazil, Singapore, and China.

35.     According to FE-1, Uber executives made a "strategic decision" to launch only UberX peer-to-peer ridesharing in Africa because it was faster, easier, and cheaper to find peer-to-peer drivers than to find commercially licensed drivers with commercially-registered vehicles. FE-1 stated that skirting local regulations helped Uber expand quickly in many new territories including Tanzania. FE-1 also confirmed that Uber drivers frequently had to pay fines related to these illegal activities, and Uber reimbursed its drivers the following week.

36.     FE-1 stated that Uber saw reimbursement of its drivers' fines as a "cost of doing business." According to FE-1, Uber drivers would come into the office with their tickets, support staff would upload a picture of the fine or ticket into Uber's system, and then drivers would be reimbursed the following week. FE-1 explained that Uber reimbursed its drivers for these fines or tickets once per week. FE-1 added that Uber did not reimburse its drivers for other types of tickets and fines, such as speeding. Rather, Uber only reimbursed its drivers for violations of local laws such as lack of commercial license or lack of commercial vehicle registration.

37.     FE-1 advised that although Uber carefully tracked its drivers' fines and reimbursements, Uber entered reimbursements for fines under "miscellaneous expenses" on Uber's balance sheet. According to FE-1, driver reimbursements came from Uber B.V. (Uber's subsidiary in the Netherlands), which oversaw all African operations for Uber. FE-1 added that fines for lack of a commercial license were not as problematic for Uber financially, at about $10 per fine, whereas the more hefty fines resulted from UberX drivers operating private vehicles that were not commercially registered, at up to $200 per fine, or even jail time. Drivers were especially susceptible to arrest at airports, where police were often on standby. FE-1 estimated that from 2017 to 2019, for Tanzania alone, Uber paid over $250,000 in fines. FE-1 also specified that Uber paid the fines knowing that getting the vehicles properly registered for commercial use would impede the growth of the business.

38.     FE-1 recalled how, in 2017, Uber's Head of Compliance put 24 to 48 hour staggered deactivations in place for drivers that lacked proper commercial licensing or vehicle registration, but this practice did not last for long. Uber quickly realized the adverse business impact and negative financial impact these deactivations were having, and Uber would reinstate the drivers despite their still lacking proper licensing and vehicle registration.

39.     FE-1 stated that, among the reasons that led him to leave Uber, he was not comfortable continuing to operate Uber Tanzania where 90% of Uber's drivers had neither commercial licenses nor commercial registration for their private vehicles. FE-1 explained that he was not comfortable with Uber condoning these practices.

40.     Around March or April 2019, FE-1 advised that Uber finally began enforcing compliance with local laws such as the requirement for drivers to have commercial licenses and commercially registered vehicles. FE-1 explained that, by then, Uber had a saturated market of drivers, so they were able to be more particular about who they allowed to drive in Tanzania. FE-1 noted, however, that Uber still does not have 90% of their drivers properly licensed, because the fines are not that expensive. Drivers have to spend a month in school to be properly licensed, but this rule was not enforced at Uber. FE-1 added that Uber has a proven track record of disregarding compliance issues.

41.     These are but a few of the countless instances that exemplify Uber's undisclosed, unsustainable, and often illegal growth at any cost business model.

42.     ***Second***, in furtherance of its growth at any cost business model, Uber deliberately ignored and failed to disclose rampant, dangerous, and even lethal passenger safety issues across the Company's ridesharing platform.

43.     In the two calendar years immediately preceding the Offering, for example, Uber received reports of 5,981 instances of sexual assault (including 464 instances of rape), 107 deaths across 97 fatal crashes, and 19 instances of fatal physical assaults—***in the United States alone***.

44.     The Company kept these facts and statistics from investors, belatedly disclosing them in a post-Offering "US Safety Report" released December 5, 2019 (the "U.S. Safety Report"). The Company has not released corresponding data for any other country across its

1   global operations, even though the Offering Documents touted how Uber operates across six

2   continents and more than 700 cities, and even though the Company professes in its U.S. Safety

3   Report that people have a "right to know" about Uber's safety records.

4         45.    The U.S. Safety Report followed on the heels of a September 25, 2019 article

5   published by *The Washington Post* (the "*WaPo* Article"), which reveals how investigators in the

6   Company's Special Investigations Unit ("SIU")—Uber's call center for passenger complaints—

7   are trained to act first to shield Uber from liability and negative publicity, putting Company

8   interests ahead of passenger safety. Reporting on information gathered from more than 20

9   current and former Uber investigators, the *WaPo* Article describes how Uber uses a "three-

10  strikes" system that permits drivers and passengers to keep using Uber's ridesharing platform

11  until three separate allegations are made, but even then, Company executives can make

12  exceptions in order to, for example, keep high earning drivers on the road collecting fares. The

13  *WaPo* Article also describes how SIU investigators are "forbidden" from directing allegations to

14  police or from advising victims to contact police or even seek legal counsel—even where

15  investigators receive confessions of felonies. Many investigators said they could be reprimanded

16  or fired if they contacted the police or urged victims to do so.

17        46.    While Uber's SIU investigators work to insulate and distance the Company from

18  liability, Uber also consistently seeks to settle related cases quickly to keep the truth from the

19  public, according to several attorneys interviewed for the *WaPo* Article.

20        47.    The alarming facts concerning Uber passenger safety, manifest in the U.S. Safety

21  Report and the *WaPo* Article, demonstrate that the Company has premised its growth and

22  reputation on the jeopardy of countless thousands of nameless, silenced victims.

23        48.    ***Third***, Uber sold itself to investors promising growth now, profits later, but its

24  growth at any cost business model was defective, and Uber concealed its true financial condition.

25        49.    Prior to and at the time of the Offering, Uber had sustained—and would continue

26  to sustain—massive losses and deteriorating growth. Unbeknownst to investors, the Company

27  planned to mitigate its ongoing losses by cutting costs in fundamental areas of its business that

28  would further hinder growth. On August 8, 2019, for example, Uber released its financial results

1  for Q2 2019—the same quarter in which Uber conducted its May 10, 2019 IPO. The Company

2  stunned investors by simultaneously disclosing a $5.2 billion net loss (its largest ever loss) and a

3  14% year-over-year ("YoY") quarterly revenue growth rate (its slowest ever growth rate). Even

4  excluding one-time expenses related to the Offering ($3.9 billion in stock-based compensation

5  paid to early investors), Uber's Q2 2019 $1.3 billion loss was still (and remains) the Company's

6  largest ever quarterly loss.

7      50.    About a month later on July 29, 2019, Uber announced the first of three waves of

8  layoffs, terminating 400 marketing employees—about one third of its critical marketing team—

9  in a desperate attempt to cut costs. As a vital source of brand advertising and direct marketing,

10  Uber's marketing team is responsible for driving growth through, for example, promotional

11  campaigns, discounts, and referrals. With a one-third reduction to this key workforce, Uber

12  reduced its opportunities to deliver the rapid growth it had committed to.

13      51.    On September 10, 2019, Uber announced the second wave of layoffs, terminating

14  435 employees across its product and engineering teams (about 8% of the two teams). Uber

15  maintains that its success depends "in large part" on its ability to attract and retain high-quality

16  engineering personnel, but this second round of layoffs—a pure cost cutting measure—stifled the

17  very team and talent that the Company depends on to ensure such success and growth.

18      52.    And on October 14, 2019, Uber announced the third wave of layoffs, terminating

19  350 employees across a variety of teams (about 1% of its workforce).

20      53.    Former Uber employees or FEs also substantiates the allegations concerning

21  Uber's defective business model and deteriorating growth.

22      54.    According to FE-1, for example, it was clear throughout his tenure that Uber's

23  pricing was unsustainable in the long-run. FE-1 specified that, historically, Uber had incentivized

24  their drivers, but immediately before the IPO in early 2019, Uber was under massive pressure to

25  lower their operational expenses and cut their spending by reducing incentives to drivers because

26  the price points they had set were unsustainable.

27      55.    FE-1 added that Uber senior leadership had taken advantage of their driver

28  employees, especially in the emerging markets where drivers are making extremely low wages,

1   as low as $2 per day. FE-1 explained that Uber was able to "strong arm" those drivers, as drivers

2   in emerging markets had to take out loans to cover gas and other expenses to meet the criteria for

3   incentives, some of which were "impossible" to achieve. FE-1 stated that Uber was intentionally

4   condoning very unethical and often illegal practices.

5       56.    According to Former Employee 2 ("FE-2"), when he started working on Uber

6   Eats, it seemed like it was the clear market leader, but as time went on, it became clear that

7   competitors were doing really well compared to Uber Eats. FE-2 also confirmed there were

8   periods during which his Uber Eats-focused marketing team struggled. FE-2's team had a weekly

9   marketing budget for the United States and Canada, and growth was measured by the number of

10  new users who signed up for Uber Eats (driven by paid marketing) and then made their first

11  order. FE-2 specified that the marketing budget was supposed to translate into "new user

12  growth," which is measured by users creating a log-in and placing an order. FE-2 explained that

13  members of his team worked with Uber's finance and strategy team to set goals for how much

14  user growth FE-2's team should achieve from paid marketing efforts, but there was quite a

15  stretch of time when the team was falling under those goals. FE-2 stated that the team was failing

16  to meet its growth goals. FE-2 also confirmed that the team got to a point where, consistently for

17  some months or longer, the team was not able to hit its marketing goals.

18      57.    These and other facts disclosed after the Offering stand in stark contrast to the

19  high-growth, nearing-profitability company Uber had portrayed itself to be.

20      58.    As the news of the adverse facts that existed prior to the IPO concerning the

21  Company's business model, passenger safety, and financial condition leaked out to the market

22  over the ensuing months, the price of Uber's common stock dropped from the $45.00 per share

23  Offering price to $29.67 per share on the day this Action was commenced (***a 34% decline from***

24  ***the Offering price***) and to an all-time low of $25.99 on November 14, 2019 (***a 42% decline from***

25  ***the Offering price***).

26  **II.    JURISDICTION AND VENUE**

27      59.    The claims asserted herein arise under and pursuant to Section 11, 12(a)(2), and

28  15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o.

1    60.    This Court has jurisdiction over this action pursuant to Section 22 of the

2    Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331.

3    61.    Venue is properly laid in this District pursuant to Section 22 of the Securities Act

4    and 28 U.S.C. § 1391(b), (c), and (d). Many of the acts and transactions that constitute violations

5    of law complained of herein, including the dissemination to the public of untrue statements of

6    material facts, occurred in this District.

7    62.    In connection with the acts alleged in this complaint, Defendants, directly or

8    indirectly, used the means and instrumentalities of interstate commerce, including, but not

9    limited to, the United States mails, interstate telephone communications, and the facilities of

10   national securities exchanges.

11   **III.   PARTIES**

12   **A.    Lead Plaintiff**

13   63.    As set forth in the Certification filed in this Action on December 3, 2019 (Doc.

14   No. 24-1), Lead Plaintiff Boston Retirement System purchased Uber's common stock in the IPO

15   and from an Underwriter Defendant (as defined herein) pursuant to and traceable to the Offering

16   Documents. Lead Plaintiff purchased Uber's common stock at a time when only shares offered

17   in the IPO were in the market. Lead Plaintiff suffered damages as a result of the violations of the

18   federal securities laws alleged herein. On January 3, 2020, the Court appointed Boston

19   Retirement System as Lead Plaintiff in this Action (Doc. No. 59).

20   **B.    Proposed Class Representatives**

21   64.    As set forth in the Certification filed in *Messinger et al., v. Uber Technologies*,

22   *Inc. et al.*, Case 3:20-cv-08610, filed on December 5, 2020 (Dkt. 3), proposed class

23   representative Plaintiff David Messinger purchased Uber's common stock in the IPO pursuant to

24   and traceable to the Offering Documents. Plaintiff Messinger purchased Uber's common stock at

25   a time when only shares offered in the IPO were in the market. Plaintiff Messinger suffered

26   damages as a result of the violations of the federal securities laws alleged herein.

27   65.    As set forth in the Certification filed in *Messinger et al., v. Uber Technologies,*

28   *Inc. et al.*, Case 3:20-cv-08610, filed on December 5, 2020 (Dkt. 3), proposed class

representative Plaintiff Ellie Marie Toronto ESA purchased Uber's common stock in the IPO

pursuant to and traceable to the Offering Documents. Plaintiff Ellie Marie Toronto ESA,

purchased Uber's common stock at a time when only shares offered in the IPO were in the

market. Plaintiff Ellie Marie Toronto ESA suffered damages as a result of the violations of the

federal securities laws alleged herein.

66.    As set forth in the Certification filed in *Messinger et al., v. Uber Technologies,*
*Inc. et al.*, Case 3:20-cv-08610, filed on December 5, 2020 (Dkt. 3), proposed class

representative Plaintiff Joseph Cianci purchased Uber's common stock in the IPO pursuant to

and traceable to the Offering Documents. Plaintiff Joseph Cianci suffered damages as a result of

the violations of the federal securities laws alleged herein.

67.    As set forth in the Certification filed in *Messinger et al., v. Uber Technologies,*
*Inc. et al.*, Case 3:20-cv-08610, filed on December 5, 2020 (Dkt. 3), proposed class

representatives Plaintiffs Irving S. Braun and Judith Braun purchased Uber's common stock in

the IPO pursuant to and traceable to the Offering Documents. Plaintiffs Irving S. Braun and

Judith Braun purchased Uber's common stock at a time when only shares offered in the IPO

were in the market. Plaintiffs Irving S. Braun and Judith Braun suffered damages as a result of

the violations of the federal securities laws alleged herein.

**C.    Defendants**

**1.    The Corporate Defendant**

68.    Defendant Uber is a Delaware corporation headquartered at 1455 Market Street,

San Francisco, California. Uber claims to be a technology company that is primarily in the

business of providing car transportation and meal delivery services to customers on an on-

demand basis. The Company's stock is listed under the ticker symbol "UBER" on the New York

Stock Exchange ("NYSE").

69.    On or about May 10, 2019, Uber conducted its IPO, in which it sold 180,000,000

shares of common stock to the public, with an underwriter over-allotment option to sell an

additional 27,000,000 shares of common stock from certain selling shareholders. The IPO, which

was priced at $45 per share, generated nearly $8 billion in proceeds for Uber. The IPO was

conducted pursuant to, and the sale of Uber stock was solicited by, several documents that were filed by Uber and the Underwriter Defendants with the SEC and disseminated to the investing public, including (i) an April 11, 2019 registration statement on Form S-1, which following amendment, was declared effective by the SEC on May 5, 2019 (the "Registration Statement"), and (ii) a May 9, 2019 final prospectus, which forms part of the Registration Statement, on Form 424(b)(4) (the "Prospectus" and, together with the Registration Statement, the "Offering Documents").

70.     The Prospectus states that it "is an offer to sell ... the shares offered [there]by." Further, the Prospectus states that "[n]either [Uber], the selling stockholders, nor any of the underwriters have authorized anyone to provide [investors] with any information other than the information contained in the prospectus."

### 2. The Individual, Executive, and Selling Stockholder Defendants

71.     At the time of the IPO, Defendant Dara Khosrowshahi ("Khosrowshahi") was Uber's CEO and served as a member of Uber's board of directors (the "Board"). In connection with the IPO, Defendant Khosrowshahi received an award of 332,725 restricted stock units ("RSUs") worth over $14 million. Defendant Khosrowshahi also owned over 196,000 Uber shares at the time of the Offering that as a result were worth over $8 million.

72.     At the time of the IPO, Defendant Nelson Chai ("Chai") was serving as Uber's Chief Financial Officer ("CFO"). In connection with the IPO, Defendant Chai received an award of 246,305 RSUs worth over $11 million.

73.     At the time of the IPO, Defendant Glen Ceremony ("Ceremony") was serving as Uber's Chief Accounting Offering ("CAO") and Global Corporate Controller. In connection with the IPO, Defendant Ceremony received an award of 126,452 RSUs worth over $5.6 million.

74.     At time of the IPO, Defendant Ronald Sugar ("Sugar") was serving as a director on the Board and was the Board's Chairperson. In connection with the IPO, Defendant Sugar received an award of 45,567 RSUs worth over $2 million. Defendant Sugar also owned over 130,000 Uber shares at the time of the Offering that as a result were worth over $5.8 million.

75.     At time of the IPO, Defendant Ursula Burns ("Burns") was serving as a director on the Board. In connection with the IPO, Defendant Burns received an award of 16,947 RSUs worth over $700,000. Defendant Burns also owned over 130,000 Uber shares at the time of the Offering that as a result were worth over $5.8 million.

76.     At the time of the IPO, Defendant Garrett Camp ("Camp"), a co-founder of the Company, was serving as a director on the Board. According to the Offering Documents, Defendant Camp offered 3,124,000 of his own Uber shares to be sold to investors in the IPO for $45 per share with the proceeds going to him. Defendant Camp also owned over 78 million Uber shares at the time of the Offering that as a result were worth over $3.5 billion.

77.     At the time of the IPO, Defendant Matt Cohler ("Cohler") was serving as a director on the Board. According to the Offering Documents, Defendant Cohler offered 5,748,000 of his own Uber shares to be sold to investors in the IPO for $45 per share with the proceeds going to him. Defendant Cohler also owned over 144 million Uber shares at the time of the Offering that as a result were worth over $6.3 billion.

78.     At the time of the IPO, Defendant Ryan Graves ("Graves") was serving as a director on the Board. According to the Offering Documents, Defendant Graves offered 1,319,000 of his own Uber shares to be sold to investors in the IPO for $45 per share with the proceeds going to him. In connection with the IPO, Defendant Graves received an award of 59,625 RSUs worth over $2.6 million. Defendant Graves also owned over 31 million Uber shares at the time of the Offering that as a result were worth over $1.3 billion.

79.     At the time of the IPO, Defendant Arianna Huffington ("Huffington") was serving as a director on the Board. In connection with the IPO, Defendant Huffington received an award of 26,468 RSUs worth over $1.1 million. Defendant Huffington also owned over 22,000 Uber shares at the time of the Offering that as a result were worth over $900,000.

80.     At the time of the IPO, Defendant Travis Kalanick ("Kalanick"), a co-founder of the Company and former Uber CEO, was serving as a director on the Board. According to the Offering Documents, Defendant Kalanick offered 3,736,000 of his own Uber shares to be sold to investors in the IPO for $45 per share with the proceeds going to him. In connection with the

1    IPO, Defendant Kalanick received an award of 389,012 RSUs worth over $17.5 million.

2    Defendant Kalanick also owned over 113 million Uber shares at the time of the Offering that as a

3    result were worth over $5 billion.

4         81.    At the time of the IPO, Defendant Wan Ling Martello ("Martello") was serving as

5    a director on the Board. In connection with the IPO, Defendant Martello received an award of

6    26,789 RSUs worth over $1.2 million. Defendant Martello also owned over 43,000 Uber shares

7    at the time of the Offering that as a result were worth over $1.9 million.

8         82.    At the time of the IPO, Defendant H.E. Yasir Al-Rumayyan ("Al-Rumayyan")

9    was serving as a director on the Board. Defendant Al-Rumayyan owned over 72 million Uber

10   shares at the time of the Offering that as a result were worth over $3.2 million.

11        83.    At the time of the IPO, Defendant John Thain ("Thain") was serving as a director

12   on the Board. In connection with the IPO, Defendant Thain received an award of 16,403 RSUs

13   worth over $700,000. Defendant Thain also owned over 130,000 Uber shares at the time of the

14   Offering that as a result were worth over $5.8 million.

15        84.    At the time of the IPO, Defendant David Trujillo ("Trujillo") was serving as a

16   director on the Board. Defendant Trujillo was at the time of the IPO a partner at the private

17   equity firm TPG Capital. Investment funds controlled by TPG Capital, L.P. ("TPG Capital")

18   offered 1,396,000 of their own Uber shares to be sold to investors in the IPO for $45 per share

19   with the proceeds going to them. TPG Capital's investment funds also owned over 31 million

20   Uber shares at the time of the Offering that as a result were worth over $1.3 billion.

21        85.    Defendants Khosrowshahi, Chai, Ceremony, Sugar, Burns, Camp, Choler,

22   Graves, Huffington, Kalanick, Martello, Al-Rumayyan, Thain, and Trujillo are collectively

23   referred to herein as the "Individual Defendants." Defendants Khosrowshahi, Chai, and

24   Ceremony are sometimes collectively referred to herein as the "Executive Defendants."

25   Defendants Camp, Cohler, Graves, and Kalanick are sometimes collectively referred to herein as

26   the "Selling Stockholder Defendants."

27        86.    Each of the Individual Defendants participated in the preparation of and signed

28   the Registration Statement and in the making of the materially inaccurate, misleading, and

incomplete statements alleged herein. The Individual Defendants signed the Registration Statement, participated in the IPO, and solicited the purchase of Uber's common stock in the IPO to serve their financial interests and those of Uber.

87.     Each of the Executive Defendants, in his capacity as a senior executive of Uber, reviewed, edited, and approved the Offering Documents. They each also reviewed, approved, and delivered to investors the IPO's roadshow presentation, talking points, and script. The Executive Defendants conducted the roadshow along with the Underwriter Defendants to solicit the purchase of Uber's common stock in the IPO and serve their financial interests and those of Uber.

88.     The Selling Stockholder Defendants solicited the sale of their shares in the IPO by means of the Offering Documents and the roadshow in order to serve their financial interests.

### 3.     The Underwriter Defendants

89.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Morgan Stanley acted as a representative of all of the underwriters. Defendant Morgan Stanley also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the IPO. Defendant Morgan Stanley was allocated 68,796,612 shares in the IPO to sell to the investing public.

90.     Defendant Goldman Sachs & Co. LLC ("GS&Co.") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant GS&Co. acted as a representative of all of the underwriters. Defendant GS&Co. also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the IPO. Defendant GS&Co. was allocated 35,864,408 shares in the IPO to sell to the investing public.

91.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation

1   and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents.

2   Defendant Merrill Lynch acted as a representative of all of the underwriters. Defendant Merrill

3   Lynch also participated in conducting and promoting the roadshow for the IPO and paying the

4   expenses of the Executive Defendants who participated in the IPO. Defendant Merrill Lynch was

5   allocated 17,813,560 shares in the IPO to sell to the investing public.

6      92.   Defendant Barclays Capital Inc. ("Barclays") was an underwriter for the IPO,

7   serving as a financial advisor for and assisting in the preparation and dissemination of the

8   materially inaccurate, misleading, and incomplete Offering Documents. Defendant Barclays also

9   participated in conducting and promoting the roadshow for the IPO and paying the expenses of

10  the Executive Defendants who participated in the IPO. Defendant Barclays was allocated

11  11,231,104 shares in the IPO to sell to the investing public.

12     93.   Defendant Citigroup Global Markets Inc. ("Citigroup") was an underwriter for the

13  IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the

14  materially inaccurate, misleading, and incomplete Offering Documents. Defendant Citigroup

15  also participated in conducting and promoting the roadshow for the IPO and paying the expenses

16  of the Executive Defendants who participated in the IPO. Defendant Citigroup was allocated

17  11,231,104 shares in the IPO to sell to the investing public.

18     94.   Defendant Allen & Company LLC ("Allen & Company") was an underwriter for

19  the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of

20  the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Allen &

21  Company also participated in conducting and promoting the roadshow for the IPO and paying

22  the expenses of the Executive Defendants who participated in the IPO. Defendant Allen &

23  Company was allocated 10,296,610 shares in the IPO to sell to the investing public.

24     95.   Defendant RBC Capital Markets, LLC ("RBC") was an underwriter for the IPO,

25  serving as a financial advisor for and assisting in the preparation and dissemination of the

26  materially inaccurate, misleading, and incomplete Offering Documents. Defendant RBC also

27  participated in conducting and promoting the roadshow for the IPO and paying the expenses of

28

1   the Executive Defendants who participated in the IPO. Defendant RBC was allocated 2,994,961

2   shares in the IPO to sell to the investing public.

3       96.   Defendant SunTrust Robinson Humphrey, Inc. ("SunTrust") was an underwriter

4   for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination

5   of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant

6   SunTrust also participated in conducting and promoting the roadshow for the IPO and paying the

7   expenses of the Executive Defendants who participated in the IPO. Defendant SunTrust was

8   allocated 2,745,763 shares in the IPO to sell to the investing public.

9       97.   Defendant Deutsche Bank Securities, Inc. ("Deutsche Bank") was an underwriter

10  for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination

11  of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant

12  Deutsche Bank also participated in conducting and promoting the roadshow for the IPO and

13  paying the expenses of the Executive Defendants who participated in the IPO. Defendant

14  Deutsche Bank was allocated 2,745,763 shares in the IPO to sell to the investing public.

15      98.   Defendant HSBC Securities (USA) Inc. ("HSBC") was an underwriter for the

16  IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the

17  materially inaccurate, misleading, and incomplete Offering Documents. Defendant HSBC also

18  participated in conducting and promoting the roadshow for the IPO and paying the expenses of

19  the Executive Defendants who participated in the IPO. Defendant HSBC was allocated

20  2,288,136 shares in the IPO to sell to the investing public.

21      99.   Defendant SMBC Nikko Securities America, Inc. ("SMBC") was an underwriter

22  for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination

23  of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant SMBC

24  also participated in conducting and promoting the roadshow for the IPO and paying the expenses

25  of the Executive Defendants who participated in the IPO. Defendant SMBC was allocated

26  1,525,424 shares in the IPO to sell to the investing public.

27      100.  Defendant Mizuho Securities USA LLC ("Mizuho") was an underwriter for the

28  IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the

materially inaccurate, misleading, and incomplete Offering Documents. Defendant Mizuho also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the IPO. Defendant Mizuho was allocated 1,525,424 shares in the IPO to sell to the investing public.

101. Defendant Needham & Company, LLC ("Needham") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Needham also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the IPO. Defendant Needham was allocated 915,127 shares in the IPO to sell to the investing public.

102. Defendant Loop Capital Markets LLC ("Loop") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Loop also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the IPO. Defendant Loop was allocated 838,983 shares in the IPO to sell to the investing public.

103. Defendant Siebert Cisneros Shank & Co., L.L.C. ("Siebert") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Siebert also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the IPO. Defendant Siebert was allocated 915,127 shares in the IPO to sell to the investing public.

104. Defendant Academy Securities, Inc. ("Academy") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Academy also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the IPO. Defendant Academy was allocated 610,169 shares in the IPO to sell to the investing public.

105.    Defendant BTIG, LLC ("BTIG") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant BTIG also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the IPO. Defendant BTIG was allocated 610,169 shares in the IPO to sell to the investing public.

106.    Defendant Canaccord Genuity LLC ("Canaccord") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Canaccord also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the IPO. Defendant Canaccord was allocated 610,169 shares in the IPO to sell to the investing public.

107.    Defendant CastleOak Securities, L.P. ("CastleOak") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant CastleOak also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the IPO. Defendant CastleOak was allocated 610,169 shares in the IPO to sell to the investing public.

108.    Defendant Cowen and Company, LLC ("Cowen") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Cowen also participated in conducting and promoting the roadshow for the IPO and paying the expenses of the Executive Defendants who participated in the IPO. Defendant Cowen was allocated 610,169 shares in the IPO to sell to the investing public.

109.    Defendant Evercore Group L.L.C. ("Evercore") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Evercore also participated in conducting and promoting the roadshow for the IPO and paying the expenses of

1    the Executive Defendants who participated in the IPO. Defendant Evercore was allocated

2    665,547 shares in the IPO to sell to the investing public.

3         110.    Defendant JMP Securities LLC ("JMP") was an underwriter for the IPO, serving

4    as a financial advisor for and assisting in the preparation and dissemination of the materially

5    inaccurate, misleading, and incomplete Offering Documents. Defendant JMP also participated in

6    conducting and promoting the roadshow for the IPO and paying the expenses of the Executive

7    Defendants who participated in the IPO. Defendant JMP was allocated 610,169 shares in the IPO

8    to sell to the investing public.

9         111.    Defendant Macquarie Capital (USA) Inc. ("Macquarie") was an underwriter for

10   the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of

11   the materially inaccurate, misleading, and incomplete Offering Documents. Defendant

12   Macquarie also participated in conducting and promoting the roadshow for the IPO and paying

13   the expenses of the Executive Defendants who participated in the IPO. Defendant Macquarie was

14   allocated 610,169 shares in the IPO to sell to the investing public.

15        112.    Defendant Mischler Financial Group, Inc. ("Mischler") was an underwriter for the

16   IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the

17   materially inaccurate, misleading, and incomplete Offering Documents. Defendant Mischler also

18   participated in conducting and promoting the roadshow for the IPO and paying the expenses of

19   the Executive Defendants who participated in the IPO. Defendant Mischler was allocated

20   610,169 shares in the IPO to sell to the investing public.

21        113.    Defendant Oppenheimer & Co., Inc. ("Oppenheimer") was an underwriter for the

22   IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the

23   materially inaccurate, misleading, and incomplete Offering Documents. Defendant Oppenheimer

24   also participated in conducting and promoting the roadshow for the IPO and paying the expenses

25   of the Executive Defendants who participated in the IPO. Defendant Oppenheimer was allocated

26   665,547 shares in the IPO to sell to the investing public.

27        114.    Defendant Raymond James & Associates, Inc. ("Raymond James") was an

28   underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and

1   dissemination of the materially inaccurate, misleading, and incomplete Offering Documents.

2   Defendant Raymond James also participated in conducting and promoting the roadshow for the

3   IPO and paying the expenses of the Executive Defendants who participated in the IPO.

4   Defendant Raymond James was allocated 610,169 shares in the IPO to sell to the investing

5   public.

6          115.    Defendant William Blair & Company, L.L.C. ("William Blair") was an

7   underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and

8   dissemination of the materially inaccurate, misleading, and incomplete Offering Documents.

9   Defendant William Blair also participated in conducting and promoting the roadshow for the IPO

10  and paying the expenses of the Executive Defendants who participated in the IPO. Defendant

11  William Blair was allocated 610,169 shares in the IPO to sell to the investing public.

12         116.    Defendant The Williams Capital Group, L.P. ("Williams Capital") was an

13  underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and

14  dissemination of the materially inaccurate, misleading, and incomplete Offering Documents.

15  Defendant Williams Capital also participated in conducting and promoting the roadshow for the

16  IPO and paying the expenses of the Executive Defendants who participated in the IPO.

17  Defendant Williams Capital was allocated 610,169 shares in the IPO to sell to the investing

18  public.

19         117.    Defendant TPG Capital BD, LLC ("TPG") was an underwriter for the IPO,

20  serving as a financial advisor for and assisting in the preparation and dissemination of the

21  materially inaccurate, misleading, and incomplete Offering Documents. Defendant TPG also

22  participated in conducting and promoting the roadshow for the IPO and paying the expenses of

23  the Executive Defendants who participated in the IPO. Defendant TPG was allocated 305,085

24  shares in the IPO to sell to the investing public. Defendant Trujillo is a partner at TPG Capital,

25  an affiliate of TPG.

26         118.    Defendants Morgan Stanley, GS&Co., Merrill Lynch, Barclays, Citigroup, Allen

27  & Company, RBC, SunTrust, Deutsche Bank, HSBC, SMBC, Mizuho, Needham, Loop, Siebert,

28  Academy, BTIG, Canaccord, CastleOak, Cowen, Evercore, JMP, Macquarie, Mischler,

Oppenheimer, Raymond James, William Blair, Williams Capital, and TPG are collectively referred to herein as the "Underwriter Defendants." Defendants Uber, the Individual Defendants, and the Underwriter Defendants are collectively referred to herein as the "Defendants."

119.    The Underwriter Defendants are investment banking houses which specialize, among other things, in underwriting public offerings of securities. The Underwriter Defendants' participation in and their solicitation of purchases of Uber's common stock in the IPO was motivated by their financial interests. Collectively, the Underwriter Defendants received over $106 million in fees and commissions in connection with their sale of Uber common stock in the IPO.

120.    The Underwriter Defendants determined that in return for their share of the IPO's proceeds, they were willing to merchandise Uber's common stock in the IPO. The Underwriter Defendants arranged for the roadshow prior to the IPO during which they, and the Executive Defendants, met with investors and presented highly favorable information about the Company, its operations, and its financial prospects.

121.    The Underwriter Defendants also demanded and obtained an agreement for Uber that Uber would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that Uber had purchased millions of dollars of directors' and officers' liability insurance.

122.    The Underwriter Defendants assisted Uber and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Uber, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Uber's operations and financial prospects.

123.    In addition to availing themselves of virtually unbridled access to internal corporate documents, the Underwriter Defendants had access to the Company's lawyers, management, and directors and top executives (including the Individual Defendants) to

1   determine: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the

2   price at which the Company's common stock would be sold; (iii) the language to be used in the

3   Offering Documents; (iv) what disclosures about the Company would be made in the Offering

4   Documents; and (v) what responses would be made to the SEC in connection with its review of

5   the Offering Documents. As a result of those constant contacts and communications between the

6   Underwriter Defendants and the Company's lawyers, management, directors, and top executives

7   (including the Individual Defendants), at a minimum, the Underwriter Defendants were negligent

8   in not knowing of the materially untrue statements and omissions contained in the Offering

9   Documents as detailed herein.

10        124.    The Underwriter Defendants caused the Offering Documents to be filed with the

11  SEC and to be declared effective in connection with offers and sales of the Company's common

12  stock pursuant and/or traceable to the IPO and the Offering Documents, including to Lead

13  Plaintiff, the Proposed Class Representatives, and the Class.

14  **IV.    FORMER UBER EMPLOYEES WHO SUBSTANTIATE THE ALLEGATIONS**

15        125.    The former Uber employees or FEs cited throughout include the following:

16        (a)    FE-1, Operations Lead, East Africa from June 2016 to December 2016;

17  and Country Manager, Tanzania from January 2017 to July 2019. At the beginning of FE-1's

18  tenure, FE-1 reported to Nate Anderson, General Manager, East Africa. FE-1 also reported to

19  Alon Lits ("Lits"), General Manager, Sub-Saharan Africa. Lits reported to Defendant Graves.

20  FE-1's job responsibilities included working on Uber's expansion into East Africa, and then

21  more specifically managing all of Uber's operations in Tanzania; and

22        (b)    FE-2 was a marketing manager from late 2015 to the summer of 2016 and

23  then a senior marketing manager until late 2019. As a marketing manager, FE-2's job

24  responsibilities included working on paid marketing rider growth in China, India, and the rest of

25  the Asia-Pacific ("APAC") region, focusing on mobile app user acquisition channels. As a senior

26  marketing manager, FE-2's job responsibilities included acting as display and programmatic lead

27

28

1  for consumer, delivery partner, and restaurant paid marketing for Uber Eats in the United States

2  and Canada.[2]

3  **V.      SUBSTANTIVE ALLEGATIONS**

4        **A.      Uber's History as a Transportation Business**

5        126.    Originally founded in 2009 and incorporated in July 2010 as Ubercab, Inc., the

6  Company was conceived as a means to an end: providing an "ÜberCab"—borrowing a term from

7  the German language—or the "BestCab" for Defendant Camp and his friends in San Francisco.

8  Defendant Camp had been blackballed or rejected from most of the taxi cab services in the city,

9  and the so-called "complexity" and "confusion"—as well as the cost—of sharing rides with

10 friends via black car services grew to be too messy for his taste.

11       127.    In early discussions with Defendant Kalanick, Defendant Camp balked at the

12 known cost of taxi medallions: half a million dollars per year. Defendant Camp was convinced

13 he could create a better, mobile app-based way to give people rides. Best case, ÜberCab would

14 become a market leader in private transportation; worst case, it would be a small transportation

15 service for Defendant Camp and his friends in San Francisco. Either way, the focus was singular:

16 providing the "best" cab that anyone could hail directly from an app on their mobile phone.

17 Dropping the umlaut for sake of clarity to Americans, Defendants Camp and Kalanick created a

18 new, on-demand transportation company: Ubercab.

19       128.    In February 2011, Ubercab changed its name to Uber Technologies.

20       129.    According to the Offering Documents, Uber's "mission" is to "ignite opportunity

21 by setting the world in motion." Uber's self-described primary business has not deviated from

22 Defendant Camp's original idea: "Every minute of every day, consumers and Drivers on our

23 platform can tap a button and get a ride or tap a button and get work."

24       130.    Uber offers two main products: Uber Rides and Uber Eats, which the Company

25 refers to collectively as its "Core Platform." Despite this moniker that refers to both businesses,

26 Uber Rides is the Company's primary business and principal source of revenue. In 2017 and

27

28      [2] Lead Plaintiff believes that the details of the FEs identities contained herein are sufficient to
satisfy the pleading requirements of Rule 8 of the Federal Rules of Civil Procedure. Lead
Plaintiff can provide additional information to the Court through an *in camera* submission.

2018, for example, Uber Rides accounted for 88% and 81% of Core Platform Revenue and 87% and 81% of total Revenue, respectively. In the same two years, Uber Eats accounted for 7% and 13% of both Core Platform Revenue and total Revenue, respectively.

131.   The Offering Documents organize Uber Rides under yet another two, broader categories: "Ridesharing," which refers to customers and drivers who use Uber's app to arrange for on-demand transportation via a variety of vehicles (cars, auto rickshaws, motorbikes, minibuses, or taxis); and "Personal Mobility," which includes both Ridesharing and "New Mobility," a category that refers to customers who use Uber's app to access on-demand alternative modes of transportation, such as dockless "e-bikes" and "e-scooters."

132.   The Company's other main product, Uber Eats, refers to customers and restaurants that use Uber's app to arrange for on-demand food delivery.

133.   The Company also offers Uber Freight, which refers to truckers and freight shippers that use Uber's app to arrange for on-demand shipping and logistics.

134.   The Offering Documents detail how the "foundation" of Uber's platform—across its various offerings—is the Company's "massive network, leading technology, operational excellence, and product expertise," which together "power movement from point A to point B." Uber's "massive network" is of primary importance, and drivers are the key element of both the Company's network and its "growth now, profits later" rationale:

*Liquidity Network Effect*



135.     The foregoing diagram, listed under "Massive Network" in the Company's Offering Documents, depicts and demonstrates the critical role Uber drivers play in enabling the Company to deliver its primary product: Uber Rides. Uber drivers are the essential condition to Uber Rides, without whom Uber cannot create what it calls a "liquidity network effect": using promotions or "incentives" to attract drivers and customers until the Company scales sufficiently to create positive margin on rides, *i.e.*, profit. Without Uber drivers, the Company cannot deliver unparalleled—or really any—growth and scale, without which Uber cannot become the largest player, dominate the market, or win market share or profits.

136.     Underscoring Uber's "growth now, profits later" rationale, the Offering Documents explain that the Company uses promotions, such as incentives for drivers and customers, "to attract platform users on both sides of our network, which can result in a negative margin [(*i.e.*, loss)] until [Uber] reach[es] sufficient scale to reduce incentives." The Company's only justification for its losses or "negative margin" is that it can grow and increase scale sufficient to "create[] category leadership and a margin advantage." In other words, Uber's pitch is that the largest player dominates the market and wins—both market share and profit.

137.     Uber recruits and approves all of the Company's drivers (hereinafter, "Uber Drivers" or "Drivers") through an "easy" sign-up or qualification process. To recruit, maintain, and grow a "massive" network of Uber Drivers, the Company provides promotions or "incentives" to its Drivers, which are separate from and in addition to the Driver's portion of the

1   fare provided by the customer. Driver incentives may include, for example, payments Uber

2   makes to its Drivers for completing a consecutive number of Trips or a cumulative number of

3   Trips over a specified period of time, *e.g.*, $10 per Trip for each of a Driver's first 100 Trips.

4        138.   Driver incentives are distinct from "Excess Driver incentives," which refers

5   generally to the amount Uber pays each Driver for a Trip in excess of the fare charged to the

6   customer, including Driver incentives but excluding "Driver referrals." Uber also provides

7   referrals to its Drivers, or payments to existing Drivers for referring new Drivers to Uber.

8        139.   In addition to recruiting and approving all Uber Drivers, the Company also sets

9   the rates or fares that customers pay for Uber's on-demand transportation or food delivery

10   services. Uber arranges for customers to make payments via credit card or other electronic

11   payment means. Uber collects revenue by retaining a portion of the fares that customers pay for

12   Uber's services. In order to maximize revenue and generate profit (as articulated in Uber's

13   liquidity network effect), the Company must continuously recruit, maintain, and grow its

14   network of Uber Drivers (supply) sufficient to meet customers' demands for services, as a

15   shortage of Drivers leads to increased wait times and fares, fewer customers, and less revenue.

16        140.   Uber also deploys incentives to expand its customer base: individuals seeking to

17   fulfill their on-demand transportation and food delivery needs. The Company uses promotions,

18   discounts, an "Uber Rewards" program, and other incentives to encourage prospective customers

19   to begin to use Uber's platform and to motivate existing customers to increase usage of Uber's

20   platform. As is the case with its Drivers, the Company must continuously attract, maintain, and

21   grow its base of customers (demand) in order to maximize revenue and generate profit.

22        141.   Incentive expenses are tracked internally and gauged against a series of metrics

23   used to validate the cost, a practice known as "couponing." Anyone in Uber's Performance

24   Marketing department can access that data once they obtain clearance from their managerial

25   channels. Uber relies on data scientists to collect the information because the specific data fields

26   are very detailed. These data scientists help the Company keep track of growth.

27        142.   Uber sets its Drivers' rates or fares using a proprietary formula based on: base rate

28   (determined by the time and distance of a trip), plus booking fee (a flat fee Uber may charge

1    customers to cover operational, regulatory, and safety costs), plus a busy times and areas fee, *i.e.*,

2    "surge" or "dynamic" pricing (when there are more customers than available Drivers, Uber

3    increases pricing until supply and demand stabilize).

4         143.    As part of Uber's pricing formula, the Company derives its revenues principally

5    from service fees it charges to its Drivers for use of Uber's app and platform—that portion of

6    fares retained by Uber, calculated as a percentage of the Driver's total fare, *e.g.*, 20%. Uber's

7    customers (whether passengers or food delivery recipients) remit payments directly to the

8    Company through the Uber app, so Uber is able to and does deduct and retain all of the fees it

9    charges its Drivers directly, before paying Drivers that portion of the fare owed to them.

10        144.    Despite controlling the method, means, and delivery of services to its customers

11   (whether transportation or food), as of the date of the Offering, Uber classified its Drivers as

12   "independent contractors" rather than as employees.

13       **B.    Uber's Toxic Culture and its Purported Attempts to Change**

14        145.    Following a Glossary of "key terms" designed to guide investors through a

15   dizzying array of proprietary terminology (and financial statements that are "confusing by

16   design"—*see infra* at ¶304), the Offering Documents begin with a "Letter from our CEO"—an

17   unusual feature. Defendant Khosrowshahi concedes that, "in getting from point A to point B

18   [Uber] didn't get everything right. Some of the attributes that made Uber a wildly successful

19   startup ... led to missteps along the way."

20        146.    In his letter, Defendant Khosrowshahi suggests that building Uber "required a

21   willingness to challenge orthodoxies and reinvent—sometimes even disrupt—ourselves[,]" but

22   underscores that, "over the past 18 months," *i.e.*, since 2017, "we have improved our governance

23   and Board oversight ... and made the changes necessary to ensure our company culture rewards

24   teamwork and encourages employees to commit for the long term." Defendant Khosrowshahi

25   concludes with a "commitment" to investors: to "treat our customers, our colleagues, and our

26   cities with respect[,]" and to "run our business with passion, humility, and integrity."

27        147.    Taken out of context, Defendant Khosrowshahi's letter reads as a heartfelt

28   promise to investors. In reality, Defendant Khosrowshahi's letter was a strategic *mea culpa* on

1    Uber's behalf intended to pacify and assure anxious investors that the Company had left its toxic

2    culture behind in 2017.

3        148.    In one of the Offering Documents' risk factors, titled "[m]aintaining and

4    enhancing our brand and reputation is critical to our business prospects[,]" Uber presents its

5    narrative on how the Company's toxic culture—as revealed by a number of scandals dating back

6    to 2017—is purportedly in the past. These scandals relate to, among other things: allegations of

7    Uber utilizing proprietary tools to evade and deceive authorities from enforcing applicable laws,

8    rules, and regulations (*i.e.*, Greyball, a piece of code affixed to a user's account that identifies a

9    police officer, transportation official, or other person as a threat, which Uber itself describes as

10   designed to "limit the vehicle views available to regulatory enforcement authorities"); a data

11   security breach; and allegations of sexual harassment and other misconduct levelled by

12   employees against superiors and co-workers at Uber.

13       149.    The allegations of sexual harassment and misconduct implicating Uber and its

14   executives are largely credited with helping to foster and foment the viral 2017 #MeToo

15   movement. In one particularly well-publicized incident, a former Uber software engineer alleged

16   she had been the target of repeated sexual harassment and workplace mistreatment. After

17   reporting such misconduct to Uber's H.R. department, this same individual was berated by her

18   managers, promised and denied a transfer out of the department where the sexual harassment and

19   misconduct took place, and subjected to fierce retaliation for reporting such incidents to H.R.

20   This individual took her concerns all the way to Uber's Chief Technology Officer, yet still

21   nothing was done until she took matters into her own hands and quit.

22       150.    The software engineer's story, first published on her personal blog, spread like

23   wildfire in the media and helped expose Uber as a poorly run company plagued by flagrant

24   misogyny, with an H.R. department that conspired with senior executives and upper management

25   to shield abusive managers from being disciplined so long as they were "high performers." At

26   the same time, Defendant Kalanick came under fire for knowingly enabling this misogynistic

27   culture and failing to act on untold scores of sexual harassment complaints at the Company.

28

151.    As the Offering Documents allude to, such allegations led to "significant media coverage and negative publicity, particularly in 2017," and the #DeleteUber campaign that followed "prompted hundreds of thousands of consumers to stop using [Uber's] platform within days." The media scrutiny, adverse publicity, and negative financial impact was so swift and severe that the Company hired former U.S. Attorney General Eric Holder ("AG Holder") to conduct an internal investigation into Uber's culture. AG Holder personally interviewed the software engineer that blew the whistle on Uber, and in total, his investigation team conducted over 200 interviews with current and former employees, as well as a document review that included searching databases containing over 3 million documents.

152.    AG Holder ultimately issued a scathing report detailing 47 recommendations for improving Uber's culture, including: first and foremost, "review and reallocate the responsibilities of" Defendant Kalanick, who set a dismal tone at the top; adopt a "zero-tolerance policy for substantiated complaints of discrimination and harassment, without regard to whether an employee is a 'high performer' or a long-term employee[;]" use "performance reviews to hold senior leaders accountable[;]" restructure the Board "to include additional independent Board [directors] ... who can exercise independent oversight of Uber's management[;]" require "mandatory leadership training for key senior management/senior executive team members[;]" and "reformulate Uber's 14 cultural values[,]" because many of the Company's adopted values could have been "used to justify poor behavior, including Let Builders Build, Always Be Hustlin', Meritocracy and Toe-Stepping, and Principled Confrontation."

153.    In a section titled "How We Approach the Future," the Offering Documents draw a hard line in the sand between 2017 Uber and the purportedly new and reformed Uber of today. Uber highlights its attempts at damage control and to stem further media scrutiny, adverse publicity, and negative financial impact. First, Uber hired Defendant Khosrowshahi "in September 2017 following many challenges regarding [its] culture, workplace practices, and reputation." Defendant Khosrowshahi was brought in primarily to lend an air of credibility to Uber and to take the Company public. In exchange, Uber agreed to pay Defendant Khosrowshahi

1  $45 million in cash and RSUs, as well as an additional $80 to $100 million if Uber achieved a

2  $120 billion market capitalization for at least three months within five years of the Offering.

3       154.    Uber claims to have made "tremendous progress in creating a program that is

4  designed to prevent and detect violations of corporate policy, law, and regulations." The

5  Company also: revamped its "senior executive team, hiring respected leaders with extensive

6  public and private sector experience[;]" and "sought to reform [its] culture fundamentally by ...

7  creating and embracing new cultural norms." Among the Company's new cultural norms, Uber

8  declares: "Our team came together to write these norms from the ground up to reflect who we are

9  and where we are going.... ***We do the right thing.*** Period."

10       155.    In sum, the Offering Documents proudly proclaim: "***It is a new day at Uber.***"

11      **C.**    **The Offering Documents Contained Materially False and Misleading Statements of Fact and Omitted Material Information**

12       156.    The Offering Documents contained materially misleading statements concerning

13  Uber's undisclosed and unsustainable growth at any cost business model. Specifically, the

14  Offering Documents failed to disclose to the truth about Uber's: (i) business model and growth

15  strategy; (ii) passenger safety issues; and (iii) financial condition. As a result, the Offering

16  Documents contained untrue statements of material facts, omitted to state other facts necessary to

17  make the statements contained in the Offering Documents not misleading, and were not prepared

18  in accordance with the rules and regulations governing their preparation.

19      **1.**    **The Offering Documents Contained Misstatements and Omissions**

20                **About Uber's Illegal Business Model and Growth Strategy**

21       157.    The Offering Documents repeatedly touted—yet misrepresented—the strength

22  and legality of Uber business model and growth strategy and failed to disclose that the

23  Company's business model and growth strategy was premised on breaking and thwarting laws,

24  rules, and regulations in many of the domestic and international jurisdictions in which the

25  Company operates. As a result, the Company faced grave consequences at the time of the IPO

26  that would fully materialize afterwards.

27       158.    The Offering Documents portrayed to investors that the Company's problems

28  were largely in the past and that the Company had "been on a new path forward since hiring …

1   Chief Executive Officer Dara Khosrowshahi in September 2017. The Offering Documents

2   stated, in pertinent part, as follows under the heading "Reputation and brand":

> We believe that **maintaining and enhancing our reputation and brand is critical to our ability to attract and retain employees and platform users**. For example, our business performance was negatively impacted in early 2017 when we faced many challenges, including the #DeleteUber campaign that encouraged platform users to delete our app and cease use of our offerings. Later in 2017, allegations of discrimination, harassment, and retaliation in the workplace adversely impacted our reputation and further encouraged platform users to cease use of our offerings. **We have been on a new path forward since the hiring of our Chief Executive Officer Dara Khosrowshahi in September 2017**.

9       159.    While Defendant Kalanick's philosophy for dealing with the localities where

10   Uber operated and the regulators with purview over Uber's operations was based on

11   "confrontation," the "new" Uber stated that its number one cultural norm was now "We do the

12   right thing. Period." The Offering Documents claim that after 2017 "[i]t is a new day at Uber"

13   and that the Company "made tremendous progress in creating a [compliance] program that is

14   designed to prevent and detect violations of corporate policy, law, and regulations" and was

15   "committed to using a proactive and collaborative approach with regulators." The Offering

16   Documents stated, in pertinent part, as follows:

> **We are on a new path forward with the hiring of our Chief Executive Officer Dara Khosrowshahi in September 2017** following many challenges regarding our culture, workplace practices, and reputation…. **Our leadership team has sought to reform our culture fundamentally by** improving our governance structure, **strengthening our compliance program, creating and embracing new cultural norms**, committing to diversity and inclusion and **rebuilding our relationship with employees, Drivers, consumers, and regulators**.
>
> \*        \*        \*
>
> **We are committed to building a best-in-class compliance program. We have made tremendous progress in creating a program that is designed to prevent and detect violations of corporate policy, law, and regulations. We continue to enhance our compliance and ethics program by conducting top-down risk assessments and developing policies and practices customized for our growing and evolving global business.**
>
> We embrace the future with optimism, and **we work towards our mission based on eight cultural norms**. Our team came together to write these norms from the ground up to **reflect who we are** and where we are going.

- *We do the right thing. Period.*

- *We build globally, we live locally. We harness the power and scale of our global operations to deeply connect with the cities, communities, drivers, and riders that we serve every day.*

- *We are customer obsessed. We work tirelessly to earn our customers' trust* and business by solving their problems, maximizing their earnings, or lowering their costs. We surprise and delight them. *We make short-term sacrifices for a lifetime of loyalty.*

  \*     \*     \*

- *We act like owners*. We seek out problems, and we solve them. We help each other and those who matter to us. *We have a bias for action and accountability*. We finish what we start, and *we build Uber to last. And when we make mistakes, we'll own up to them.*

  \*     \*     \*

*We are committed to using a proactive and collaborative approach with regulators. As a result, we are rebuilding and strengthening our relationships with regulators around the world and engaging in an ongoing, constructive dialogue.* For example, in Berlin and Munich, we have actively worked with regulators to introduce eco-friendly products, such as dockless e-bikes and our all-electric vehicle product, Uber Green, to help those cities decrease air pollution, reduce urban congestion, and increase access to clean transportation options. *Additionally, in 2018, we partnered with officials in the province of Mendoza, Argentina to design the country's first ridesharing regulations. We believe that this long-term collaborative approach will enable us to drive positive legislative change and allow people all over the globe to benefit from modern and efficient transportation options.*

  \*     \*     \*

*It is a new day at Uber.*

160.   The Offering Documents told investors that a "foundation of [Uber's] platform" was "operational excellence" which included using "market-specific knowledge to rapidly launch and sale products in cities" and "build and enhance relationships with cities and regulators." The Offering Documents stated, in pertinent part: "*Operational excellence. Our regional on-the-ground operations teams use their extensive market-specific knowledge to rapidly launch and scale products in cities*, support Drivers, consumers, restaurants, shippers, and carriers, and *build and enhance relationships with cities and regulators*."

161.    The Offering Documents also told investors that "*regional on-the-ground teams enable [Uber] to better understand and contribute to communities that[the Company] serves*."

162.    The Offering Documents touted that Uber "*celebrate[s] cities*" and that it was "*committed to complementing city infrastructure and collaborating with local leaders and communities to provide opportunities for cities to thrive*."

163.    The Offering Documents told investors that Uber "*derived 24% of [its] Rideshare Gross Bookings from five metropolitan areas*—Los Angeles, New York City, and the San Francisco Bay Area in the United States; *London in the United Kingdom*; and Sao Paulo in Brazil."

164.    The Offering Documents claimed that Uber's growth strategy consisted of the following:

> *Key elements of our growth strategy* include:
>
> - Increasing Ridesharing penetration in existing markets;
> - Expanding Personal Mobility into new markets;
> - Continuing to invest in and expand Uber Eats;
> - Pursuing targeted investments and acquisitions;
> - Leveraging our platform to launch new products;
> - Increasing Driver and consumer engagement;
> - Continuing to invest in and expand Uber Freight;
> - Continuing to innovate and transform our products to meet platform user needs; and
> - Investing in advanced technologies, including autonomous vehicle technologies.

165.    The Offering Documents also expanded upon Uber's "Expanding Personal Mobility into new markets" growth strategy by identifying six locations were Uber did not have "a major presence" due to "current regulations," and, thus, Uber was waiting to expand there. The Offering Documents stated, in pertinent part, as follows:

> *Due to current regulations, our Personal Mobility offering does not have a major presence in Argentina, Germany, Italy, Japan, South Korea, or Spain, which represent an aggregate population of over 400 million people, 0.8 trillion miles, and $0.5 trillion of*

*potential addressable market opportunity. We intend to expand in each of these markets as regulations permit and as we introduce products that conform with local regulations such as taxi products or livery offerings.* We believe that the popularity of Uber Eats, which is available in Japan, Italy, South Korea, and Spain, demonstrates that demand exists in these countries for our platform and brand.

166.    The Offering Documents stated that "[r]egulations that permit or limit [Uber's] ability to provide Ridesharing in certain markets impact our financial performance" and touted that when changes to regulations were made, for example in New York City, the Company made adjustments to address those changes and that "partnerships with regulators have resulted in favorable changes, for example in Argentina where Uber "partnered with officials" to design "ridesharing regulations." The Offering Documents stated, in pertinent part, as follows:

*Regulation that permit or limit our ability to provide Ridesharing in certain markets impact our financial performance*. For example, in August 2018, New York City instituted a limit on new vehicle licenses for offerings like ours for one year, and in February 2019, New York City instituted per-mile and per-minute rates, designed to target minimum hourly earnings, for drivers providing for-hire services in New York City, such as those provided by Drivers on our platform. We are still *working through adjustments to be made with respect to rider promotions, driver supply, and other aspects of our business in response to these regulations*. Although these regulations positively impacted our category position in New York City thus far, the regulations had a negative impact on our financial performance in New York City in the first quarter of 2019 and may have a similar adverse impact in the future. *In other regions, our partnerships with regulators have resulted in favorable change.* In 2018, we partnered with officials in the province of Mendoza to design the first ridesharing regulations in Argentina.

167.    The Offering Documents claimed that "*[a] commercial license is not required for Drivers on UberX in most cities*."

168.    The Offering Documents stated that the Company was subject to a "variety of U.S. and foreign laws, rules and regulations" and changes could harm Uber's business. The Offering Documents also stated that "[i]n the United States, many state and local laws, rules, and regulations impose legal restrictions and other requirements on operating our Ridesharing products, including licensing, insurance, screening, and background check requirements." In particular, states had adopted Transportation Network Company ("TNC") regulations," which

required Uber "to comply with rules regarding, among other things, background checks, vehicle inspections, accessible vehicles driver and consumer safety, insurance, driver training, driver conduct, and other similar matters." The Offering Documents stated, in pertinent part, as follows:

> We operate in a particularly complex legal and regulatory environment. ***Our business is subject to a variety of U.S. and foreign laws, rules, and regulations. We are subject to many U.S. federal, state, local, and foreign laws and regulations, including*** those related to internet activities, privacy, rights of publicity, data protection, intellectual property, ***health and safety***, competition, protection of minors, ***consumer protection, payments, transportation services, and taxation. These laws and regulations are constantly evolving and may be interpreted, applied, created, or amended, in a manner that could harm our business.***

> \*       \*       \*

> ***Our platform, and in particular our Ridesharing products, are subject to differing, and sometimes conflicting, laws, rules, and regulations in the numerous jurisdictions in which we operate. In the United States, many state and local laws, rules, and regulations impose legal restrictions and other requirements on operating our Ridesharing products, including licensing, insurance, screening, and background check requirements. Outside of the United States, certain jurisdictions have adopted similar laws, rules, and regulations while other jurisdictions have not adopted any laws, rules, and regulations which govern our Ridesharing products. Further, certain jurisdictions***, including Argentina, Germany, Italy, Japan, South Korea, and Spain, the six countries that we have identified as near-term priorities, ***have adopted laws, rules, and regulations banning certain ridesharing products or imposing extensive operational restrictions.*** This uncertainty and fragmented regulatory environment creates significant complexities for our business and operating model.

> \*       \*       \*

> ***At least 43 states in the United States and numerous municipalities in the United States and around the world have adopted Transportation Network Company ("TNC") regulations.*** These regulations generally focus on companies that operate websites or mobile apps that connect individual drivers with their own vehicles to passengers willing to pay to be driven to their destinations. ***These regulations often require TNCs to comply with rules regarding, among other things, background checks, vehicle inspections, accessible vehicles, driver and consumer safety, insurance, driver training, driver conduct, and other similar matters.***

169.    The Offering Documents informed investors that Uber had integrated values and ethical conduct into its culture and that employees were expected "to raise concerns or questions

---

regarding ethics, compliance, workplace culture, discrimination, or harassment, and to promptly

report suspected violations of these and other applicable laws, regulations, rules, policies,

procedures, and standards." The Offering Documents stated, in pertinent part, as follows:

> ***Guided by our senior management team, we focus on
> empowering individuals by establishing global policies,
> programs, and processes that integrate our values, cultural
> norms, and standards of conduct into our organization and guide
> and support our employees in making decisions that adhere to
> our values, cultural norms, and standards of conduct. We aim to
> put integrity at the core of all of our decisions.***

> \*         \*         \*

> ***Promoting Integrity***

> ***At Uber, we want to develop an environment where we hold
> ourselves to the highest standards of integrity. We expect
> employees to raise concerns or questions regarding ethics,
> compliance, workplace culture, discrimination, or harassment,
> and to promptly report suspected violations of these and other
> applicable laws, regulations, rules, policies, procedures, and
> standards, including our Business Conduct Guide.***

170.     The Offering Documents claimed that Uber operated in jurisdictions where laws

and regulations were "ambiguous" or in Uber's view "invalid or inapplicable." In discussing

fines that may be imposed on drivers due to laws and regulations governing Uber's products and

offerings, the Offering Documents stated that "as a gesture of goodwill" the Company will "pay

the fines on behalf of Drivers" or pay for "Drivers' defense costs." The Offering Documents

stated, in pertinent part, as follows:

> ***In certain jurisdictions, we are subject to national, state, local, or
> municipal laws and regulations that are ambiguous in their
> application or enforcement or that we believe are invalid or
> inapplicable.*** In such jurisdictions, we may be subject to regulatory
> fines and proceedings and, in certain cases, may be required to
> cease operations altogether if we continue to operate our business
> as currently conducted, unless and until such laws and regulations
> are reformed to clarify that our business operations are fully
> compliant*.* ***In certain of these jurisdictions, we continue to
> provide our products and offerings while we assess the
> applicability of these laws and regulations to our products and
> offerings or while we seek regulatory or policy changes to
> address concerns with respect to our ability to comply with these
> laws and regulations.*** Our decision to continue operating in these
> instances has come under investigation or has otherwise been
> subject to scrutiny by government authorities. Our continuation of
> this practice and other past practices may result in fines or other
> penalties against us and Drivers imposed by local regulators,

potentially increasing the risk that our licenses or permits that are necessary to operate in such jurisdictions will not be renewed. Such fines and penalties have in the past been, and may in the future continue to be, imposed solely on Drivers, which may cause Drivers to stop providing services on our platform. ***In many instances, we make the business decision as a gesture of goodwill to pay the fines on behalf of Drivers or to pay Drivers' defense costs, which, in the aggregate, can be in the millions of dollars.***

171.    The statements referenced above in ¶¶157-170 concerning, *inter alia*, the "new" Uber's business model, practices, and legality, as well as growth strategy, compliance, integrity, and relationships with government entities, Drivers, and customers, were each false and misleading statements of material fact when made because they failed to disclose and misrepresented the following material adverse facts, material adverse trends, material uncertainties, or significant risks that existed at the time of the IPO, including:

(a)    Uber was not on a "new path" since 2017 nor was it a "new day at Uber." Prior to the IPO, Uber developed and implemented a "playbook" for launching ridesharing in new cities and countries, which included launching in markets throughout the United States and abroad (including Tanzania, Greece, Croatia, Indonesia, India, Latin America, Singapore, and China) where it was not legal to operate peer-to-peer ridesharing. Such illegal operations existed at the time of the IPO. Uber expected and required employees to have a willingness to evade rules and laws when necessary, as the Company believed that concepts like "breaking the law" were not applicable to the Company because relevant and applicable laws were "bullshit in the first place[;]"

(b)    Uber did not comply with the rules, regulations, and laws that the Offering Documents identified as applying to or limiting its operations. Nor was Uber waiting on the sidelines for their operation to become legal in localities. Rather, the Company launched regardless of illegality and in contradiction of their stated growth strategy;

(c)    Rather than "doing the right thing" and building, maintaining, strengthening, and enhancing relationships with cities and regulators, Uber bribed local officials in various markets, including Indonesia and Tallahassee, Florida, to secure authorities' acquiescence to the Company's illegal operations and favorable provisions in local ordinances

1    that regulate the transportation industry that the Company operates in. Uber's employees

2    considered bribery of local officials in international jurisdictions to be a necessary evil and a cost

3    of doing business for an American company operating on foreign soil;

4              (d)       Uber obstructed investigations into the Company's operations in various

5    markets, including Colombia, by, among other things, adopting and implementing policies that

6    urged employees to deny regulators' access to information and Company computers, thereby

7    exposing the Company to hundreds of thousands of dollars' worth of fines;

8              (e)       Drivers were operating without commercial licenses and without

9    commercial vehicle registrations in markets where doing so was illegal or a crime;

10             (f)       Uber was not paying fines and tickets for Drivers as a gesture of

11   "goodwill." Rather, Uber paid millions of dollars to reimburse fines and tickets for Drivers that

12   were caught by police operating without proper commercial licenses or commercial vehicle

13   registrations, because Uber had them operating illegally and needed them to continue doing so.

14   Uber considered the reimbursement of Drivers' fines and tickets to be a "cost of doing business"

15   and entered such reimbursements under "miscellaneous expenses" on its balance sheet. Uber

16   transmitted messages to its Drivers via emails, text messages, and other means reminding

17   Drivers that Uber would reimburse costs associated with violating the law and providing Drivers

18   with a list of tactics to evade police;

19             (g)       Uber failed to comply with local regulations in various markets, including

20   London, England, governing background checks on Drivers, vehicle insurance, and passenger

21   safety; and

22             (h)       Rather than making short-term sacrifices for a lifetime of loyalty, Uber

23   misclassified its Drivers as independent contractors rather than as employees in various markets,

24   including New Jersey and California, in order to, among other things, avoid applicable minimum

25   wage and benefit laws as well as unemployment and disability insurance taxes, thereby exposing

26   the Company to hundreds of millions of dollars' worth of assessments.

27

28

**2.      The Offering Documents Contained Misstatements and Omissions About Uber Passenger Safety**

172.    The Offering Documents repeatedly misrepresented how the Company enhances safety for its passengers from pick up to arrival and failed to disclose that, in furtherance of its growth at any cost business model, Uber ignored rampant, dangerous, and even lethal passenger safety issues across its ridesharing platform, which resulted from the Company's own defective safety policies and practices.

173.    As noted above, the Offering Documents told investors that the Company was on a "new path" since 2017, the Company's philosophy was "do the right thing," and the Company was "rebuilding [its] relationship with … customers." When the new Uber "make[s] mistakes, [it] own[s] up to them." According to the Company's new cultural norms Uber "work[s] tirelessly to earn [its] customer's trust" and make[s] short-term sacrifices for a lifetime of loyalty. The Offering Documents stated, in pertinent part, as follows:

> *We are customer obsessed. We work tirelessly to earn our customers' trust and business* by solving their problems, maximizing their earnings, or lowering their costs. We surprise and delight them. *We make short-term sacrifices for a lifetime of loyalty.*

174.    The Offering Documents stated that a "foundation of [Uber's] platform" was "product expertise," which included delivering to its customers "safety and trust." The Offering Documents stated, in pertinent part, as follows:

> *Product expertise. Our products are built with the expertise that allows us to* set the standard for powering movement on-demand, provide platform users with a contextual, intuitive interface, continually evolve features and functionality, and *deliver safety and trust.*

175.    The Offering Documents expanded upon "safety and trust" by claiming that Uber designs its "products to include robust safety tools for all platform users." The Offering Documents stated, in pertinent part, as follows:

> *Safety and trust. We design our products to include robust safety tools for all platform users.* For example, in 2018, we launched our Safety Toolkit, which allows both Drivers and consumers to access a menu of safety features directly from the home screen of our app. We have a two-way ratings system that enables both Drivers and consumers to rate each other, which increases accountability on our platform.

176.    According to the Offering Documents, Uber's "goal is to make riding in an Uber a safe transportation option in any city." The Offering Documents also told investors that they provided customers with a "rapid incident response system" and that the Company was "committed to rapidly responding to any reported safety incident with trained teams available 24 hours a day." The Offering Documents stated, in pertinent part, as follows:

> **Safety. Our goal is to make riding in an Uber a safe transportation option in any city. From pick up to arrival, we strive to enable a safe experience for riders by providing transparency, real-time tracking, feedback, and rapid incident response systems.** When we match a rider with a Driver, the rider sees the Driver's name, license plate number, photo, and rating before entering the car. Once riders begin their trips, our Safety Toolkit, which is available on the home screen of our app in many cities, enables riders to share estimated times of arrival and routes with friends and family or, where available, to contact emergency response services with the tap of a button. After every trip, riders can rate Drivers and provide anonymous feedback about the ride. **We receive all rider feedback and are committed to rapidly responding to any reported safety incidents with trained teams available 24 hours a day.**

177.    The Offering Documents also touted that Uber "record[s] the location of every ride in real time, and [its] team can rapidly respond to safety incidents that are reported to us." The Offering Documents stated, in pertinent part, as follows:

> **Increased safety.** We are continuously developing new technology tools that aim to improve safety in cities. **We record the location of every ride in real time, and our team can rapidly respond to safety incidents that are reported to us…. We also build relationships with local officials and law enforcement to promote safe cities.** For example, we have published procedures to enable law enforcement to access trip data and other information that may be critical for solving criminal cases quickly and securely through our Uber Law Enforcement Portal.

178.    The Offering Documents stated that "**In 2019, we expect to begin reporting information about safety incidents occurring on or in connection with our platform.**"

179.    The Offering Documents claimed that safety was "at the heart of the Uber experience." The Offering Documents stated, in pertinent part, as follows:

> **Enhancing safety of Drivers and consumers. With over 150 employees focused on building new technologies that put safety at the heart of the Uber experience, and thousands of community operations employees dedicated to ensuring safety on our platform, we are committed to enhancing safety.** To that end, we have formed a Safety Advisory Board composed of outside

experts, added additional safety features to our platform, and have strengthened our background checks in the United States. In December 2018, we introduced our partnership with Crime Stoppers International in a few cities across the United States, Canada, and Latin America to provide Drivers with tools to report criminal activity while keeping their identities anonymous. ***We strive to promote the safety of our employees, Drivers, and consumers.***

180. The statements referenced above in ¶¶172-179 concerning, *inter alia*, Uber passenger safety and its policies and practices related to passenger safety were each false and misleading statements of material fact when made because they failed to disclose and misrepresented the following material adverse facts, material adverse trends, material uncertainties, or significant risks that existed at the time of the IPO, including:

(a)     Rather than delivering safety and trust or making short-term sacrifices for a lifetime of loyalty, Uber hired, trained, and staffed a team of investigators dedicated to the Company's Special Investigations Unit, or SIU, who were coached by the Company to act in the Company's interest first, ahead of passenger safety;

(b)     Uber was not "rapidly responding" to safety incidents. Rather Uber's SIU maintained a "three-strikes" system to determine whether Uber Drivers or passengers reported for misconduct, violence, and other violations (*e.g.*, sexual misconduct and sexual assault) should be deactivated from Uber's app, but Company executives can and did make exceptions to this three-strikes system in order to, for example, keep high earning Uber Drivers on the road collecting fares;

(c)     Uber was not working with local officials and law enforcement to promote safe cities. Approximately one-third of cases handled by Uber's SIU investigators dealt with sexual misconduct, including rape or unwanted flirtation or advances, yet Uber's SIU investigators were forbidden from routing allegations to police or advising victims to seek legal counsel or make their own police reports, even when SIU investigators received confessions of felonies. Investigators could be reprimanded or fired for contacting the police or advising victims to do so;

1          (d)     Uber did not require SIU investigators to have any prior experience

2 conducting investigations or handling safety calls or insurance claims;

3          (e)     Uber sought to settle lawsuits related to sexual assaults and other criminal

4 activity (during rides hailed on the Uber Rides app) quickly in order to avoid the scrutiny and

5 negative publicity that may result from open court;

6          (f)     Uber breached Transport for London ("TfL" or "London TfL," London,

7 England's transportation authority) regulations by failing to address issues with checks on

8 Drivers, insurance, and safety, and a security lapse resulted in at least 14,000 trips involving 43

9 Uber Drivers where someone other than the booked Driver picked up passengers;

10          (g)     Uber's breaches of London TfL regulations resulted in Uber's customers

11 taking trips with dismissed or suspended Drivers whose licenses had been revoked and at least

12 one Driver whose private hire license had been revoked after he was cautioned for distributing

13 indecent images of children;

14          (h)     Prior to the Offering, Uber received reports of 97 fatal crashes, 19 fatal

15 physical assaults, and 5,981 sexual assaults—including non-consensual sexual penetration—in

16 the United States that occurred during 2017 and 2018;

17          (i)     Prior to the Offering, Uber received reports of 2,936 and 3,045 sexual

18 assaults in 2017 and 2018, respectively, or an average of eight sexual assaults per day. 75% of

19 reporting parties for non-consensual kissing of a sexual body part were passengers, and 72% of

20 reporting parties for non-consensual sexual penetration were passengers, throughout both 2017

21 and 2018; and

22          (j)     Uber charged its customers a purported "Safe Rides Fee" that—contrary to

23 what the Company told its customers—was neither earmarked specifically for safety nor

24 dedicated to industry-leading background checks, regulator motor vehicle checks, Driver safety

25 education, development of safety features in Uber's app, or insurance, but rather was devised

26 primarily to add about $1 of pure margin to each trip.

27

28

### 3. The Offering Documents Contained Misstatements and Omissions About Uber's Financial Condition

181.    Throughout the Offering Documents, Uber repeatedly touts the Company's unparalleled and rapid growth and scale, while failing to disclose that the Company's growth at any cost business model was defective, Uber had sustained—and would continue to sustain—massive losses and deteriorating growth, and the Company planned to mitigate its ongoing losses by cutting costs in fundamental areas of its business that would further hinder growth.

182.    The Offering Documents touted to investors that, "*[w]hile we have had unparalleled growth at scale, we are just getting started: only 2% of the population in the 63 countries where we operate used our offerings in the quarter ended December 31, 2018, based on MAPCs.*"

183.    The Offering Documents explained that the Company's rapid growth demonstrated the size of Uber's opportunity. The Offering Documents stated, in pertinent part, as follows:

> *The rapid growth and scale of our Ridesharing products, which to date have accounted for virtually all of our Personal Mobility offering, demonstrates the size of our opportunity*:
>
> - Revenue derived from our Ridesharing products grew from $3.5 billion in 2016 to $9.2 billion in 2018.
>
> - Gross Bookings derived from our Ridesharing products grew from $18.8 billion in 2016 to $41.5 billion in 2018.
>
> - Consumers traveled approximately 26 billion miles on our platform in 2018.
>
> We believe that *Personal Mobility represents a vast, rapidly growing, and underpenetrated market opportunity*.

184.    The Offering Documents touted the value of Uber's "driver incentives" as driving its ability to grow, and specifically that Uber "*offer[s] a variety of Driver incentives to encourage Driver activity on [Uber's] platform, which consequently allows[it] s to attract and engage consumers on [the] platform*."

185.    The Offering Documents told investors, under the title "*Increasing scale, creating category leadership and a margin advantage*" that Uber would "*continue to use*

***Driver incentives and consumer discounts and promotions to grow our business relative to lower-priced alternatives, such as personal vehicle ownership, and to maintain balance between Driver supply and customer demand***."

186.    Likewise, the Offering Documents told investors that Uber would continue to invest in its offerings to "fuel multiple virtuous cycles of growth." The Offering Documents stated, in pertinent part, as follows: "***We intend to continue to invest in new platform offerings that we believe will further strengthen our platform and existing offerings and fuel multiple virtuous cycles of growth.***"

187.    The Offering Documents touted that Uber expected "MAPC growth to continue" and that the Company would "continue to use incentives, discounts, and promotions … to grow these categories and to acquire, engage, and retain MAPCs. The Offering Documents stated, in pertinent part, as follows:

> ***MAPCs.***
>
> ***Changes in MAPCs are a key factor driving our Gross Bookings. We expect MAPC growth to continue as consumer adoption of our Personal Mobility and Uber Eats offerings increases, and we plan to continue to use incentives, discounts, and promotions, as well as restaurant expansion, to grow these categories and to acquire, engage, and retain MAPCs.*** These incentives and promotions may include new consumer referral programs and coupons for reduced fares on our Ridesharing products or Uber Eats offering. We believe that new product launches, including the expansion of existing products into new cities, will grow MAPCs by addressing more use cases and by increasing MAPC retention. Over time, we expect to continue to expand into geographies where we do not currently have scaled presence, including in the six key countries where our current presence is limited as a result of the regulatory environments: Argentina, Germany, Italy, Japan, South Korea, and Spain.

The Offering Documents touted to investors that "[o]n a quarterly basis, our revenue increased for all quarters presented as a result of increases in Gross Bookings. ***The increase in Gross Bookings was primarily driven by an increase in Trips due to the growth of our MAPCs as we continue to expand the reach of our platform***."

188.    The Offering Documents told investors that Uber would "continue to offer significant Driver incentives and consumer discounts and promotions" in order to "remain

competitive" and "generate network scale and liquidity." The Offering Documents stated, in

pertinent part, as follows:

> *To remain competitive in certain markets and generate network scale and liquidity, we have in the past lowered, and expect in the future to continue to lower, fares of service fees, and we have offered and expect to continue to offer significant Driver incentives and consumer discounts and promotions.*

189.    The statements referenced above in ¶¶181-188 concerning, *inter alia*, Uber's

financial condition were each false and misleading statements of material fact when made

because they failed to disclose and misrepresented the following material adverse facts, material

adverse trends, material uncertainties, or significant risks that existed at the time of the IPO,

including:

(a)    At the time of the Offering, Uber's growth strategy was failing and, as a

result, the Company was in the process of dissolving its COO and CMO positions and planning

to terminate one-third of its marketing team, or about 400 employees;

(b)    At the time of the Offering, Uber planned to terminate approximately 350

employees across the Company's Uber Eats, performance marketing, Advanced Technologies

Group, recruiting, and global rides and platform departments;

(c)    Prior to the Offering, Uber ramped up incentives spending with few limits

and little discretion, including by giving city managers the latitude to spend millions of dollars in

Driver and rider incentives based on little more than a hunch and data from their personal

spreadsheets;

(d)    At the time of the Offering, Uber was in the processing of sustaining more

than a $5 billion loss and the slowest quarterly revenue growth, and slowed Uber Rides quarterly

revenue growth, in the Company's history during Q2 2019;

(e)    At the time of the Offering, Uber was in the process of sustaining the

slowest quarterly Trips and MAPCs growth in the Company's history during Q2 2019; and

(f)    At the time of the Offering, Uber was in the process of incurring total

costs and expenses that had doubled or even tripled, depending on whether cost of revenue and

depreciation and amortization ("D&A") are factored in, during Q2 2019.

4.    **The Offering Documents Failed to Disclose and Misrepresented
Significant Risks That Made the Offering More Speculative and Risky**

190.    The Offering Documents contained materially misleading risk factors that failed to warn of the significant risks posed by Uber's undisclosed and unsustainable growth at any cost business model. Specifically, the Offering Documents contained materially misleading risk factors that purported to warn of various risks related to Uber's (i) business model, (ii) passenger safety, and (iii) financial condition that "may" adversely affect the Company, while failing to disclose that these very "risks" had materialized prior to and at the time of the Offering.

(a)    **Materially Misleading Business Model Risk Factors**

191.    The Offering Documents inaccurately described as *potential*, certain risks associated with the Company's "forward-leading approach," which "*may*" have adverse impacts on Uber's business, financial condition, operating results and prospects, rather than disclosing the actual events and trends or uncertainties that had already manifested. The Offering Documents stated, in pertinent part, as follows:

> *Our workplace culture and forward-leaning approach created operational, compliance, and cultural challenges, and a failure to address these challenges would adversely impact our business, financial condition, operating results, and prospects.*
>
> *Our workplace culture and forward-leaning approach created significant operational and cultural challenges that have in the past harmed, and may in the future continue to harm, our business results and financial condition.* Our focus on aggressive growth and intense competition, and our prior failure to prioritize compliance, has led to increased regulatory scrutiny globally. *Recent changes in our company's cultural norms and composition of our leadership team, together with our ongoing commitment to address and resolve our historical cultural and compliance problems and promote transparency and collaboration, may not be successful, and regulators may continue to perceive us negatively, which would adversely impact our business, financial condition, operating results, and prospects.*

192.    The Offering Documents inaccurately described as *potential*, certain risks associated with the Company being blocked or limited in operating in certain jurisdiction, which "*may*" have adverse impacts on Uber's business, financial condition, and growth, rather than

disclosing the actual events and trends or uncertainties that had already manifested. The Offering

Documents stated, in pertinent part, as follows:

> ***We may continue to be blocked from or limited in providing or operating our products and offerings in certain jurisdictions, and may be required to modify our business model in those jurisdictions as a result.***
>
> ***In certain jurisdictions, including key markets such as Argentina, Germany, Italy, Japan, South Korea, and Spain, our ridesharing business model has been blocked, capped, or suspended, or we have been required to change our business model, due primarily to laws and significant regulatory restrictions in such jurisdictions.*** In some cases, we have applied for and obtained licenses or permits to operate and must continue to comply with the license or permit requirements or risk revocation. In addition, we may not be able to maintain or renew any such license or permit. For example, [TfL] announced in September 2017 that it would not renew our license to operate in London because it determined that we were not fit and proper to hold an operator's license. We appealed this decision and in June 2018, we were granted a license to operate in London on a 15-month term (instead of the usual five-year term). ***If we are not successful in complying with the terms of the 15-month license and, as a result, it is terminated or not renewed, we would likely appeal any such decision as we did in 2017. Any inability to operate in London, as well as the publicity concerning any such termination or non-renewal, would adversely affect our business, revenue, and operating results. We cannot predict whether the TfL decision, or future regulatory decisions or legislation in other jurisdictions, may embolden or encourage other authorities to take similar actions even where we are operating according to the terms of an existing license or permit.***
>
> *                    *                    *
>
> ***In certain jurisdictions, we are subject to national, state, local, or municipal laws and regulations that are ambiguous in their application or enforcement or that we believe are invalid or inapplicable. In such jurisdictions, we may be subject to regulatory fines and proceedings and, in certain cases, may be required to cease operations altogether if we continue to operate our business as currently conducted, unless and until such laws and regulations are reformed to clarify that our business operations are fully compliant.*** In certain of these jurisdictions, we continue to provide our products and offerings while we assess the applicability of these laws and regulations to our products and offerings or while we seek regulatory or policy changes to address concerns with respect to our ability to comply with these laws and regulations. Our decision to continue operating in these instances has come under investigation or has otherwise been subject to scrutiny by government authorities. ***Our continuation of this practice and other past practices may result in fines or other penalties against us and Drivers imposed by local regulators, potentially increasing the risk that our licenses or permits that***

*are necessary to operate in such jurisdictions will not be renewed. Such fines and penalties have in the past been, and may in the future continue to be, imposed solely on Drivers, which may cause Drivers to stop providing services on our platform.* In many instances, we make the business decision as a gesture of goodwill to pay the fines on behalf of Drivers or to pay Drivers' defense costs, which, in the aggregate, can be in the millions of dollars. *Furthermore, such business practices may also result in negative press coverage, which may discourage Drivers and consumers from using our platform and could adversely affect our revenue. In addition, we face regulatory obstacles, including those lobbied for by our competitors or from local governments globally, that have favored and may continue to favor local or incumbent competitors, including obstacles for potential Drivers seeking to obtain required licenses or vehicle certifications.* We have incurred, and expect that we will continue to incur, significant costs in defending our right to operate in accordance with our business model in many jurisdictions. *To the extent that efforts to block or limit our operations are successful, or we or Drivers are required to comply with regulatory and other requirements applicable to taxicab and car services, our revenue and growth would be adversely affected.*

193.    The Offering Documents inaccurately described as *potential*, certain risks associated with laws and regulations, which "*may*" have adverse impacts on Uber's business, financial condition, operating results, and prospects, rather than disclosing the actual events and trends or uncertainties that had already manifested. The Offering Documents stated, in pertinent part, as follows:

*Our business is subject to numerous legal and regulatory risks that could have an adverse impact on our business and future prospects.*

*Our platform is available in over 700 cities across 63 countries. We are subject to differing, and sometimes conflicting, laws and regulations in the various jurisdictions in which we provide our offerings. A large number of proposals are before various national, regional, and local legislative bodies and regulatory entities, both within the United States and in foreign jurisdictions, regarding issues related to our business model. Certain proposals, if adopted, could significantly and materially harm our business, financial condition, and operating results by restricting or limiting how we operate our business, increasing our operating costs, and decreasing our number of platform users.* We cannot predict whether or when such proposals may be adopted.

*Further, existing or new laws and regulations could expose us to substantial liability, including significant expenses necessary to comply with such laws and regulations, and could dampen the growth and usage of our platform.* For example, as we expand our offerings in new areas, such as non-emergency medical

transportation, we may be subject to additional healthcare-related federal and state laws and regulations. ***Additionally, because our offerings are frequently first-to-market in the jurisdictions in which we operate, several local jurisdictions have passed, and we expect additional jurisdictions to pass, laws and regulations that limit or block our ability to offer our products to Drivers and consumers in those jurisdictions, thereby impeding overall use of our platform.*** We are actively challenging some of these laws and regulations and are lobbying other jurisdictions to oppose similar restrictions on our business, especially our ridesharing services.

*       *       *

In addition, we are currently involved in litigation in a number of the jurisdictions in which we operate. We initiated some of these legal challenges to contest the application of certain laws and regulations to our business. Others have been brought by taxicab owners, local regulators, local law enforcement, and platform users, including Drivers and consumers. These include individual, multiple plaintiff, and putative class and class action claims for alleged violation of laws related to, among other things, transportation, competition, advertising, consumer protection, fee calculations, personal injuries, privacy, intellectual property, product liability, discrimination, safety, and employment. ***These legislative and regulatory proceedings, allegations, and lawsuits are expensive and time consuming to defend, and, if resolved adversely to us, could result in financial damages or penalties, including criminal penalties, incarceration, and sanctions for individuals employed by us or parties with whom we contract, which could harm our ability to operate our business as planned in one or more of the jurisdictions in which we operate, which could adversely affect our business, revenue, and operating results.***

194.    The Offering Documents inaccurately described as ***potential***, certain risks associated inquiries, investigations, and requests for information directed at Uber which "***may***" have adverse impacts on Uber's business, reputation, and financial condition, rather than disclosing the actual events and trends or uncertainties that had already manifested. The Offering Documents stated, in pertinent part, as follows:

> ***We currently are subject to a number of inquiries, investigations, and requests for information from the DOJ and other U.S. and foreign government agencies, the adverse outcomes of which could harm our business.***
>
> We are the subject of DOJ criminal inquiries and investigations, as well as related civil enforcement inquiries and investigations by other government agencies in the United States and abroad. Those inquiries and investigations cover a broad range of matters…. We are also subject to inquiries and or investigations by various government authorities related to, among other matters, the use of a tool to limit the vehicle views available to regulatory

enforcement authorities (known as Greyball), alleged deceptive business practices and fraud, the use of alleged inappropriate means to obtain a rape victim's medical records, and our disclosures to certain investors. ***Investigations and enforcement actions from such entities, as well as continued negative publicity and an erosion of current and prospective platform users' trust, could severely disrupt our business.***

\*    \*    \*

These government inquiries and investigations are time-consuming and require a great deal of financial resources and attention from us and our senior management. ***If any of these matters are resolved adversely to us, we may be subject to additional fines, penalties, and other sanctions, and could be forced to change our business practices substantially in the relevant jurisdictions. Any such determinations could also result in significant adverse publicity or additional reputational harm, and could result in or complicate other inquiries, investigations, or lawsuits from other regulators in future merger control or conduct investigations. Any of these developments could result in material financial damages, operational restrictions, and harm our business.***

195. The Offering Documents inaccurately described as ***potential***, certain risks associated with licensing requirements for Uber's Drivers," which "***may***" have adverse impacts on Uber's business, growth, and prospects, rather than disclosing the actual events and trends or uncertainties that had already manifested. The Offering Documents stated, in pertinent part, as follows:

> ***Drivers may become subject to increased licensing requirements, and we may be required to obtain additional licenses or cap the number of Drivers using our platform.***
>
> ***Many Drivers currently are not required to obtain a commercial taxi or livery license in their respective jurisdictions. However, numerous jurisdictions in which we operate have conducted investigations or taken action to enforce existing licensing rules,*** including markets within Latin America and the Asia-Pacific region, and many others, including countries in Europe, the Middle East, and Africa, have adopted or proposed new laws or regulations that require Drivers to be licensed with local authorities or require us or our subsidiaries to be licensed as a transportation company. ***Local regulations requiring the licensing of us or Drivers may adversely affect our ability to scale our business and operations.***

196. The Offering Documents inaccurately described as ***potential***, certain other risk associated with Uber's classification of Drivers as independent contractors, which "***could***" have an adverse effect on its business and financial condition, rather than disclosing the actual events

and trends or uncertainties that had already manifest. The Offering Documents stated, in

pertinent part, as follows:

> **Our business would be adversely affected if Drivers were classified as employees instead of independent contractors.**
>
> The independent contractor status of Drivers is currently being challenged in courts and by government agencies in the United States and abroad. We are involved in numerous legal proceedings globally, including putative class and collective class action lawsuits, demands for arbitration, charges and claims before administrative agencies, and investigations or audits by labor, social security, and tax authorities that claim that Drivers should be treated as our employees (or as workers or quasi-employees where those statuses exist), rather than as independent contractors. **We believe that Drivers are independent contractors because, among other things, they can choose whether, when, and where to provide services on our platform, are free to provide services on our competitors' platforms, and provide a vehicle to perform services on our platform. Nevertheless, we may not be successful in defending the independent contractor status of Drivers in some or all jurisdictions. Furthermore, the costs associated with defending, settling, or resolving pending and future lawsuits (including demands for arbitration) relating to the independent contractor status of Drivers could be material to our business.**
>
> *                    *                    *
>
> **Changes to foreign, state, and local laws governing the definition or classification of independent contractors, or judicial decisions regarding independent contractor classification, could require classification of Drivers as employees (or workers or quasi-employees where those statuses exist). Examples of recent judicial decisions relating to independent contractor classification include the California Supreme Court's recent decision in** Dynamex Operations West, Inc. v. Superior Court, **which established a new standard for determining employee or independent contractor status in the context of California wage orders**, the Aslam, Farrar, Hoy and Mithu v. Uber BV, et al. ruling by the Employment Appeal Tribunal in the United Kingdom that found that Drivers are workers (rather than self-employed), and a decision by the French Supreme Court that a driver for a third-party meal delivery service was under a "subordinate relationship" of the service, indicating an employment relationship. In Razak v. Uber Technologies, Inc., the Third Circuit Court of Appeals is reviewing misclassification claims by UberBLACK Drivers in Philadelphia following a summary judgment order in our favor at the district court level, and we expect a decision in the near term. **If, as a result of legislation or judicial decisions, we are required to classify Drivers as employees (or as workers or quasi-employees where those statuses exist), we would incur significant additional expenses for compensating Drivers, potentially including expenses associated with the application of wage and hour laws (including minimum wage, overtime, and meal and rest period requirements), employee benefits, social**

***security contributions, taxes, and penalties. Further, any such reclassification would require us to fundamentally change our business model, and consequently have an adverse effect on our business and financial condition.***

197.     The statements referenced above in ¶¶191-196 were each inaccurate statements of material fact when made because while noting only the potential negative impacts on Uber's business, financial condition, and results of operations, the Offering Documents failed to disclose and misrepresented the following significant, then-existing material events and adverse trends or uncertainties that Uber had already been facing at the time of the IPO, including:

(a)     Uber was not on a "new path" since 2017 nor was it a "new day at Uber." Prior to the IPO, Uber developed and implemented a "playbook" for launching ridesharing in new cities and countries, which included launching in markets throughout the United States and abroad (including Tanzania, India, Latin America, Singapore, and China) where it was not legal to operate peer-to-peer ridesharing. Such illegal operations existed at the time of the IPO. Uber expected and required employees to have a willingness to evade rules and laws when necessary, as the Company believed that concepts like "breaking the law" were not applicable to the Company because relevant and applicable laws were "bullshit in the first place[;]"

(b)     Uber was not waiting on the sidelines for their operation to become legal in localities; rather they launched regardless of illegality and in contradiction of their stated growth strategy;

(c)     Rather than "doing the right thing" and building, strengthening, and enhancing relationships with cities and regulators, Uber bribed local officials in various markets, including Indonesia and Tallahassee, Florida, to secure authorities' acquiescence to the Company's illegal operations and favorable provisions in local ordinances that regulate the transportation industry that the Company operates in. Uber's employees considered bribery of local officials in international jurisdictions to be a necessary evil and a cost of doing business for an American company operating on foreign soil;

(d)     Uber did not comply with the rules, regulations, and laws that the Offering Documents identified as applying to or limiting its operations;

1            (e)      Uber obstructed investigations into the Company's operations in various

2    markets, including Colombia, by, among other things, adopting and implementing policies that

3    urged employees to deny regulators' access to information and Company computers, thereby

4    exposing the Company to hundreds of thousands of dollars' worth of fines;

5            (f)      Drivers were operating without commercial licenses and without

6    commercial vehicle registrations in markets where doing so was illegal or a crime;

7            (g)      Uber was not paying fines and tickets for Drivers as a gesture of

8    "goodwill." Rather, Uber paid millions of dollars to reimburse fines and tickets for Drivers that

9    were caught by police operating without proper commercial licenses or commercial vehicle

10   registrations, because Uber had them operating illegally and needed them to continue doing so.

11   Uber considered the reimbursement of Drivers' fines and tickets to be a "cost of doing business"

12   and entered such reimbursements under "miscellaneous expenses" on its balance sheet. Uber

13   transmitted messages to its Drivers via emails, text messages, and other means reminding

14   Drivers that Uber would reimburse costs associated with violating the law and providing Drivers

15   with a list of tactics to evade police;

16           (h)      Uber failed to comply with local regulations in various markets, including

17   London, England, governing background checks on Drivers, vehicle insurance, and passenger

18   safety; and

19           (i)      Rather than making short-term sacrifices for a lifetime of loyalty, Uber

20   misclassified its Drivers as independent contractors rather than as employees in various markets,

21   including New Jersey and California, in order to, among other things, avoid applicable minimum

22   wage and benefit laws as well as unemployment and disability insurance taxes, thereby exposing

23   the Company to hundreds of millions of dollars' worth of assessments.

24           **(b)**      **Materially Misleading Passenger Safety Risk Factors**

25       198.    The Offering Documents inaccurately described as ***potential***, certain risks

26   associated with dissatisfaction with Uber, negative publicity, safety incidents, and the

27   Company's culture, which "***could***" have an adverse effect on Uber's ability attact and retain

28   platform users or cause the business to "suffer," rather than disclosing the actual events and

trends or uncertainties that had already manifested. The Offering Documents stated, in pertinent

part, as follows:

> Our number of **platform users may decline materially or fluctuate as a result of many factors, including**, among other things, **dissatisfaction with the operation of our platform**, the price of fares, meals, and shipments (including a reduction in incentives), **dissatisfaction with the quality of service provided by the Drivers** and restaurants on our platform, **quality of platform user support**, dissatisfaction with the restaurant selection on Uber Eats, **negative publicity related to our brand, including as a result of safety incidents and corporate reporting related to safety**, perceived political or geopolitical affiliations, treatment of Drivers, perception of a toxic work culture, **perception that our culture has not fundamentally changed**, or dissatisfaction with our products and offerings in general.... In addition, **if we are unable to provide high-quality support to platform users or respond to reported incidents, including safety incidents, in a timely and acceptable manner, our ability to attract and retain platform users could be adversely affected**. If Drivers, consumers, restaurants, shippers, and carriers do not establish or maintain active accounts with us, if a campaign similar to #DeleteUber occurs, **if we fail to provide high-quality support**, or if we cannot otherwise attract and retain a large number of Drivers, consumers, restaurants, shippers, and carriers**, our revenue would decline, and our business would suffer**.

199.    The Offering Documents inaccurately described as **potential**, certain risk

associated with Uber's background-check requirements and legislators and regulators passing

laws or adopting regulations, which "**may**" have an adverse effect on its business, costs, and

growth, rather than disclosing the actual events and trends or uncertainties that had already

manifested. The Offering Documents stated, in pertinent part, as follows:

> **[C]hanges in Driver qualification and background-check requirements may increase our costs and reduce our ability to onboard additional Drivers to our platform. Our Driver qualification and background check process varies by jurisdiction, and there have been allegations, including from regulators, legislators, prosecutors, taxicab owners, and consumers, that our background check process is insufficient or inadequate**…. Legislators and regulators **may pass laws or adopt regulations in the future requiring Drivers to undergo a materially different type of qualification, screening, or background check process**, or that limit our ability to access information used in the background check process in an efficient manner, **which could be costly and time-consuming. Required changes in the qualification, screening, and background check process … could also reduce the number of Drivers in those markets or extend the time required to recruit new Drivers to our platform, which would adversely impact our business and growth.**

200.    The Offering Documents inaccurately described as **_potential_**, certain risks associated with Uber maintaining and enhancing its brand and reputation as well as sexual assaults and other safety incidents, which "**_may_**" have adverse impacts on Uber's business, brand, financial condition, operating results, and prospects, rather than disclosing the actual events and trends or uncertainties that had already manifested. The Offering Documents stated, in pertinent part, as follows:

> **_Maintaining and enhancing our brand and reputation is critical to our business prospects. We have previously received significant media coverage and negative publicity, particularly in 2017, regarding our brand and reputation, and failure to rehabilitate our brand and reputation will cause our business to suffer_**.

> We have previously received a high degree of negative media coverage around the world, which has adversely affected our brand and reputation and fueled distrust of our company. In 2017, the #DeleteUber campaign prompted hundreds of thousands of consumers to stop using our platform within days. Subsequently, our reputation was further harmed when an employee published a blog post alleging, among other things, that we had a toxic culture and that certain sexual harassment and discriminatory practices occurred in our workplace. Shortly thereafter, we had a number of highly publicized events and allegations, including investigations related to a software tool allegedly designed to evade and deceive authorities, a high-profile lawsuit filed against us by Waymo, and our disclosure of a data security breach. These events and the public response to such events, as well as other negative publicity we have faced in recent years, have adversely affected our brand and reputation, which makes it difficult for us to attract and retain platform users, reduces confidence in and use of our products and offerings, invites legislative and regulatory scrutiny, and results in litigation and governmental investigations. Concurrently with and after these events, our competitors raised additional capital, increased their investments in certain markets, and improved their category positions and market shares, and may continue to do so.

> **_In 2019, we plan to release a transparency report, which will provide the public with data related to reports of sexual assaults and other safety incidents claimed to have occurred on our platform in the United States. The public responses to this transparency report or similar public reporting of safety incidents claimed to have occurred on our platform, which may include disclosure of reports provided to regulators, may result in negative media coverage and increased regulatory scrutiny and could adversely affect our reputation with platform users. Further unfavorable media coverage and negative publicity could adversely impact our financial results and future prospects_**.

> *       *       *

*Our brand and reputation might also be harmed by events outside of our control.... [I]f Drivers, restaurants, or carriers provide diminished quality of service, are involved in incidents regarding safety or privacy, engage in malfeasance, or otherwise violate the law, we may receive unfavorable press coverage and our reputation and business may be harmed. As a result, any of these third parties could take actions that result in harm to our brand, reputation, and consequently our business.*

While we have taken significant steps to rehabilitate our brand and reputation, the successful rehabilitation of our brand will depend largely on maintaining a good reputation, minimizing the number of safety incidents, improving our culture and workplace practices, improving our compliance programs, maintaining a high quality of service and ethical behavior, and continuing our marketing and public relations efforts. *Our brand promotion, reputation building, and media strategies have involved significant costs and may not be successful.* We anticipate that other competitors and potential competitors will expand their offerings, which will make maintaining and enhancing our reputation and brand increasingly more difficult and expensive. *If we fail to successfully rehabilitate our brand in the current or future competitive environment or if events similar to those that occurred in 2017 occur in the future, our brand and reputation would be further damaged and our business may suffer.*

201.    The Offering Documents inaccurately described as *potential*, certain risks associated with Uber's ability to provide a safe environment to customers, background checks on Drivers, Driver criminal activity, misconduct, and inappropriate conduct, and sexual assaults, which "*may*" have an adverse impact on Uber's reputation, business, financial condition, and operating results, rather than disclosing the actual events and trends or uncertainties that had already manifested. The Offering Documents stated, in pertinent part, that:

*If platform users engage in, or are subject to, criminal, violent, inappropriate, or dangerous activity that results in major safety incidents, our ability to attract and retain Drivers, consumers, restaurants, shippers, and carriers may be harmed, which could have an adverse impact on our reputation, business, financial condition, and operating results.*

*We are not able to control or predict the actions of platform users and third parties, either during their use of our platform or otherwise, and we may be unable to protect or provide a safe environment for Drivers and consumers as a result of certain actions by Drivers, consumers, restaurants, carriers, and third parties. Such actions may result in injuries, property damage, or loss of life for consumers and third parties, or business interruption, brand and reputational damage, or significant liabilities for us. Although we administer certain qualification processes for users of the platform, including background checks on Drivers through third-party service providers, these*

1  *qualification processes and background checks may not expose
   all potentially relevant information and are limited in certain*
2  *jurisdictions according to national and local laws, and our third-
   party service providers may fail to conduct such background*
3  *checks adequately or disclose information that could be relevant
   to a determination of eligibility.* Further, the qualification and
4  background check standards for Uber Eats Drivers are generally
   less extensive than those conducted for Ridesharing Drivers. In
5  addition, we do not independently test Drivers' driving skills.
   Consequently, we expect to continue to receive complaints from
6  riders and other consumers, as well as actual or threatened legal
   action against us related to Driver conduct. We have also faced
7  civil litigation alleging, among other things, inadequate Driver
   qualification processes and background checks, and general
8  misrepresentations regarding the safety of our platform.

9  *If Drivers or carriers, or individuals impersonating Drivers or
   carriers, engage in criminal activity, misconduct, or*
10 *inappropriate conduct or use our platform as a conduit for
   criminal activity, consumers and shippers may not consider our*
11 *products and offerings safe, and we may receive negative press
   coverage as a result of our business relationship with such*
12 *Driver or carrier, which would adversely impact our brand,
   reputation, and business.* There have been numerous incidents and
13 allegations worldwide of Drivers, or individuals impersonating
   Drivers, sexually assaulting, abusing, and kidnapping consumers,
14 or otherwise engaging in criminal activity while using our
   platform. For example, in December 2014, a Driver in New Delhi,
15 India kidnapped and raped a female consumer, and was convicted
   in October 2015. Furthermore, if consumers engage in criminal
16 activity or misconduct while using our platform, Drivers and
   restaurants may be unwilling to continue using our platform. In
17 addition, certain regions where we operate have high rates of
   violent crime, which has impacted Drivers and consumers in those
18 regions. For example, in Latin America, there have been numerous
   and increasing reports of Drivers and consumers being victimized
19 by violent crime, such as armed robbery, violent assault, and rape,
   while taking or providing a trip on our platform. *If other criminal,*
20 *inappropriate, or other negative incidents occur due to the
   conduct of platform users or third parties, our ability to attract*
21 *platform users may be harmed, and our business and financial
   results could be adversely affected.*
22
23 *Public reporting or disclosure of reported safety information,
   including information about safety incidents reportedly*
24 *occurring on or related to our platform, whether generated by us
   or third parties such as media or regulators, may adversely*
25 *impact our business and financial results.*

26     202.    The statements referenced above in ¶¶198-201 were each inaccurate statements of

27 material fact when made because while noting only the potential negative impacts on Uber's

28 business, financial condition, and results of operations, the Offering Documents failed to disclose

---

1   and misrepresented the following significant, then-existing material events and adverse trends or

2   uncertainties that Uber had already been facing at the time of the IPO, including:

3        (a)      Rather than delivering safety and trust or making short-term sacrifices for

4   a lifetime of loyalty, Uber hired, trained, and staffed a team of investigators dedicated to the

5   Company's Special Investigations Unit, or SIU, who were coached by the Company to act in the

6   Company's interest first, ahead of passenger safety;

7        (b)      Uber was not "rapidly responding" to safety incidents. Rather Uber's SIU

8   maintained a "three-strikes" system to determine whether Uber Drivers or passengers reported

9   for misconduct, violence, and other violations (*e.g.*, sexual misconduct and sexual assault)

10  should be deactivated from Uber's app, but Company executives can and did make exceptions to

11  this three-strikes system in order to, for example, keep high earning Uber Drivers on the road

12  collecting fares;

13       (c)      Approximately one-third of cases handled by Uber's SIU investigators

14  dealt with sexual misconduct, including rape or unwanted flirtation or advances, yet Uber's SIU

15  investigators were forbidden from routing allegations to police or advising victims to seek legal

16  counsel or make their own police reports, even when SIU investigators received confessions of

17  felonies. Investigators could be reprimanded or fired for contacting the police or advising victims

18  to do so;

19       (d)      Uber did not require SIU investigators to have any prior experience

20  conducting investigations or handling safety calls or insurance claims;

21       (e)      Uber sought to settle lawsuits related to sexual assaults and other criminal

22  activity (during rides hailed on the Uber Rides app) quickly in order to avoid the scrutiny and

23  negative publicity that may result from open court;

24       (f)      Uber breached Transport for London ("TfL" or "London TfL," London,

25  England's transportation authority) regulations by failing to address issues with checks on

26  Drivers, insurance, and safety, and a security lapse resulted in at least 14,000 trips involving 43

27  Uber Drivers where someone other than the booked Driver picked up passengers;

28

(g)     Uber's breaches of London TfL regulations resulted in Uber's customers taking trips with dismissed or suspended Drivers whose licenses had been revoked and at least one Driver whose private hire license had been revoked after he was cautioned for distributing indecent images of children;

(h)     Prior to the Offering, Uber received reports of 97 fatal crashes, 19 fatal physical assaults, and 5,981 sexual assaults—including non-consensual sexual penetration—in the United States that occurred during 2017 and 2018;

(i)     Prior to the Offering, Uber received reports of 2,936 and 3,045 sexual assaults in 2017 and 2018, respectively, or an average of eight sexual assaults per day. 75% of reporting parties for non-consensual kissing of a sexual body part were passengers, and 72% of reporting parties for non-consensual sexual penetration were passengers, throughout both 2017 and 2018; and

(j)     Uber charged its customers a purported "Safe Rides Fee" that—contrary to what the Company told its customers—was neither earmarked specifically for safety nor dedicated to industry-leading background checks, regulator motor vehicle checks, Driver safety education, development of safety features in Uber's app, or insurance, but rather was devised primarily to add about $1 of pure margin to each trip.

### (c)     Materially Misleading Financial Condition Risk Factors

203.    The Offering Documents contained the following materially false and misleading statements concerning Uber's financial condition under the section purporting to list the Company's Risk Factors.

204.    The Offering Documents inaccurately described as *potential* certain risks associated with Uber's efforts "increase the number of Drivers [and] consumers … using our platform through incentives, discounts, and promotions," as well as "expand marketing channels and operations," which "*may* prove more expensive than we anticipate" and "*may* not succeed in increasing our revenue sufficiently to offset these expenses," rather than disclosing the actual events and trends or uncertainties that had already manifested by the time of the Offering. The Offering Documents stated, in pertinent part, as follows:

We have incurred significant losses since inception. We incurred operating losses of $4.0 billion and $3.0 billion in the years ended December 31, 2017 and 2018, and as of December 31, 2018, we had an accumulated deficit of $7.9 billion. We will need to generate and sustain increased revenue levels and decrease proportionate expenses in future periods to achieve profitability in many of our largest markets, including in the United States, and even if we do, we may not be able to maintain or increase profitability. ***We anticipate that we will continue to incur losses in the near term as a result of expected substantial increases in our operating expenses, as we continue to invest in order to: increase the number of Drivers, consumers,*** restaurants, shippers, and carriers ***using our platform through incentives, discounts, and promotions***; expand within existing or into new markets; increase our research and development expenses; invest in ATG and Other Technology Programs; ***expand marketing channels and operations***; hire additional employees; and add new products and offerings to our platform. ***These efforts may prove more expensive than we anticipate, and we may not succeed in increasing our revenue sufficiently to offset these expenses.***

205.    The Offering Documents inaccurately described as ***potential***, certain risks associated with the Company's operating result fluctuations, which "***may***" have adverse impacts on Uber's business, financial condition, and operating results, rather than disclosing the actual events and trends or uncertainties that had already manifested. The Offering Documents stated, in pertinent part, that:

> ***We may experience significant fluctuations in our operating results. If we are unable to achieve or sustain profitability, our prospects would be adversely affected and investors may lose some or all of the value of their investment.***
>
> Our operating results may vary significantly and are not necessarily an indication of future performance…. In addition to seasonality, ***our operating results may fluctuate as a result of factors including our ability to attract and retain new platform users, increased competition in the markets in which we operate, our ability to expand our operations in new and existing markets, our ability to maintain an adequate growth rate and effectively manage that growth***, our ability to keep pace with technological changes in the industries in which we operate***, changes in governmental or other regulations affecting our business, harm to our brand or reputation, and other risks described elsewhere in this prospectus***. As such, we may not accurately forecast our operating results. We base our expense levels and investment plans on estimates. A significant portion of our expenses and investments are fixed, and ***we may not be able to adjust our spending quickly enough if our revenue is less than expected, resulting in losses that exceed our expectations***. If we are unable to achieve sustained profits, our prospects would be adversely affected and investors may lose some or all of the value of their investment.

206.    The Offering Documents inaccurately described as *potential*, certain risk associated with Uber' growth strategy, which "*may*" have an adverse effect on its financial results and future prospects, rather than disclosing the actual events and trends or uncertainties that had already manifested. The Offering Documents stated, in pertinent part, as follows:

> We believe that *our growth depends on a number of factors, including our ability to*:
>
> - grow supply and demand on our platform;
>
> - increase existing platform users' activity on our platform;
>
> - continue to introduce our platform to new markets;
>
> - *provide high-quality support to Drivers, consumers, restaurants, shippers, and carriers*;
>
> - expand our business and increase our market share and category position;
>
> - *compete with the products and offerings of, and pricing and incentives offered by, our competitors*;
>
> - develop new products, offerings, and technologies;
>
> - identify and acquire or invest in businesses, products, offerings, or technologies that we believe could complement or expand our platform (including, for example, our pending acquisition of Careem);
>
> - penetrate suburban and rural areas and increase the number of rides taken on our platform outside metropolitan areas;
>
> - reduce the costs of our Personal Mobility offering to better compete with personal vehicle ownership and usage and other low-cost alternatives like public transportation, which in many cases can be faster or cheaper than any other form of transportation;
>
> - *maintain existing local regulations in key markets where we operate*;
>
> - enter or expand operations in some of the key countries in which we are currently *limited by local regulations, such as Argentina, Germany, Italy, Japan, South Korea, and Spain*; and
>
> - *increase positive perception of our brand*.
>
> *We may not successfully accomplish any of these objectives. A softening of Driver, consumer, restaurant, shipper, or carrier demand, whether caused by changes in the preferences of such parties, failure to maintain our brand, changes in the U.S. or*

1

***global economies, licensing fees in various jurisdictions,
competition, or other factors, may result in decreased revenue or
growth and our financial results and future prospects would be
adversely impacted.*** We expect to continue to incur significant
expenses, and if we cannot increase our revenue at a faster rate
than the increase in our expenses, we will not achieve profitability.

207.    The statements referenced above in ¶¶203-206 were each inaccurate statements of

material fact when made because while noting only the potential negative impacts on Uber's

business, financial condition, and results of operations, the Offering Documents failed to disclose

and misrepresented the following significant, then-existing material events and adverse trends or

uncertainties that Uber had already been facing at the time of the IPO, including:

(a)     At the time of the Offering, Uber's growth strategy was failing and, as a

result, the Company was in the process of dissolving its COO and CMO positions and planning

to terminate one-third of its marketing team, or about 400 employees;

(b)     At the time of the Offering, Uber planned to terminate approximately 350

employees across the Company's Uber Eats, performance marketing, Advanced Technologies

Group, recruiting, and global rides and platform departments;

(c)     Prior to the Offering, Uber ramped up incentives spending with few limits

and little discretion, including by giving city managers the latitude to spend millions of dollars in

Driver and rider incentives based on little more than a hunch and data from their personal

spreadsheets;

(d)     At the time of the Offering, Uber was in the processing of sustaining more

than a $5 billion loss and the slowest quarterly revenue growth, and slowed Uber Rides quarterly

revenue growth, in the Company's history during Q2 2019;

(e)     At the time of the Offering, Uber was in the process of sustaining the

slowest quarterly Trips and MAPCs growth in the Company's history during Q2 2019; and

(f)     At the time of the Offering, Uber was in the process of incurring total

costs and expenses that had doubled or even tripled, depending on whether cost of revenue and

depreciation and amortization ("D&A") are factored in, during Q2 2019.

**5.** **The Offering Documents Failed to Disclose Adverse Trends, Passenger Safety Uncertainties, and Significant Risks Regarding Uber's Business Model**

208.      Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), required the Defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations." Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105, requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the most significant factors that make the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk." The failure of the Offering Documents to disclose the omitted material facts set forth above in ¶¶157-170, 172-179, 181-188, 191-196, 198-201, and 203-206—including the fact that Uber had been and was continuing to operate illegally in many jurisdictions; as Uber grew but failed to address safety issues, the number of safety incidents affecting its passengers grew; and Uber's ongoing losses were increasing greatly and growth was slowing driven by massive incentive spending and would slow more as the Company executed on its planned cost-cutting measures—violated Item 303, because these undisclosed facts were known and would (and did) have an unfavorable impact on the Company's sales, revenues, and income from continuing operations. This also violated Item 105, because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in Uber's stock speculative or risky. Indeed, as alleged above in ¶¶191-196, 198-201, and 203-206, the purported Risk Factors that were provided in the Offering Documents were themselves materially false and misleading when made.

**D.** **Additional Facts Demonstrating That the Offering Documents Were False and Misleading at the Time of the Offering**

209.      Unbeknownst to investors, Uber premised its growth on an undisclosed, unsustainable, and often illegal growth at any cost business model. Prior to the Offering, the Company's growth at any cost business model principally manifest in three distinct ways, including an illegal business model, rampant passenger safety issues, and massive losses and

slowing growth. In the months following Uber's IPO, news concerning these adverse facts and

conditions that existed prior to and at the time of the Offering leaked out to the market.

### 1. Post-IPO Events Demonstrating That Uber's Illegal Business Model and the Risks It Posed Existed Prior to the Offering

210. First, Uber maintained an undisclosed and illegal business model that included:

(a) illegally launching and continuing to operate P2P ridesharing services in markets where

neither Uber nor its Drivers were licensed to offer for-hire transportation services via private,

non-commercially registered vehicles; and (b) illegally misclassifying its Drivers as independent

contractors rather than as employees in order to, among other things, avoid applicable minimum

wage and benefit laws as well as unemployment and disability insurance taxes.

### (a) Uber's Domestic and International Illegal Operations

211. Prior to and at the time of the Offering, Uber pursued its illegal business model

both domestically and internationally, illegally launching and operating its P2P ridesharing

services using private, non-commercially registered vehicles, and irrespective of whether the

Company or its Drivers were licensed, registered, or lawfully permitted to operate there.

212. On August 2, 2019, for example, *Law360* published an article titled "Uber

Flouted Regs to 'Destroy' Mass. Taxis, Judge Hears." The article described the conclusion of a

seven-day bench trial in *Anoush Cab, Inc. v. Uber Techs., Inc.*, No. 16-cv-10142 (D. Mass.), a

suit that alleged Uber owed dozens of taxi companies "$124 million in damages for operating in

Boston for three years in violation of city laws." Plaintiffs' counsel showed Judge Nathaniel M.

Gorton of the U.S. District Court for the District of Massachusetts ("Judge Gorton") complaints

that "Uber received from drivers who got tickets from the Boston Police Department and, in at

least one case, said they were threatened with arrest for ***operating the company's UberX product***

***in defiance of a city ordinance***." Judge Gorton also heard how "Uber 'lied' to the drivers by

telling them they could keep working in Boston and ultimately covered $200,000 in driver

tickets 'to induce them to keep violating the law.'" Pointing to "***internal emails in which Uber***

***executives indicated they knew they were breaking the law***[,]" counsel for plaintiffs described

how "Uber knew it was violating local laws when it entered the market in 2013, but continued to

do so until Massachusetts passed a 2016 law regulating transportation network companies."

Plaintiffs' counsel summed up Uber's brazen and illegal strategy as follows: "'*We'll launch, we'll break the law and we'll see if we can get away with it*.'"

213.    The trial transcripts from *Anoush Cab*, filed July 29, 2019 (days one through three) and August 16, 2019 (days four through seven), recount a slew of internal emails from Uber executives that establish Uber knew it was breaking the law by launching and continuing to operate UberX P2P ridesharing in Boston, Massachusetts. The August 2, 2019 transcript (the "Day Seven Transcript," filed August 16, 2019) is particularly instructive. As early as March 15, 2013, Michael Pao ("Pao"), then-General Manager of Uber Boston, states, "'In Boston, the *regulation clearly outlines that for-hire private vehicles cannot do pick up, and Police may arrest and fine violators*.'" When Meghan Joyce ("Joyce") replaces Pao as General Manager of Uber Boston in late May 2013, Joyce emails and inquires about the "analysis of the Massachusetts regulations," asking to see a copy. Nick Mathews, then-Boston Community Manager, replies, "'Sure. Let me find the PowerPoint. There was *one law in particular that defines for-hire ride providers and pretty clearly states its illegality*.'" Another internal email describes Uber's executives' interpretation of the Boston ordinance regulating ride-sharing: "'The legality of ride-sharing rests in the legal definition of "private vehicle" and "for hire." And in order to make ride-sharing legal, the pick-up cannot be considered for hire.'" In a separate email chain, Matt Marra ("Marra"), then-Operations and Logistics Manager for Uber Boston, poses the critical question: "'Is P2P legal in the State of Massachusetts?'" The answer Marra receives directs him to the same Boston ordinance, which the Uber team had "*already concluded answers the question, No, it's not legal*."

214.    Shortly before the launch, Pao states in another email, "'*This will be the first time that Uber launches P2P ride-sharing in a market where we do not have formal or tacit approval from regulators*.'"

215.    Shortly after the Company launches UberX P2P ridesharing in Boston, the Day Seven Transcript describes how police began issuing UberX Drivers "hundreds and hundreds of tickets ... for violating the Boston ordinance and ... the State regulation[,]" and Uber paid

"$200,000 worth of tickets that their drivers had received for violating the Boston ordinance and the regulations." As plaintiffs' counsel neatly sums up, "Uber paid drivers' citations to induce them to keep violating the law." Internal emails show UberX Drivers were alarmed by the growing number of tickets. In one email to the Company, an UberX Driver queries:

> "Is it illegal to drive UberX in Boston? I just got a $500 ticket for doing my job. I dropped off a rider at Boston South Station and got pulled over by an undercover State Police Officer, and he wrote me a ticket for being a 'passenger vehicle for hire.' *I am completely outraged that Uber would allow people to work in a city where it's illegal*. Now I don't know what to do."

In another email to the Company, an UberX Driver states:

> "Hello. Yesterday I was pulled over by a Boston PD unmarked car in front of the station on Sudbury and written a citation for $500. The *Officer informed me that UberX is illegal in the City of Boston and that I could be arrested*. As a new driver to UberX, I've never heard of this, and I'm very upset. Is there something I should know regarding the legalities of my involvement with this company?"

216.    As the Day Seven Transcript further recounts, the Company lied to its own Drivers about the legality of operating UberX in Boston. When asked during a FED. R. CIV. P. 30(b)(6) deposition whether Uber ever told Drivers that UberX was a legal service, a Company executive described as "Mr. Holt" states, "'Yes, we did. In conversations with drivers, we reassured them ... that Uber's operation in the State of Massachusetts was legal.'" This answer flies in the face of contemporaneous internal emails and documents, which establish that Uber knowingly broke the law by launching and continuing to operate UberX in Boston. As late as June 2015, the Company expresses its real view on operating UberX in Boston in a document distributed internally: "'Currently ... *anyone other than a licensed taxicab is prohibited from offering vehicle-for-hire services* for the purposes of transporting, soliciting or picking up a passenger for hire.'"

217.    On August 6, 2019, the *Tallahassee Democract* published an article titled "CORRUPTION CONFIRMED: Scott Maddox, Paige Carter-Smith guilty after 4-year Tallahassee probe." The article describes how, following a four year federal criminal investigation, former Tallahassee mayor and City Commissioner Scott Maddox ("Maddox") and

his business associate Paige Carter-Smith ("Carter-Smith"), former head of the Downtown

Improvement Authority, pled guilty to three counts in a 48-count indictment, including "honest

services wire fraud, honest services mail fraud and conspiracy to defraud the United States." As

the article describes, "Maddox and Carter-Smith's guilty pleas involve their dealings with ride

share giant Uber, which sought favorable provisions in a city ordinance.... ***Uber paid $40,000 to***

***[Maddox and Carter-Smith's] consulting firm, Governance, over several months in 2015;***

***Governance in turn paid Maddox $40,000***." In a DOJ press release issued that same day

announcing the guilty pleas ("Suspended City Commissioner Maddox & Associate Carter-Smith

Plead Guilty to Corruption & Tax Charges"), the DOJ explained, "***Governance was part of a***

***racketeering enterprise that accepted bribes and extorted money from Governance clients***

under color of Maddox's office through fear of the economic harm Maddox could inflict through

his influential position as a City Commissioner."

218.    On August 12, 2019, both *Reuters* and *The Associated Press* reported that the

Colombian SIC would fine Uber more than $629,000 for obstructing an investigation into the

Company's operations in Colombia. According to the reports, the fines stemmed from charges

that Uber obstructed an October 2017 regulatory site visit to Uber's Colombian office in Bogota;

Uber adopted and implemented a policy urging "employees not to give information to regulators

and to block access to company computers." In a statement, one Colombian SIC regulator

explained, "'The Company presented a disrespectful and obstructive attitude in the face of

different information requirements on the part of officials.'" The report also described how Uber

had "***repeatedly drawn the ire of authorities in Colombia, where use of the service is***

***widespread but illegal***. The country ... has said it will suspend for 25 years the licenses of drivers

caught working for the platform." The Colombian SIC also fined three Uber executives

separately, in amounts ranging from $1,469 to $7,344.

219.    On September 3, 2019, Mike Isaac ("Isaac"), a technology reporter at *The New*

*York Times*, published his book "Super Pumped: The Battle for Uber" ("Super Pumped"). Isaac's

book, which is "[b]ased on hundreds of interviews with current and former Uber employees,

along with previously unpublished documents," further establishes how Uber's business was built on breaking the law in furtherance of the Company's growth at any cost business model.

220.    According to Super Pumped, for example, Uber grew by "systematically moving from city to city, sending a strike team of employees to recruit hundreds of drivers, blitz smartphone users with coupons for free rides, and create a marketplace where drivers were picking up passengers faster than the **blindsided local authorities** could possibly track or control." Indeed, "[w]henever [Uber] entered a new city, the [C]ompany used the same, reliable approach.... Uber only expected that new filed operations staff have ambition, the capacity to work twelve- to fourteen-hour days, and a willingness to evade the rules—even laws—when necessary." At Uber "*[c]oncepts like 'breaking the law' weren't applicable*" because the Company believed "the **laws were bullshit in the first place**."

221.    Super Pumped recounts how this was the case in foreign countries, as well as domestic cities such as Portland, Philadelphia, and even Uber's hometown—San Francisco.

222.    Indeed, just as Uber launched in San Francisco, Super Pumped describes how the San Francisco Municipal Transportation Agency served Uber with a cease and desist order because "the [C]ompany was breaking the law by skirting existing transportation regulations." According to the book, "[e]very day [Uber] was in operation, the [C]ompany faced fines of up to **$5,000 per trip**." When Defendant Graves asked "What are we supposed to do here?" Defendant Kalanick's response would essentially become Uber's playbook going forward: "**We ignore it**."

223.    Super Pumped also explains how, in Philadelphia, Uber pushed headlong into the market illegally and was fined $12 million for its 120,000 violations of the transit code, but Defendant Kalanick "**viewed fines and tickets as just another cost of doing business**." Uber sent text messages like the following to its Drivers:

> **UBERX: REMINDER:** If you are ticketed by the PPA, CALL US at XXX-XXX-XXXX. You have 100% of our support anytime you are on the road using Uber—we are here for you, and we will get you home safe. All costs associated will be covered by us. Thank you for committing to providing safe, reliable rides to the citizens of Philadelphia. Uber-ON!

224.    Super Pumped would also send emails to Drivers with "a ***list of tactics to evade police capture***[,]" including:

> —Keep your Uber phone off your windshield—put it down in your cupholder [sic]
> —Ask the rider if they would sit up front
> —Use the lanes farthest from the terminal curbside for pickup and dropoff [sic]
> Remember, if you receive a ticket while picking up or dropping off Uber riders at the airport, Uber will reimburse your costs for the ticket and provide any necessary legal support. Take a picture of your ticket and send it to XXXXXXXXXX@uber.com.

225.    Super Pumped also informed readers that Uber was, "as of this writing," under investigation by the DOJ for "potential violation of the Foreign Corrupt Practices Act." Why? Uber's employees "***considered bribery a necessary evil, a cost of doing business for an American company operating on foreign soil***."

226.    In fact, Super Pumped provided "never-before-reported details" of one case in Indonesia that became an "enormous" problem:

> As Uber set up shop to compete with Grab in Indonesia [another ride-hailing company], Uber would open "green light hubs," which were makeshift checkpoints for drivers in the area to receive vehicle inspections, register complaints with district managers, and other activities. The problem was that the hubs were set up in suburban districts zoned for residential use only. Almost overnight, the green light hubs began attracting hundreds of drivers, which clogged the suburban streets and angered the locals. When the police found out, they threatened to shut Uber's hubs down.
>
> Instead of moving the company's hubs, ***local Uber mangers decided to pay off the cops. Every time a police officer would show up, and Uber manager would fork over a cash bribe ... and the officer would leave***.

227.    Uber's flouting and breaking laws and regulations continued to have serious global consequences over the next few months. On September 24, 2019, for example, the London TfL announced it would only grant Uber a temporary, "'two-month private hire operator license to allow for scrutiny of additional information that we are requesting ahead of consideration of any potential further licensing application.'" As the *BBC* reported in an article titled "Uber's London license renewed for two months," Uber had previously "lost its license in 2017 due to public safety concerns, after which a judge granted a 15-month extension which was

1    due to expire on [September 24]." TfL said Uber's license would "now be renewed temporarily

2    while [TfL] requested additional information from the firm[,]" and that "Uber must also meet

3    new conditions on passenger safety."

4         228.    On November 25, 2019, the TfL announced it had decided not to extend Uber's

5    London license beyond midnight local time. As reported in *The Guardian* in an article published

6    that day, the TfL disclosed in a prepared statement that it had "identified a '***pattern of failures***'

7    by Uber, including several breaches that placed passengers and their safety at risk." Following

8    the two-month extension of its license granted in September, the TfL had informed Uber that it

9    "needed to address issues with checks on drivers, insurance and safety," but Uber failed to do so.

10   Specifically, the TfL disclosed it had discovered that "more than 14,000 trips were taken with

11   drivers who had faked their identity on the firm's app." The TfL also stated, "Despite addressing

12   some of these issues, TfL does not have confidence that similar issues will not reoccur in the

13   future, which has led it to conclude that ***the company is not fit and proper at this time***."

14        229.    On December 20, 2019, a judge at the ***Colombian SIC ordered Uber to cease***

15   ***operations in Colombia***, following a lawsuit filed by taxi service platform Cotech SA ("Cotech")

16   alleging Uber had violated competition norms. After the market closed, *Bloomberg* published an

17   article that same day explaining that the judge had ordered "an '***immediate' service suspension***,"

18   which was the "latest in a series of setbacks for Uber's global operations." In a prepared

19   statement, the Colombian SIC explained, "'[Uber] violates the rules that regulate the market,

20   generates a significant advantage in the market, and generates a deviation from the clientele of

21   Cotech.'" According to the article, Uber "said more than 2 million people use the service [in

22   Colombia], which involves 88,000 drivers." The article separately noted that "[r]egulators in

23   London, one of Uber's largest markets, last month yanked its license to operate after concluding

24   it wasn't 'fit and proper' to continue as it risked passenger safety by failing to properly vet

25   drivers[,]" while a court in Germany "ruled Uber had run afoul of its transit dispatch laws."

26

27

28

**(b)     Uber's Illegal Misclassification of Workers**

230.    Prior to and at the time of the Offering, Uber also illegally misclassified its workers as independent contractors rather than as employees and broke labor and employment laws in many if not most of the jurisdictions in which the Company operates.

231.    On May 17, 2019, for example, *Bloomberg* published an article titled "San Francisco's Uber-Nuisance Probe Gets Go-Ahead From Court," detailing how a May 17, 2019 California appellate court decision paved the way forward for a City of San Francisco probe into how many of Uber's Drivers are "responsible for illegal parking, traffic congestion and safety hazards." The City's probe also sought to determine whether Uber was "underpaying its drivers in *violation of the city's minimum wage laws*." *Bloomberg* noted that Uber's common stock share price had struggled since the Offering "in part under the *weight of questions about the viability of its business model*—specifically whether drivers will be compensated as employees or remain independent contractors as Uber treats them now."

232.    On May 29, 2019, the California State Assembly passed AB5, which would limit the use of independent contractors in most industries. AB5 codifies the California State Supreme Court's 2018 landmark decision in *Dynamex Operations W., Inc. v. Super. Ct.*, No. S222732 (Cal. Apr. 30, 2018), which creates a presumption that all workers are employees (not independent contractors) and places a burden on hiring entities to prove that workers are independent contractors under a newly adopted ABC test (the "ABC Test"). Under the ABC Test, a worker is an independent contractor only if the hiring entity establishes:

> (A) that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of such work and in fact;
>
> (B) that the worker performs work that is outside the usual course of the hiring entity's business; and
>
> (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity.

233.    The California State Assembly passed AB5 by a vote of 53-11, and AB5 would next move to the California Senate and to Governor Gavin Newsom ("Governor Newsom") for

1  signature. Also on May 29, 2019, *The Guardian* published an article titled "Gig economy:

2  California bill granting employee status passes assembly," noting Uber Drivers "could be

3  entitled to protections and benefits if the bill is signed."

4          234.    Two weeks later, on June 12, 2019, Defendant Khosrowshahi and two senior Lyft,

5  Inc. ("Lyft") executives published an Op-Ed (responding to the California State Assembly's

6  passage of AB5) in the *San Francisco Chronicle* titled "Open Forum: Uber, Lyft ready to do our

7  part for drivers." Defendant Khosrowshahi and the two Lyft executives conceded that "a change

8  to the employment classification of ride-share drivers would pose a risk to our businesses" and

9  even threatened the State of California with a "wave of litigation" should AB5 pass into law.

10  Like the Offering Documents, Defendant Khosrowshahi's Op-Ed ignores the fact that AB5

11  merely sought to codify well-settled employee classification law in California, as announced by

12  the California State Supreme Court's 2018 landmark decision in *Dynamex*.

13          235.    The market took notice of the Uber and Lyft executives' Op-Ed, with one news

14  outlet reporting that AB5 posed an "existential threat" to Uber's very existence as a public

15  company. On June 12, 2019, *Bloomberg* published an article titled "Uber, Lyft Executives Urge

16  California Compromise on Driver Pay," which explained:

17          The executives' public appeal follows months of private efforts by
            the ride-share giants and other companies to secure support from
18          California's governor, state lawmakers, and labor leaders for some
            deal to shield them from a sweeping 2018 state supreme court
19          ruling that makes it difficult for firms to claim their workers aren't
            employees.
20
            Whether Uber and Lyft drivers remain independent contractors or
21          must be treated like employees goes to the heart of the on-demand
            economy's reliance on a casual labor force to keep costs down.
22          ***For both companies, which just went public, the prospect of
            being compelled in their home state to completely overhaul how
23          drivers are compensated is an existential threat***.

24          Under the April 2018 ruling known as Dynamex, workers are
            employees entitled to state wage-law protections unless they are
25          conducting "work that it [sic] outside the usual course" of the
            company's business. For companies whose core service is
26          transporting customers via an army of drivers they claim are all
            contractors, that could be a challenging test to pass.
27

28

236.    Two days later on June 14, 2019, *Business Insider UK* published an article titled "Uber and Lyft are trying to make an end-run around unionization," also addressing the Uber and Lyft executives' Op-Ed. In response to the Uber and Lyft executives' concession that AB5 "pose[s] a risk to our businesses," the article stressed that "*[t]his severely understates the case*. Uber and Lyft can't afford significantly higher labor costs, if they want to satisfy investors. More growth means more drivers, and that equation doesn't add up to future profits that would vindicate Uber and Lyft's market caps, now $71 billion and $16 billion[,]" respectively.

237.    On June 20, 2019, Judge Edward M. Chen of the U.S. District Court for the Northern District of California declined to dismiss allegations that Uber's misclassification of workers violates the California Unfair Competition Law ("UCL"), finding that the plaintiff there had "adequately alleged a causal link between Uber's misclassification practices and [plaintiff's] UCL injury." *Diva Limousine, Ltd. v. Uber Techs., Inc.*, No. 18-cv-05546 (N.D. Cal. June 20, 2019). Citing *Dynamex*, Judge Chen noted that "worker misclassification can violate the policy or spirit of antitrust laws because it significantly threatens or harms competition."

238.    In an article published the next day on June 21, 2019, *Bloomberg Law* observed that the *Diva Limousine* ruling was a "significant warning to ride-hailing companies." The article also noted that Uber had "identified *Dynamex* in regulatory filings as a *long-term [(not immediate)] potential risk factor* for its business success."

239.    On July 5, 2019, David Weil ("Weil")—wage and hour administrator at the U.S. Department of Labor ("DOL") under President Barack Obama from 2014-2017 and a prominent social policy academic—published an Op-Ed in the *Los Angeles Times* titled "Call Uber and Lyft drivers what they are: employees." Weil argues that while there are "certainly companies whose workers operate in the gray area between employees and contractors[,] ... Uber and Lyft are not among those close, gray area cases. Their *status as employers is really quite clear*."

240.    On July 15, 2019, the *Los Angeles Times* published an article titled "Uber and Lyft drivers were paid up to $100 to protest a bill that could make them employees," detailing how Uber and other ride-hailing companies "recruited drivers to rally outside the [California] state Capitol ... in advance of a Senate labor hearing" on AB5. The rally sought "changes that

would allow drivers to continue working as independent contractors[,]" and drivers who attended the rally were ***paid up to $100*** by the "I'm Independent Coalition," a group funded in part by Uber. In addition to what the coalition offered, "Uber sent drivers an in-app notification offering them a ***$15 lunch voucher*** and inviting them, their family 'and anyone you know who also has a stake in maintaining driver flexibility' to the rally to talk 'about the issues.'"

241.    The *Los Angeles Times* article noted that companies asking workers to "engage in political activity on their behalf can be fraught," and Ken Jacobs—chairman of the UC Berkeley Center for Labor Research and Education—was quoted stating, "'While it is always good for people to engage in the legislative process, the power relationship inherent in employment raises ***concerns about coercion***.... It is especially worrisome in the context of employer threats over what actions they will take if the AB 5 passes.'"

242.    On July 17, 2019, *InvestorPlace* published an article titled "California AB-5 Vote Is Bad News for Uber and Lyft Stock." The article explains that the "***fact that Uber and Lyft are fighting AB-5 so hard is a clear sign the law would be bad news for business***. California has historically been a leader in progressive movements that ultimately sweep nationwide. In other words, the damage for UBER and LYFT stock may not be contained in California."

243.    On August 29, 2019, *The New York Times* published an article titled "Uber, Lyft and DoorDash Pledge $90 Million to Fight Driver Legislation in California" (among other media outlets that reported the same news). AB5's sponsor, Assemblywoman Lorena Gonzalez ("Gonzalez"), stated she did not "foresee a deal" with Uber or the other two companies: "'Billionaires who say they can't pay minimum wages to their workers say they will spend tens of millions to avoid labor laws.... Just pay your damn workers!'"

244.    On September 11, 2019, the California Senate passed AB5, which was expected to be signed into law by Governor Newsom in short order. On the same day, *CNN Business* published an article titled "Uber claims new California law still won't force it to classify drivers as employees." The article quoted Uber's Chief Legal Officer Tony West ("CLO West") who—in defiance of both *Dynamex* and AB5—stated that "'drivers will not be automatically reclassified as employees, even after January of next year,' when the bill would take effect." The

article also quoted Katie Wells, a fellow at Georgetown University who researches the social and economic effects of on-demand services: "'This is such a ***cut to the heart of their business practice***.... The fact that they are suggesting that there is a solution to be had acknowledges that there is a problem. ***It is a watershed moment***.'"

245.    Market analysts joined the chorus of concern over the implications of AB5 and whether Uber could survive the financial impact of reclassifying its Drivers as employees in California. On September 11, 2019, *Fortune* published an article titled "New Labor Bill Passed by California Senate Would Transform the Gig Economy—And Could Cost Uber $500 Million a Year." The article described reporting from two market analysts, Barclays Plc and Macquarie Capital, who estimate that "[g]iving employee status and benefits to workers in California would cost Uber and Lyft an additional $2,000 to $3,600 per driver annually.... That would be ***as much as $500 million for Uber in the state each year. California often sets the legislative tone for other states to emulate, and the costs could quickly add up if more follow suit***." The article stressed that AB5 would "deal a significant blow to companies that built multi-billion dollar businesses on independent contractors."

246.    Other media outlets echoed the same concerns over AB5's likely impact on Uber. On September 11, 2019, for example, *Bloomberg* published an article titled "Uber Rejects Labeling Drivers as Employees Under California Law." The article emphasized that Uber was "[f]acing the ***most serious threat yet to its business model***" in AB5, which "***threaten[ed] to upend [Uber's] source of cheap labor***." The article also quoted Jason Lohr, a San Francisco, California-based employment attorney, who stated that "Uber is '***whistling past the graveyard***' if it underestimates how much AB 5 would favor drivers."

247.    On September 18, 2019, Governor Newsom signed AB5 into law in California. On the same day, *NPR* published an article titled "California Governor Signs Law Protecting Gig Economy Workers." The article quoted Governor Newsom, who in his signing statement declared, "'The hollowing out of our middle-class has been 40 years in the making, and the need to create lasting economic security for our workforce demands action.'" The article also stated

1   that both "labor groups and the ride-hailing companies, such as Uber, anticipate national

2   implications from the signing of AB5."

3        248.   On October 17, 2019, *Bloomberg Law* published an article titled "Uber, Lyft

4   Being Probed in New Jersey on Misclassifying Drivers," reporting that New Jersey labor

5   auditors were investigating Uber and Lyft "to see if the rideshare companies are ***wrongly***

6   ***classifying drivers*** as independent contractors and should be on the hook for employment taxes."

7   The article explained that the New Jersey Department of Labor and Workforce Development (the

8   "N.J. Dep't of LWD") had "sent surveys to drivers across the state ***over the last year*** seeking

9   information about their work arrangements and tax status[,]" and a N.J. Dep't of LWD staffer

10   confirmed the audit and probe on the condition of anonymity. The article also described how the

11   probe was the "latest challenge to the Uber and Lyft business model" and that the "companies'

12   costs per driver could jump by more than 20% if they have to reclassify workers as employees."

13        249.   On November 14, 2019, the N.J. Dep't of LWD levied a ***$642 million assessment***

14   ***against Uber for unpaid unemployment and disability insurance taxes, after the Company had***

15   ***misclassified drivers as independent contractors rather than employees*** over the preceding four

16   years (2015-2018). In an article published that day, *Bloomberg Law* reported that Uber and its

17   subsidiary Raiser LLC were "assessed $523 million in past-due taxes over the last four years," as

18   well as another "$119 million in interest and penalties on the unpaid amounts, according to ...

19   internal department documents." The article also reported that New Jersey had previously

20   informed Uber in 2015 "that it had obtained a court judgment ordering the company to pay about

21   $54 million in overdue unemployment and temporary disability insurance contributions[,]" but it

22   was "not clear whether the company ever paid any of that bill." In a prepared statement, N.J.

23   Dep't LWD Commissioner Robert Asaro-Angelo noted that "'cracking down on employee

24   misclassification' is a 'priority'" for Governor Phil Murphy's administration.

          **2.**     **Post-IPO Events Demonstrating That Uber's Rampant Passenger**
25                      **Safety Issues Existed Prior to the Offering**

26

27        250.   Second, and in furtherance of its growth at any cost business model, Uber

28   deliberately ignored and failed to disclose rampant, dangerous, and even lethal passenger safety

1   issues across the Company's ridesharing platform, including, among other things, thousands of

2   annual sexual assaults in the United States alone and policies and practices designed to place the

3   Company's interests ahead of passenger safety.

4           251.    On August 13, 2019, Judge Jon S. Tigar of the U.S. District Court for the

5   Northern District of California granted final approval to a ***$32.5 million settlement Uber reached***

6   ***with a class of passengers to settle claims related to the Company's purported "Safe Rides***

7   ***Fee."*** *McKnight v. Uber Techs., Inc.*, No. 14-cv-05615 (N.D. Cal. Aug. 13, 2019). In an article

8   published August 14, 2019 titled "After Extended Delay, Judge Approves $32.5M Settlement in

9   Uber 'Safe Rides' Class Action," *The Recorder* explained that the case was "originally filed in

10  2014 claiming Uber misled consumers about conducting 'industry-leading' background checks

11  and failed to use the Safe Rides Fee to pay to provide more secure rides." As part of the

12  settlement, Uber agreed to "cease charging 'Safe Rides Fees' and to refrain from using

13  statements like 'safest ride on the road' and 'industry-leading' when describing company safety

14  measures in advertising."

15          252.    Ten days later, on August 23, 2019, *The New York Times* published an article

16  titled "How Uber Got Lost," adapted from Mike Isaac's then-not yet published book "Super

17  Pumped." The article shockingly reveals how Uber's "Safe Rides Fee" had nothing to do with

18  passenger safety. In fact, Uber created and added the Safe Rides Fee to each passenger's trip

19  simply to boost revenue and margins, while deceiving passengers into believing the Company

20  would allocate the extra $1 charge per trip towards safety improvements. The article explains:

21              It was April 2014, and Uber was announcing a new $1 charge on
                fares called the Safe Rides Fee. The start-up described the charge
22              as necessary to fund "an industry-leading background check
                process, regulator motor vehicle checks, driver safety education,
23              development of safety features in the app, and insurance." But that
                was misleading. Uber's margin on any given fare was mostly
24              fixed, at around 20 to 25 percent, with the remainder going to the
                driver. According to employees who worked on the project, the
25              ***Safe Rides Fee was devised primarily to add $1 of pure margin to***
                ***each trip***. Over time, court documents show, it brought in nearly
26              half a billion dollars for the company, and after the money was
                collected, it was ***never earmarked specifically for improving***
27              ***safety***. At the time, "driver safety education" consisted of little
                more than a short video course, and in-app safety features weren't
28              a priority until years later.... ***"We boosted our margins saying our***
                ***rides were safer,"*** one former employee told me last year, as I was

reporting a book about Uber. ***"It was obscene."*** (Uber and its
founder, Travis Kalanick, declined to comment for this article.)

253.     News of Uber's deceptive scheme quickly spread, with a number of other news
outlets covering the story that Mike Isaac from *The New York Times* had broken. In an article
published that same day titled "Uber's $1-per-ride 'safe rides fee' had nothing to do with safety,"
*The Verge* reported that Uber's Safe Rides Fee "was ***just a play for profit***[,]" and elaborated that
while the Safe Rides Fee "varied from market to market," passengers were charged as much as
$1.65 per trip. On August 27, 2019, *Business Insider* published a similar article titled "Uber
made nearly $500 million from a 'safe rides fee'—and that money went straight to the
company's pockets." The article explains that while passengers understood Uber's Safe Rides
fee would be used to "bolster the company's background checks, safety education, and more[,] ...
***that fee didn't actually go anywhere except straight to the company's coffers***."

254.     On September 3, 2019, Mike Isaac published Super Pumped, which recounted in
striking detail how, "[u]nbeknownst to outsiders, ***Uber operations teams dealt with thousands of
misconduct cases ever year, including increasing instances of sexual assault***." Indeed, "[t]he
problem became so significant" that the Company had to "create its own taxonomy of twenty-
one different classifications of sexual misconduct and assault in order to properly organize the
sheer number of annual incidents reported."

255.     According to Super Pumped, "[w]hen a new rape accusation or lawsuit was
leveled against the [C]ompany or a driver, some Uber employees would remind others that
drivers are always 'innocent until proven guilty.'" Even Defendant Kalanick "himself would
repeat the phrase often, especially to the security and legal teams.... Uber was the real victim, he
felt." This was the culture at Uber set from the top: "[o]n occasion, when a sexual assault victim
decided not to pursue litigation or if the evidence in a police report was not conclusive enough to
prosecute, a ***round of cheers would ring out across the fifth floor of Uber HQ***."

256.     Super Pumped described how passenger safety was not a priority at Uber, and
Uber "had so lowered the bar to becoming a driver that people who might have been prevented
from driving in the official taxi industry could easily join Uber." According to Super Pumped,

"[t]axi and livery services used fingerprint testing, which offers a thorough history of a driver's past, but often took weeks to complete," but "[w]aiting weeks for a background check was intolerable for Uber." So the Company "used a background check system that moved new recruits through the system quickly" and "did not require fingerprint tests." Rather than put passenger safety first, "[i]n states where fingerprint-based background checks were legally required, Uber hired lobbyists to get laws rewritten." Nevertheless, Uber was telling passengers that it was using "an industry-leading background check process."

257.   As previously reported in *The New York Times*, Super Pumped also blew Uber's cover on its purported "Safe Rides Fee," explaining:

> Uber's margins were fixed for the most part; they took an approximately 20 to 25 percent cut of every ride while giving the driver the remainder of the fare.

> Until 2014, that is, when one executive had the brilliant idea of introducing the "Safe Rides Fee," a new charge that added $1 to the cost of each trip. At the time Uber billed it as necessary for passengers: "This Safe Rides Fee supports our continued efforts to ensure the safest possible platform for Uber rides and drivers, including an industry leading background check process, regular motor vehicle checks, driver safety education, development of safety features in the apps, and insurance…."

> After the money was collect it was never earmarked specifically for improving safety. "Driver safety education" consisted of little more than a short, online video course."

258.   As also reported in *The New York Times*, Super Pumped confirmed a former Uber employee's account of the Company's strategy behind its Safe Rides Fees: Uber "boosted [its] margins saying [its] rides were safer…. It was obscene."

259.   The *WaPo* Article, first published on *The Washington Post*'s website after the market closed on September 25, 2019 and then in the newspaper's print edition the following day, reveals a stunning account of how Uber puts its own interests ahead of passenger safety—even when the Company receives reports of sexual misconduct and sexual assault. Titled "When rides go wrong: How Uber's investigations unit works to limit the company's liability," the *WaPo* Article recounts in shocking detail how investigators in Uber's SIU (or Special

1   Investigations Unit, the Company's call center for passenger complaints) are "***coached by Uber***

2   ***to act in the company's interest first, ahead of passenger safety***."

3       260.    Based on interviews with more than 20 current and former investigators, the

4   *WaPo* Article describes how Uber maintains a "three-strikes" system that keeps "bad actors" on

5   the road collecting fares and provides little, if any, recourse to victims:

6           ***Uber relies on a three-strikes system that can allow bad actors —***
       ***both drivers and riders — to keep using the app until three***

7           ***uncorroborated allegations are made***, according to the more than
       20 current and former investigators. For more egregious claims, it

8           is generally two such strikes, they said. Without corroborating
       evidence, such as a police report or rape kit, they said, ***they don't***

9           ***have the time, resources or encouragement to delve deeply into***
       ***most allegations***. If drivers or passengers deny the allegations,

10          investigators said they often have little recourse with Uber but to
       briefly suspend access to the app and possibly refund a passenger's

11          money....

12          [I]nvestigators say Uber's process leaves bad actors on the road.
       One investigator recalled the ***San Francisco driver who***

13          ***purportedly forced his way into the back seat and put his hand up***
       ***a passenger's blouse before she struggled free. Another heard***

14          ***from riders that their driver threatened them with a hammer***
       ***hidden under his seat. Neither lost their driving privileges at the***

15          ***time***.

16  Perhaps more egregious, Company executives can make "exceptions" to the three-strikes system

17  or overrule SIU investigators in order to, for example, keep high earning Drivers on the road:

18          Uber has a three-strikes system, investigators said, but executives
       have made exceptions to keep drivers on the road. For instance, a

19          New York-area driver allegedly made three separate sexual
       advances on riders, said an investigator assigned to the case. ***After***

20          ***an executive overruled the investigator, the driver was allowed to***
       ***continue working until a fourth incident, when a rider claimed***

21          ***he raped her***....

22          [T]he ***strikes system can be superseded by Uber executives who***
       ***may be motivated to keep as many drivers on the road as possible,***

23          ***investigators said***. In one case, an investigator said he had
       recommended a driver — who already had two strikes — be

24          permanently deactivated after the driver attempted to rub the leg of
       a female passenger without her consent. (The driver denied the

25          allegations, according to the investigator.) An ***Uber executive,***
       ***noting the driver was a high earner and had completed more***

26          ***than 10,000 rides, allowed him to continue taking fares,***
       ***according to the investigator***.

27

28

One former investigator in Phoenix, Arizona, Lilli Flores ("Flores"), recalls how "in her time there *about one-third of cases handled by investigators dealt with sexual misconduct, including rape or unwanted flirtation or advances*."

261.   The *WaPo* Article also describes how SIU investigators are "forbidden" from taking direct steps to assist victims: "The *agents are forbidden by Uber from routing allegations to police or from advising victims to seek legal counsel or make their own police reports, even when they get confessions of felonies*, said Lilli Flores, a former investigator in Phoenix — a guideline corroborated in interviews with investigators, alleged victims and plaintiffs' attorneys."

262.   In fact, the consequences of taking such direct steps to aid victims can be severe: "Many investigators said they understood that if they contacted the police or advised victims to do so, they could be *reprimanded or even fired*." As one former SIU investigator explained, this is because Uber designed the SIU to shield the Company from liability and negative publicity, rather than help and protect victims: "'*Investigators are there first to protect Uber*; and then next to protect the customer,' said Flores, who worked nearly two years for Uber as an investigator and investigations trainer before leaving in November. '*Our job is to keep the tone of our conversations with customers and drivers so that Uber is not held liable*.'"

263.   The *WaPo* Article further describes how Uber trains SIU investigators to avoid asking questions, and the Company provides investigators with scripted "responses" designed to distance Uber from victims and from liability: "The *investigators said they are taught to avoid asking alleged perpetrators directly about the claims against them. And to alleged victims, to only offer condolences that distance Uber from a purported incident*: 'No one should have to go through something like that' rather than 'I am so sorry that happened to you.'"

264.   SIU investigators also explained that, although investigations may last "just minutes" or "stretch for hours or days[,] ... [b]ecause of the sheer number of tickets that flow through investigators' queue, they rarely have time to spend more than a few minutes at a stretch talking to victims and the accused.... Several investigators said *managers send instant messages to nudge them when a call lasts too long*." SIU investigators stressed that "*alleged crimes — especially sexual misconduct — happen during ride-hailing trips at an alarming rate*."

Case 3:19-cv-06361-RS   Document 137   Filed 05/14/21   Page 90 of 121

265.    In Chicago alone, for example, the *WaPo* Article reports that "more than 300 drivers were banned from Uber, Lyft and rival Via for allegations of sexual misconduct between January 2016 and August 2019, according to data obtained by a Freedom of Information Act request." Among nearly 70,000 active registered drivers in Chicago, "[m]ore than 1,100 ... were barred for matters of safety during that time, according to the data, which showed that drug use or possession and traffic accidents ranked after sexual misconduct as the top reasons for a driver being blocked." As explained by SIU investigators, "the number of drivers banned would probably be higher" if they "pursued accusations of misconduct more aggressively."

266.    The *WaPo* Article further reports that "[e]ven while arguing it shouldn't be held liable for driver or rider conduct, Uber has sought to settle cases quickly to avoid the scrutiny of open court," according to numerous attorneys familiar with such cases. In 2018, for example, the Company settled one such highly publicized case for $25 million, when "20 women ... alleged various sexual assaults in rides hailed" through the Uber Rides app.

267.    In another civil suit filed in Chattanooga, Tennessee (pending as of the date the *WaPo* Article was published but since settled), "two female riders allege a ***driver sexually assaulted them because Uber failed to keep him off the road*** following the first woman's claim he groped her breast and compelled her to grab his penis. Within 15 days of that alleged incident, he exposed himself to the second woman and tried to grab her, according to the complaint."

268.    Despite the fact that SIU investigators "handle sensitive incidents, like sexual assaults or fatal accidents," the *WaPo* Article reports that Uber said it "only recently began requiring a minimum of one year's prior experience conducting investigations or handling safety calls or insurance claims." Underscoring the degree to which Uber takes passenger safety seriously, the article describes how "***[a]mong those Uber has previously hired for the [SIU] post are a former fry cook, grocery store cashier and barista***."

269.    Tellingly, when reached for comment on the *WaPo* Article, Tracey Breeden ("Breeden")—Head of Global Women's Safety at Uber—told *The Washington Post*, "At the end of the day, we're not the judge and jury to determine whether a crime has occurred.... ***We're here***

Second Amended Class Action Complaint
Case No. 19-cv-06361-RS

87

1   *to gather information, make a business decision*. We're not law enforcement." Breeden's

2   comment exposes how Uber prioritizes its business interests over passenger safety.

3        270.    The *WaPo* Article's revelations about passenger safety issues drew an immediate

4   backlash against the Company, including from sitting members of Congress. On September 25,

5   2019, in a public letter addressed to Defendant Khosrowshahi (the "Blumenthal Letter"), U.S.

6   Senator Richard Blumenthal—a member of the Committee on Commerce, Science, and

7   Transportation, which has "jurisdiction over a variety of domestic and international commercial

8   areas" including "transportation infrastructure"—opens his letter by stating he is writing "in the

9   wake of *deeply disturbing reports about sexual assault and harassment* that have occurred

10   through your ride-sharing app and your responses to those incidents."

11        271.    Senator Blumenthal stresses that the *WaPo* Article's "report about Uber's

12   handling of these claims raises *serious concerns about whether your company takes sexual*

13   *misconduct seriously*." Senator Blumenthal notes he is "further alarmed by Uber's public

14   statements about this issue," and he castigates Defendant Khosrowshahi for the Company's

15   "*brazenly careless attitude about your responsibility to your customers*." In response to

16   Breeden's comment that Uber is only "here to gather information, make a business decision[,]"

17   Senator Blumenthal emphasizes, "*This is simply unacceptable*."

18        272.    The Blumenthal Letter draws a sharp contrast between the way Uber has

19   marketed itself and its business model and the Company's actual policies and practices with

20   respect to passenger safety:

21   > Uber has repeatedly marketed itself as a way of ensuring a safe
   > ride home after a night of drinking. If marketing your company as
22   > providing safe rides for young, intoxicated women is going to be
   > part of your business model, then *it is especially crucial that you*
23   > *ensure that these rides are in fact safe*. Otherwise, these
   > advertisements serve as a signal to sexual predators that driving for
24   > Uber is an effective way to prey on vulnerable young women....

25   Citing the *WaPo* Article, Senator Blumenthal continues:

26   > It has also been reported that Uber's policy is to not share findings
   > from complaints of sexual assault with background check firms,
27   > competitors or law enforcement. Apparently, the reason for this
   > policy is to allow "a survivor to be able to own their story" and
28   > "choose whether they provide that information to police." Yet
   > news reports indicate that investigators are urged not to advise

victims to contact the police at all. ***Putting the onus on a victim of sexual assault to report it to law enforcement, to your competitors and to background checking companies while simultaneously directing your employees not to advise victims to go to the police demonstrates your lack of seriousness about the sexual misconduct that occurs through your app***.

The Blumenthal Letter concludes that Uber "must clearly do more to ensure rider safety."

273. News about Uber's extensive passenger safety issues, as reported in the *WaPo* Article, also drew the ire of Assemblywoman Gonzalez, AB5's sponsor and author. On September 26, 2019, in an article titled "California lawmaker seeks to hold Uber accountable for sexual assault investigations," *The Washington Post* reported that Assemblywoman Gonzalez was seeking to hold Uber accountable by introducing "legislation that would ensure Uber and Lyft properly investigate claims of sexual assault and harassment." Specifically, the article explained that Assemblywoman Gonzalez was "considering mandatory reporting requirements for allegations of sexual assault after" the *WaPo* Article revealed "Uber's internal investigators are forbidden to share them with law enforcement or other ride-hailing companies." Speaking with *The Washington Post*, Assemblywoman Gonzalez explained that if "a customer reports a crime, ... it must be properly investigated. '***There does need to be a responsibility to truly investigate.... That's clearly not happening***.'"

274. News of the passenger safety issues reported in the *WaPo* Article also made its way to national television. On September 26, 2019, for example, the national *CBS This Morning* television program aired an interview with former SIU investigator Lilli Flores, who explained that "'[i]nvestigators do not report any of the incidents that happen on the Uber app to law enforcement.... The lack of communication between the rideshare apps really ***puts people in a very dangerous position***.'"

275. Also on September 26, 2019, in an article titled "Uber makes changes amid swarm of criticism over rider safety," *The Washington Post* reported that Uber was rolling out a "suite of initiatives ... aimed at keeping riders safe." As the article explains, these purported changes were announced only after "Uber has faced increase scrutiny of its safety practices ... as some critics complain the company hasn't done enough to protect both riders and drivers who

1   use the app. ***Many riders have alleged sexual harassment and other types of misconduct,***

2   ***sparking lawmaker scrutiny***."

3         276.    The article also quoted Sachin Kansal, Uber's head of safety products, who

4   stating, "'[U]nderreporting is a big issue in every industry and we want to be able to help with

5   that.... If a user has a bad experience, we want to hear about that.'" Kansal's statement belies

6   statements from the 20 current and former SIU investigators interviewed for the *WaPo* Article,

7   who described in startling detail how Company executives discourage inexperienced

8   investigators from asking questions or from taking "too long" on calls.

9         277.    Contemporaneous news reports also contradict Uber's newfound interest in

10   "keeping riders safe." On September 29, 2019, for example, *The Register-Guard* (a Eugene,

11   Oregon-based daily newspaper) published an article, titled "Uber, Lyft driver checks miss

12   convicted murderer, sex offender," describing how the Company had failed to perform adequate

13   background checks on its Drivers, jeopardizing passengers. While Uber and Lyft were "pushing

14   for statewide legislation that would eliminate stringent background checks[,] ... [f]or about a

15   week, a convicted murderer was working as a driver for a ride-hailing company in the Eugene-

16   Springfield[, Oregon] area."

17         278.    As *The Register-Guard* article further explained:

18          In another case, a registered sex offender was behind the wheel.

19          In all, according to city statistics, about ***two dozen drivers for Lyft***
20          ***and Uber were allowed to drive passengers in their personal***
            ***vehicles for a short time after they cleared the companies' third-***
21          ***party background checks but failed the local check conducted***
            ***after they were allowed to work.***

22          It was background checks by the Eugene Police Department that
            ultimately prompted a city regulator to take the for-hire drivers off
23          the road. ***Police discovered the offenses while running their own***
            ***more stringent check and recommended the revocation of the***
24          ***drivers' city-issued license....***

25          [T]he number illustrates the potential public safety risk in the
            compromise that city leaders made to bring ride-hailing back into
26          the market. And it raises questions as Uber and Lyft continue to
            push for statewide regulations that would pre-empt local
27          background checks....

28

The city provided the following information about ride-sharing drivers using conditional licenses who failed the local EPD background check from September through late spring:

- Five for public safety concerns, including one registered sex offender and a convicted murderer

- 10 for misdemeanor arrests within three years

- Three for felony arrests within seven years

- Three for felony arrests within 10 years

- Four for having currently open court cases, including one open felony case

279.    All this took place in the city of Eugene, Oregon alone, but as Tracey Breeden told *CBS This Morning* in her televised interview, Uber "do[es] 17 million trips across the world every day. ***Every day.***"

280.    On September 30, 2019, with media scrutiny on Uber passenger safety intensifying, several media outlets—including *U.S. News & World Report*, *Yahoo Finance*, and *The Washington Times*—picked up a report from *The Associated Press* describing how an Uber Driver had kidnapped and sexually assaulted a female passenger in North Carolina. According to a Kernersville, North Carolina police detective, an "unidentified woman summoned the Uber service early Friday.... [T]he Uber driver didn't take the woman to her intended destination, but instead took her to a different location without her consent and committed the sexual offense against her while she was physically helpless."

281.    On October 1, 2019, responding to a September 27, 2019 *Wired* tweet that Uber was "rolling out a raft of new safety features[,]" Senator Blumenthal tweeted that "***Uber's new safety features are a meager start***. They do nothing to address the fundamental problems of ensuring drivers pass rigorous background checks & preventing predatory drivers from jumping from one app to another."

282.    Senator Blumenthal also tweeted: "Drivers with credible allegations of sexual assault should be kicked off the app & when companies get complaints, law enforcement must be notified immediately. ***Uber & Lyft should not be telling employees to dissuade victims from notifying authorities—this is unacceptable***."

283.    In a separate tweet posting images of the Blumenthal Letter, Senator Blumenthal denounced Uber and Lyft directly: "Uber/Lyft have stated they 'do not tolerate harassment or violence' on their platform, but *if they aren't taking reports of harassment & violence seriously, this is difficult to believe*. I've written to these companies demanding they must do more to ensure rides are in fact safe."

284.    In mid-October 2019, numerous media outlets (including *The Washington Post*, *Insurance Journal*, and *Business Insider*) reported that Uber and Lyft executives had refused to appear before the U.S. House of Representatives' Committee on Transportation and Infrastructure for an October 16, 2019 hearing called to examine so-called "transportation network companies" that have "flooded our roadways with disruptive technologies."

285.    In his opening remarks, Representative and Committee Chairman Peter DeFazio (whose congressional district includes Eugene, Oregon) lambasted Uber and Lyft for failing to attend the hearing:

> *Their failure to appear at this hearing is a telling sign that they would rather suffer a public lashing than answer questions on the record about their operations. Perhaps they don't want to talk about their public safety problems*.... In my district, a dozen applicants with serious criminal convictions, including a convicted murderer and a registered sex offender, were cleared through Uber and Lyft's screening process and allowed to drive passengers. It wasn't until the local police department performed their own, more comprehensive background checks that the drivers' criminal records were discovered, and they were removed from service.

286.    As detailed *supra* at ¶228, on November 25, 2019, the TfL announced its decision not to renew Uber's license to operate in London. As reported in *The Guardian* that day, the TfL had told Uber it "needed to address issues with checks on drivers, insurance and safety," but Uber had "failed to satisfy the capital's transport authorities." The TfL "said it had found *several breaches that put Uber passengers at risk*[,]" including a "security lapse [that] resulted in at least 14,000 trips—involving 43 drivers—where someone other than the booked driver picked up passengers." According to the TfL, these "*incidents mostly occurred from late 2018 until early 2019*," and among the "43 fraudulent drivers discovered were some whose licenses had been revoked." In an article published that same day titled "Uber loses license to operate in London,"

the *BBC* elaborated that the TfL "found dismissed or suspended drivers had been able to create Uber accounts and carry passengers. In one example, a ***driver was able to continue working for Uber, despite the fact his private hire license had been revoked after he was cautioned for distributing indecent images of children***."

287.    Months later on January 24, 2020, in an article titled "Uber in London Failed to Flag Assault Complaints, Monitor Drivers' Insurance Status," *Insurance Journal* reported that the TfL released a "***scathing***" 62-page report "detailing why it moved to ban" Uber from London. The TfL focused on "charges that Uber failed to adequately verify drivers' identities and safeguard the service for passengers." The TfL said Uber had "blamed [a] 'system or human error' for its failing to promptly notify [TfL] about seven incidents that led the company to suspend a driver. A ***number of these related to allegations of rape and sexual assault***."

288.    After the market closed on December 5, 2019, following months of shocking revelations of rampant passenger safety issues across Uber's ridesharing platform (and the defective policies and practices that failed to keep passengers safe), the Company finally released its U.S. Safety Report. The 84-page document reveals a startling account of 107 deaths across 97 fatal crashes, 19 fatal physical assaults, and ***5,981 sexual assaults*** that occurred during 2017 and 2018 (the two calendar years immediately preceding the Offering)—***in the Unites States alone***.

289.    With respect to sexual assault, the U.S. Safety Report describes how, based on the "5 most serious categories of sexual assault," Uber received reports of ***2,936 and 3,045 instances of sexual assault for 2017 and 2018***, respectively, or ***eight sexual assaults per day*** each year. The U.S. Safety Report does not present these top-line figures, but rather presents the number of annual incident reports according to each of the five "most serious categories" of sexual assault:

| *Serious Category of Sexual Assault* | *2017 (# of incident reports)* | *2018 (# of incident reports)* |
|---|---|---|
| Non-Consensual Kissing of a Non-Sexual Body Part | 570 | 594 |
| Attempted Non-Consensual Sexual Penetration | 307 | 280 |
| Non-Consensual Touching of a Sexual Body Part | 1,440 | 1,560 |

| Non-Consensual Kissing of a Sexual Body Part | 390 | 376 |
| Non-Consensual Sexual Penetration | 229 | 235 |

290.    The U.S. Safety Report presents "breakdowns" of the combined five categories of sexual assault by "reporting party" and also by "accused party," indicating that, overall, 56% of reporting parties were passengers and 54% of accused parties were Drivers.

291.    These overall reporting and accused party figures seem to be at odds with the specific "reporting party" figures presented for the first four categories of sexual assault: non-consensual kissing of a sexual body part (***75% of reporting parties were passengers***); attempted non-consensual sexual penetration (***72% of reporting parties were passengers***); non-consensual kissing of a non-sexual body part (46% of reporting parties were passengers); and non-consensual touching of a sexual body part (oddly, the percentage of reporting parties that were passengers is not presented, but the percentage of reporting parties that were Drivers is: 51%). A small minority of reports of sexual assault were made by third parties, *i.e.*, neither passengers nor Drivers. The U.S. Safety Report does not present the specific "accused party" figures for any of the five categories, nor does it present the specific "reporting party" figures for the fifth and "most serious" category: non-consensual sexual penetration.

292.    The U.S. Safety Report does, however, present "data on victims" for non-consensual sexual penetration, the only category of sexual assault for which this figure is presented. For non-consensual sexual penetration (and "[a]cross both years"), the "***survivor was the rider in roughly 92% (n=429) of incident reports, and 25% (n=109) of those were guest riders***". Drivers were survivors in about 7% (n=31) of incident reports." In addition, "***women and female-identifying survivors made up 89% of the survivors in the dataset***[,]" while "men and male-identifying survivors comprised about 8%" of non-consensual sexual penetration survivors. Less than "1% of survivors identified as gender minorities."

293.    The U.S. Safety Report also presents "a preview of estimated 2019 sexual assault data" for January through June of 2019, *i.e.*, the four months preceding and the two months following Uber's May 2019 IPO. The U.S. Safety Report does not present raw figures for the

number of incident reports across any of the five categories, but it does present "% estimated incident rate change vs. full year 2018" for each category, from which raw figures can be calculated and tallied. Based on "reports as of November 15, 2019[,]" Uber received approximately **2,500 reports of "serious sexual assaults" in the first six months of 2019 alone**.

294.    In its Executive Summary, the U.S. Safety Report proclaims that Uber does not "believe corporate secrecy will make anyone safer. **People have a right to know about the safety records of the companies and organizations they rely on every day**. And we believe that publishing this data will help us develop best practices that will prevent serious safety incidents from occurring in the first place." These tell-tale statements suggest Uber omitted at least two material facts from the Offering Documents: first, Uber kept this shocking data a "secret" prior to and at the time of the IPO, and second, the Company had neither developed nor implemented sufficient policies or practices with respect to passenger safety at the time of the IPO.

295.    Uber's release of the U.S. Safety Report— and the passenger safety issues it disclosed—promptly drew an onslaught of negative publicity and indignation from the public, but also criticism that the U.S. Safety Report does not go far enough in terms of transparency.

296.    On December 5, 2019, for example, in an article titled "Uber Says 3,045 Sexual Assaults Were Reported in U.S. Rides Last Year," *The New York Times* stressed that while "the ride-hailing company detailed sexual assaults, murders and fatal crashes through its platform[,]" the report "**did not give a comprehensive picture of safety across Uber's operations. It provided no information on the 65 countries outside the United States where Uber offers its services**. In Brazil, India and elsewhere, murders and assaults stemming from ride-hailing services have been widely reported." The article also quoted CLO West: "The **numbers are jarring and hard to digest**." In another article published that same day titled "Uber releases safety report revealing 5,981 incidents of sexual assault," *CNN Business* notes that "Uber repeatedly attempted to contextualize the number of sexual assaults as a percentage of total rides.... It also contextualized its incidents of sexual assault and homicide by citing national rates." The *CNN Business* article also stressed that the "84-page report contained **data that Uber had from 2017 and 2018**, and included incident reports resolved on or before October 31, 2019[,]" *i.e.*, prior to the IPO.

297.     On December 6, 2019, *The Washington Post* published an article titled "On Uber, hundreds of rape allegations go unreported to police." The article explains how the data presented in the U.S. Safety Report offers an incomplete picture of passenger safety at Uber:

> Buried inside Uber's inaugural safety report this week that detailed thousands of sexual assaults and more than 100 deaths was another staggering revelation: ***Hundreds of rape allegations have gone undisclosed to law enforcement***....
>
> That suggests police weren't aware of nearly 300 rape allegations, potential felonies. Uber didn't disclose the involvement of law enforcement in the 6,000 reports of sexual assault. That means police are potentially unaware of thousands more cases of sexual assaults....
>
> The ***finding that Uber knows vastly more than police about the scale of rape and sexual assault during its rides is raising alarms among law enforcement, regulators and victims [sic] advocates who say the company keeps valuable information to itself*** — and struggles to take responsibility for what happens on its platform.
>
> "***These numbers represent a staggering systemic failure***," said Sen. Richard Blumenthal (D-Conn.), a frequent critic of ride-hailing services who accuses them of dodging responsibility for safety concerns....
>
> Former San Francisco [D]istrict Attorney [G]eorge Gascón ... said the company's revelation raises serious issues with the platform and its aggressive expansion.
>
> "I think it's extremely troubling that we're finding out now that only a third of [offenses] have been reported because what we know also is that people who engage in sexual assault and receive no consequences tend to reoffend," said Gascón....
>
> Victims [sic] rights groups and other experts said the thousands of reports of sexual assault could represent just a fraction of the incidents during ride-hailing trips....
>
> "Nothing that they have done is defensible regarding not reporting these incidents to police," [Mike Bomberger said, an attorney with Estey & Bomberger, LLP]. "***Look at the consequences of not reporting: What's the message you send to your drivers if you know a crime's been committed in the car, you're aware of it and it's not been reported to police? Number two: You know that a particular driver has committed a crime, is a sexual predator, and now you're going to let that sexual predator back into the public to do whatever sexual predators do***. You look at the pros and cons, and there's no way you can defend not reporting that" to police....
>
> Some of the reporting issues stem from ***systemic issues*** at Uber's Special Investigations Unit, a call center in Phoenix that is charged with handling the most sensitive reports from passengers and

1    drivers. The Post revealed in September that workers in that unit
2    were charged with serving the company's interest first, seeking to
     avoid liability for safety issues, guided by a policy that prohibited
3    reporting to police.

4    298.    The U.S. Safety Report even drew the ire of major presidential candidates. On

5    December 6, 2019, responding to Faiz Siddiqui's (a reporter at *The Washington Post*) December

6    5, 2019 tweet reporting that Uber had "disclosed 3,000 sexual assaults in U.S. rides last year,

7    including 235 people raped," U.S. Senator Elizabeth Warren ("Senator Warren") tweeted to her

8    millions of followers on Twitter, "***Uber's safety investigators are reportedly more concerned***

9    ***about protecting their company from liability than protecting passengers and drivers.***

10   ***Misclassifying their employees as contractors is just another way to avoid responsibility. Uber***

11   ***must be held accountable***."

12   299.    On December 6, 2019, *Wired* published an article titled "A Criminologist Says

13   Uber's Crime Report Is 'Highly Alarming.'" The article described how "***there were more than***

14   ***3,000 sexual assaults related to Uber rides last year, up 4% from the year before***." The article

15   also quoted John Roman (a senior fellow at NORC at the University of Chicago, an independent

16   social research institution), who explained why the data is so troubling:

17       More than 3,000 people reported sexual assaults related to Uber
         rides in the US last year, the ride-hail company said Thursday in a
18       long-awaited report on violence and safety—an average of eight
         per day....

19       The data is difficult to put in context....

20       Still, one criminologist said that, unlike [CLO] West, he was
21       surprised by the numbers contained in the Uber safety report, and
         not in a good way. "***It's highly alarming***," says John Roman....

22       Data on violence, and particularly sexual violence, is fraught, as
23       victims historically have been loath to involve law enforcement.
         Uber noted in its report that police were involved in just 37 percent
24       of the rape incidents reported through its app; that likely makes
         Uber's reported numbers look artificially high when compared with
25       national crime statistics. Plus, the FBI's data on sexual assault has
         been bedeviled by issues of classification. In fact, Uber worked
26       with advocacy groups to create a "taxonomy" of sexual assault—
         five categories ranging from nonconsensual kissing of a nonsexual
27       body part to nonconsensual penetration—for the report. Still,
         "stranger rape" is relatively rare: Just 27,000 incidents occurred
28       last year, according to the Rape, Abuse & Incest National
         Network, fewer than 20 percent of the total rape incidents reported
         to the FBI.

Uber, meanwhile, reported 235 rapes last year, about one in every 5 million trips. To Roman, that seems very high, especially given that most of these incidents are between strangers who interact fleetingly during an Uber ride. That goes for "stranger" homicides too—just about 450 arguments between strangers led to murders in the US last year. According to Uber data, 19 of those were related to the company's rides.

*"We all think being victimized by a stranger is just the price of ... living in America," says Roman. "But I think people don't understand how rare stranger homicides and stranger rapes are. To see all these [Uber-related] rapes and murders—that's the thing that makes me really alarmed*" here....

Uber cautions against comparing the rate of incidents on rides with national data because its riders tend to be more urban and more affluent than other Americans.

But **Roman surmises that Uber's model contributes to crimes. For one, unlike taxi drivers, Uber drivers use their own vehicles, which typically don't include your classic plexiglass divider**. A study in the Baltimore area in the mid-1990s suggests that assaults on taxi drivers dropped precipitously after the city required taxi owners to put partitions into all their vehicles. The intimate quarters of an Uber car ride might invite inappropriate behavior—and a partition might prevent it.

The **violence may also be related to Uber's controversial employment model, which classifies drivers as independent contractors rather than full-time employees**. "There's a big literature in criminology that finds people are less likely to commit crimes if they fear losing their job because of it," says Roman. But if drivers only view their job as an occasional, part-time gig—not a job—Roman says they're less likely to approach driving with professionalism, or with fear of termination.

300.    Also on December 6, 2019, after the market closed, *The Mercury News* (a San Jose, California-based daily newspaper) published an article titled "Uber loses $1.4 billion in value after reporting thousands of sexual assaults in its rides." As reported in the article, "***Uber's stock market value fell by $1.4 billion***" on Friday, December 6, 2019, "on the heels of the company's release of a safety report revealing that 3,000 incidents of sexual assault took place during its U.S. rides in 2018." The article also quoted Dan Ives (Managing Director at Wedbush Securities), who stated, "'The ***safety report[] paints another black eye for Uber as the company continues [to] have business model issues*** which need to [be] addressed.'"

301.    On the same day, *Barron's* published an article titled "If Uber Thought Its Safety Report Would Help Its Reputation, Wall Street Didn't Buy It." The article explained: "though

[Uber] tried its best to frame the figures within the context of national averages, the headline numbers, especially for sexual assaults, didn't help." The article also quoted Ives, who stated, "'***It's a disaster and another major black eye for Uber with safety issues front and center***.'"

3. **Post-IPO Events Demonstrating That Uber's Financial Condition Was Worse Than the Offering Documents Led Investors to Believe**

302.     Third, Uber failed to disclose that its growth at any cost business model was defective, and as a result the Company had sustained massive losses and decelerating growth. Moreover, the Company was in the process of implementing purported cost saving measures that would only exacerbate the problem.

303.     After the market closed on May 30, 2019, within a month of Uber's IPO, the Company reported its financial results for the quarter ended March 31, 2019 ("Q1 2019")—a quarter that ended more than a month before the Offering. In its Q1 2019 earnings release, Uber reported a ***$1.012 billion loss and the slowest quarterly revenue growth in the Company's history***, on both a GAAP Revenue (20% YoY) and an Adjusted Net Revenue (14% YoY) basis. ***Uber Rides—the Company's most important offering and main source of revenue—posted its slowest quarterly revenue growth ever***: 9% and 10% YoY on a GAAP Revenue and Adjusted Net Revenue basis, respectively. Q1 2019 marked the first time in the Company's history that Uber Rides' revenue growth slowed into the single digits. Moreover, Uber reported its slowest ever growth in terms of trips (36% YoY) and 10% slower growth in MAPCs (33% YoY) than the same quarter the prior year—both key measures of the Company's financial condition.

304.     On the same day, *Quartz* published an article titled "Uber's earnings are confusing by design." Although Uber's revenue was up "20% from the same period in 2018[,]" the article reported that "[m]ost of that growth came from food-delivery platform Uber Eats," which grew 89% YoY. *Quartz* explained that Uber's financial reports are "so complicated you need a glossary of terms to get through a single sentence." During the Q1 2019 earnings call, Defendant Khosrowshahi claimed that Uber's "story is simple," but *Quartz* questioned this line:

> Why does such a simple story require such a complicated financial report? Perhaps because ***there are certain key elements of that story Uber doesn't want investors to focus on***. For instance, Uber may not want investors to pay too much heed to the excess driver incentives and referrals it pays out, the former of which ballooned

to $291 million on Eats in the latest quarter, a 200% increase over the first quarter of 2018. ***That 89% boost in Eats revenue looks less impressive when you realize Uber tripled incentive payouts to achieve it***.

305.    The article stressed that Uber's $1.012 billion loss, or ***"[n]et income, meanwhile, was so much lower than the same time last year***—the first and to date only quarter in which Uber reported a profit, thanks to sales of international operations—***that the company described the year-over-year change as 'not meaningful.'"***

306.    The *Quartz* article further questioned whether investors should "even be looking at revenue and net income, [(or loss),] anyway," as Uber also reports a slew of other figures:

> Uber also reports "adjusted net revenue" and "core platform adjusted net revenue." Uber calculates these adjusted figures, known in industry terminology as non-GAAP financial measures ... by taking its original revenue figures and deducting certain incentives it pays to its independent-contractor workforce. Adjusted net revenue is consistently lower than revenue.
>
> What is "core platform," you ask? Why, one of Uber's two operating segments. It includes rides, Eats, and "other core platform," the last of which is primarily Uber's "Vehicle Solutions" business. This "other core platform" shouldn't be confused with "Other Bets," which is Uber's second operating segment. "Other Bets" mainly includes the company's trucking business, Uber Freight, plus "new mobility" (electric bikes and scooters).
>
> ***Got that? No? Confused? Yeah, me too. The market seemed equally uncertain what to make of it***. Uber's stock drifted upward immediately after the company shared its results, then dipped down.... ***Uber closed out regular trading on May 30 at $39.80, 11% below its $45 IPO price***.

307.    On June 7, 2019, less than a month after the Offering, Uber announced that its Chief Operating Officer Barney Harford ("COO Harford") and Chief Marketing Officer Rebecca Messina ("CMO Messina") were "stepping down." On the same day, *CNBC* published an article titled "Uber's chief operating officer and chief marketing officer are stepping down," which included an internal email Defendant Khosrowshahi sent to employees announcing COO Harford and CMO Messina's departure. In the email, Defendant Khosrowshahi states, "[A]t every critical milestone, it's important to step back and think about how best to organize for the future. ***Given that we're a month past the IPO, now is one of those times, and I've been discussing this topic***

1    *a lot with [COO Harford] and the leadership team*." Defendant Khosrowshahi explains that

2    from now on he would be "more involved in the day-to-day operations of ... the core platform of

3    Rides and Eats," with both Rides and Eats reporting directly to him, and "[g]iven this, [COO

4    Harford] and I have agreed that the COO role no longer makes sense, and he's decided to leave

5    Uber."

6          308.    With respect to CMO Messina, Defendant Khosrowshahi states in the email that

7    he had "decided to combine [Uber's] Marketing, Communications, and Policy teams into one,

8    led by Jill [Hazelbaker]. Given this, [CMO Messina] and I have agreed it makes sense for her to

9    move on." Defendant Khosrowshahi concludes, "***There's never really a right time to announce***

10   ***departures or changes like this, but with the IPO behind us, I felt this was a good moment*** to

11   simplify our org and set us up for the future."

12         309.    In other words, Defendant Khosrowshahi waited until after the Offering to

13   announce these material changes to the Company. The *CNBC* article notes that shares of Uber

14   common stick "slipped more than 1% in after-hours trading."

15         310.    On July 29, 2019, less than three months after the Offering, Uber announced its

16   first wave of layoffs, revealing that the Company was ***terminating one-third of its marketing***

17   ***team, or about 400 employees***.

18         311.    In an article published that same day titled "Uber Lays Off 400 as Profitability

19   Doubts Linger After I.P.O.," *The New York Times* reported that the "cuts ... are ... the latest

20   shake-up since [Uber] went public two months ago."

21         312.    In another article published that day titled "Uber Lays Off 400 Employees From

22   Marketing Team" *Forbes* reported that the layoffs were announced "as the ***company contends***

23   ***with worries about slowing growth*** and internal dissatisfaction on the marketing team."

24         313.    Then, on August 7, 2019, in an article titled "Stuck In Traffic: Uber Set To Report

25   Earnings As Stock Still Under Pressure," Forbes explained that such sizeable layoffs are "***not***

26   ***usually a sign of things going swimmingly***."

27         314.    After the market closed on August 8, 2019, Uber reported its financial results for

28   the quarter ended June 30, 2019 ("Q2 2019"), the same quarter in which Uber conducted its IPO.

In its Q2 2019 earnings release, Uber reported a ***$5.236 billion loss—the largest ever quarterly loss in the Company's history by more than five times***. Uber blamed this massive loss on one-time expenses, *i.e.*, $3.9 billion of stock-based compensation expenses in connection with its IPO, but even excluding these one-time expenses, the Company's $1.336 billion loss was still (and remains) its largest quarterly loss ever. ***For the second quarter in a row, Uber also reported the slowest quarterly revenue growth in the Company's history***, on both a GAAP Revenue (14% YoY) and an Adjusted Net Revenue (12% YoY) basis.

315.    While Q1 2019 was the first time in the Company's history that Uber Rides' revenue growth slowed into the single digits, Q2 2019 marked the first time that ***Uber Rides' revenue growth nearly flatlined***. Uber Rides, the Company's main source of revenue, posted its ***slowest ever quarterly growth for the second quarter in a row***: 2% YoY and 4% YoY on a GAAP Revenue and Adjusted Net Revenue basis, respectively. Regarding rides and trips, two key measures of the Company's financial condition, Uber reported its ***slowest ever trips growth for the second quarter in a row*** (35% YoY) and its ***slowest ever MAPCs growth*** (30% YoY).

316.    Uber's slowing growth across a variety of measures stunned investors, especially because its ***total costs and expenses doubled or even tripled***, depending on whether cost of revenue (which includes Excess Driver Incentives, one of Uber's largest costs) and D&A are factored in. Uber's Q2 2019 costs and expenses totaled $8.651 billion, or 147% more than the same quarter the prior year. Excluding cost of revenue and D&A, Uber's costs and expenses totaled $6.788 billion, or 228% more than the same quarter the prior year. Moreover, Uber's sales and marketing expenses (part of total costs and expenses by either calculation) increased by $507 million YoY, or 71%, to $1.222 billion. Expressed differently, on a YoY basis, Uber's Q2 2019 total revenue grew by only 14%, while total expenses grew by 147%, so ***total expenses grew much faster than revenue***.

317.    The market's reaction was fierce and unsympathizing. On August 8, 2019, *TechCrunch* published an article titled "Uber lost more than $5B last quarter," reporting:

> ***$5.2 billion in net losses represents the company's largest-ever quarterly loss. Revenue, for its part, is up only 14% year-over-year, igniting concerns over slower-than-ever growth***. The company says a majority of 2Q losses are a result of stock-based

1
2

> compensation expenses for employees following its May IPO. Stock compensation aside, Uber still lost $1.3 billion, up 30% from Q1.

3
4

> Analysts had expected losses per share of $3.12 versus Uber's $4.72. As for revenue, analysts, per CNBC, had expected $3.36 billion, or an additional $200 million.

5
6
7
8

318.    That same day, in an article titled "Uber loses $5 billion, misses Wall Street targets despite easing price war," *Reuters* reported that the Company had posted a "***record $5.2 billion loss and revenue that fell short of Wall Street targets ... as growth in its core ride-hailing business slowed, sending its shares down 6%***." The article also explained:

9
10

> The company said a price war in the United States was easing and that an important measure of profitability topped its target, but ***slowing revenue growth raised questions about Uber's ability to expand and fend off competition***.

11
12
13

> "Losses are widening and the competition is cut-throat," said Haris Anwar, analyst at financial markets platform Investing.com. ***"What's sapping investor confidence and hitting its stock hard after this report is the absence of a clear path to grow revenue and cut" costs***....

14
15
16

> Uber reported that ***revenue growth slowed to 14% to $3.2 billion and fell short of the average analyst estimate of $3.36 billion, according to IBES data from Refinitiv. The company's core business, ride-hailing, grew revenue only 2% to $2.3 billion***.

17
18
19
20
21

319.    In addition, *Reuters* reported that Uber was "keeping less money per car ride." Also on August 8, 2019, the *BBC* published an article titled "Uber shares tumble as profit figures disappoint Wall Street," noting that while Uber said "price pressure is easing[,]" the Company's "***costs still rose an astonishing 147%***." The *BBC* also quoted Alyssa Altman, an analyst from Publicis Sapient, who stated, "***Uber has turned into the magical money burning machine***."

22
23
24
25
26
27

320.    On August 9, 2019, *The Economist* published an article titled "Uber lost over $5bn in the second quarter," explaining that "even the company's preferred measure of profits, 'adjusted-[earnings before interest, taxes, depreciation, and amortization ("EBITDA"),]' showed a loss of $656m, better than the first quarter of the year but worse than the same period a year earlier. And ***the rapid growth that the losses are intended to sustain seems to be faltering***." On the same day, Michael Hewson of CMC Markets posted his analysis, stating: "Against the low

28

1  expectations, **Uber's Q2 numbers still managed to disappoint on pretty much every level**,

2  posting an eye-watering loss of $5.2bn for the quarter."

3       321.    Also on August 9, 2019, in an article titled "Uber burned through $5.2 billion last

4  quarter, its biggest quarterly loss ever," *CNN Business* reasoned that "[e]ven by Uber's

5  standards, the **company burned through a staggering amount of money in its most recent**

6  **quarter**." The article elaborated:

7              Uber ... said Thursday that it lost $5.2 billion in the three months
             ending in June, its **largest quarterly loss ever, fueled mostly by**
8            **$3.9 billion in stock-based compensation expenses** related to its
             public offering during the quarter.
9
             **Without those charges, however, the company still lost about $1.3**
10           **billion during the quarter, a roughly 50% spike from the year**
             **prior**. The mounting losses come as Uber continues to invest in
11           freight shipping, meal deliveries and offering discounts for its core
             ride-hailing business to attract new customers and compete with
12           companies like Lyft....

13           But **even as it invests aggressively, Uber's revenue growth**
             **continues to slow. The company posted revenue of $3.1 billion**
14           **during the quarter, a 14% increase from the year prior** — hardly
             the rocket ship growth that investors typically expect from newly
15           public technology firms.

16           **Uber's core ride-hailing business was all but flat. Revenue in this**
             **sector ticked up just 2% from the same quarter a year ago**....
17
             **Shares of Uber fell by as much as 12% in after hours trading**
18           Thursday following the disappointing earnings report.

19       322.    After the market closed on August 9, 2019, Uber instituted a hiring freeze for

20  software engineers and product managers across the United States and Canada. In an article

21  published that day titled "Uber Freezes Hiring of U.S. Tech Staff, Seeks to Cut Costs,"

22  *Bloomberg* noted the freeze was initiated as the Company "faces mounting losses.... The decision

23  ... comes after a painful second quarter for Uber. The company missed revenue expectations and

24  posted a $5.24 billion net loss, its biggest ever. The stock is down 11% from its May [IPO]

25  price."

26       323.    In another article published that day titled "Uber imposes engineer hiring freeze

27  as losses mount: Exclusive," *Yahoo Finance* reported that the "**hiring freeze comes after 400**

28  **layoffs in its marketing department last week**, which raised concerns and fears company-wide."

324.    In addition to the record losses and slowest ever growth reported in Uber's Q2 2019 earnings release, the Company's hiring freeze weighed on its common stock share price. On August 13, 2019, *MarketWatch* published an article titled "Uber closes at record low as losses, hiring freeze continue to weight [sic] on stock," explaining that "Uber's share[s] have dropped 15% in the past month."

325.    As late as September 11, 2019, in an article titled "Why Uber Stock Crashed 23% in August," *The Motley Fool* reported that Uber's common stock shares "were moving in reverse last month after the ridesharing pioneer reported another underwhelming quarter, featuring slowing revenue growth and wide losses. As a result, the ***stock fell 23% during August***." The article also explained:

> [M]ost of the stock's losses for the month came during the second week of August after its second-quarter earnings report came out....
>
> ***Revenue in the quarter rose just 14% to $3.17 billion, badly missing estimates at $3.36 billion***, though gross bookings grew faster, increasing by 31%, or 37% in constant currency, to $15.8 billion. Revenue, adjusted for currency and a one-time driver award associated with the IPO, was up 26%.
>
> ***More concerning may have been that the company's adjusted EBITDA loss more than doubled in the period, increasing 125% to $625 million***, a sign that profitability is only getting further away for the ride-hailing juggernaut. That translated into a per-share loss of $4.72 versus analyst expectations of a $3.12 loss.
>
> ***The stock continued to decline following the report as news emerged that Uber had instituted a hiring freeze, a warning sign for a growth stock***....
>
> ***At this point, Uber looks like a broken IPO***. Growth is sharply decelerating, and it's still losing billions of dollars a year. The company has plenty of ideas and several secondary businesses in addition to its core ridesharing operation, but that doesn't really matter if the numbers don't add up. If top-line growth continues to slow, look for the stock to fall even lower.

326.    Super Pumped, published on September 3, 2019, revealed in striking detail how Uber had ramped up incentives spending with few limits and little discretion. According to the book, "city managers were given the latitude to spend millions of dollars in driver and rider incentives—freebies to get people to use the service—in order to spur demand and, later, to lure riders away from other ride-hailing competitors." These city mangers "rarely had to check with

1    headquarters[,]" and "[l]ocal managers were greenlighting seven-figure promotional campaigns

2    based on little more than a hunch and data from their personal spreadsheets."

3         327.    On September 10, 2019, four months after the Offering, Uber announced its

4    second wave of layoffs, revealing that the Company was *terminating another 435 employees,*

5    *this time from the Company's product and engineering teams*. In an article published that day

6    titled "Uber Lays Off Hundreds More Workers as It Struggles to Make Money," *The New York*

7    *Times* reported that the "cuts, which total about 8% of Uber's global product and engineering

8    group, follow 400 layoffs in July from the marketing team. In a message to employees about the

9    layoffs ..., Uber's chief executive, *[Defendant] Khosrowshahi, said the company had gone off*

10   *course* as it grew and must streamline to regain its competitive edge."

11        328.    On October 14, 2019, Uber announced its third wave of layoffs, revealing that

12   another 350 employees had been terminated across the Company's Uber Eats, performance

13   marketing, Advanced Technologies Group, recruiting, and global rides and platform

14   departments. In an article published that day titled "Uber's Layoff Total Rises Past 1,000 With

15   Latest Cuts," *The New York Times* reported that the "cuts, the third round in recent months, were

16   focused in the autonomous vehicle unit, operations, recruiting and customer support [teams]....

17   Since July, the *company has cut more than 1,000 jobs, more than 2 percent of its work force*."

18        329.    Three weeks later, after the market closed on November 4, 2019, Uber reported its

19   financial results for the quarter ended September 30, 2019 ("Q3 2019"). In its Q3 2019 earnings

20   release, Uber reported another *massive $1.162 billion loss*, or $761 million excluding one-time

21   stock-based compensation expenses in connection with its IPO. For the third quarter in a row,

22   Uber reported its *slowest ever growth in terms of trips* (31% YoY); for the second quarter in a

23   row, the Company reported its *slowest ever MAPCs growth rate* (26% YoY). Uber's costs and

24   expenses also continued to balloon, totaling $4.919 billion, or 33% more than the same quarter

25   the prior year. Excluding cost of revenue and D&A, Uber's costs and expenses totaled $2.957

26   billion, or 43% more than the same quarter the prior year. Moreover, Uber's sales and marketing

27   expenses (part of total costs and expenses by either calculation) increased by $328 million YoY,

28   or 42%, to $1.113 billion.

330.    As with Q2 2019, the market reacted adversely to Uber's third quarter earnings release. In an article published the same day titled "Uber's quarterly loss widens as costs rise; shares fall," *Reuters* reported that the Company had "***posted a wider third-quarter loss as the company tries to outspend competitors through discounts*** and invests heavily in loss-making business ventures, sending its shares down 5.5% in after-hours trading." The article also noted that "Uber's costs jumped about 33% to $4.92 billion in the latest quarter."

331.    In another article published that day titled "Uber falls after reporting that it lost more than $1 billion in the last 3 months," *MarketsInsider* reported that "***[b]ig quarterly losses are adding up for Uber***. Shares of the ride-sharing company fell as much as 7.4% in early trading Tuesday after it reported it lost $1.1 billion in its third-quarter earnings release Monday."

332.    As the news of the adverse facts that existed prior to the IPO concerning the Company's business model, passenger safety, and financial condition leaked out to the market over the ensuing months, the price of Uber's common stock dropped from the $45.00 per share Offering price to $29.67 per share on the day this Action was commenced (***a 34% decline from the Offering price***) and to an all-time low of $25.99 on November 14, 2019 (***a 42% decline from the Offering price***).

## VI.    CLASS ALLEGATIONS

333.    Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who purchased or otherwise acquired Uber's publicly traded common stock pursuant and/or traceable to the Offering Documents for Uber's IPO, and who were damaged thereby (the "Class"). Excluded from the Class: the Defendants and the Individual Defendants' immediate family members; the officers, directors, affiliates of Uber and the Underwriter Defendants, at all relevant times, including Uber's employee retirement and/or benefit plan(s) and their participants and/or beneficiaries to the extent they purchased or acquired Uber's common stock through any such plan(s); any entity in which Defendants have or had a controlling interest; and the legal representatives, heirs, successors, or assigns of any such excluded person or entity.

334.     The members of the Class are so numerous that joinder of all members in impracticable. The exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery. Lead Plaintiff believes there are at least thousands of members in the proposed Class as the Company offered over 180 million shares of common stock in the IPO. Record owners and other members of the Class may be identified from records maintained by Uber or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

335.     Lead Plaintiff's and the Proposed Class Representatives' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the Securities Act as set forth herein.

336.     Lead Plaintiff and the Proposed Class Representatives will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

337.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

        (a)     whether Defendants violated the Securities Act;

        (b)     whether the Offering Documents contained inaccurate statements of material fact and/or omitted material information required to be stated therein; and

        (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

338.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

1

## VII.    CAUSES OF ACTION

2

### COUNT I
### FOR VIOLATION OF SECTION 11 OF THE SECURITIES ACT
### <u>Against All Defendants</u>

3

4

339.    Lead Plaintiff repeats and realleges each and every allegation above as if fully set

5

forth herein.

6

340.    This cause of action is brought pursuant to Section 11 of the Securities Act, 15

7

U.S.C. § 77k, on behalf of the Class, against Defendant Uber, each of the Individual Defendants,

8

and each of the Underwriter Defendants,.

9

341.    This cause of action does not sound in fraud. Lead Plaintiff does not claim that

10

any of the Defendants committed intentional or reckless misconduct or that any of the

11

Defendants acted with scienter or fraudulent intent. This Count is based solely on strict liability

12

as to Uber and negligence as to the remaining Defendants. Lead Plaintiff expressly disclaims any

13

allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged

14

statements of opinion or belief made in connection with the IPO are alleged to have been

15

materially misstated statements of opinion or belief when made.

16

342.    The Registration Statement issued in connection with the IPO was inaccurate and

17

misleading, contained untrue statements of material facts, omitted material facts necessary to

18

make the statements made not misleading, and omitted material facts required to be stated

19

therein.

20

343.    Uber is the registrant and issuer of the common stock sold pursuant to the

21

Registration Statement. As such, Uber is strictly liable for the materially inaccurate statements

22

contained in the Registration Statement and the failure of the Registration Statement to be

23

complete and accurate. By virtue of the Registration Statement containing material

24

misrepresentations and omissions of material fact necessary to make the statements therein not

25

false and misleading, Uber is liable under Section 11 of the Securities Act to Lead Plaintiff and

26

the Class.

27

28

344. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

345. The Individual Defendants each signed the Registration Statement and caused its issuance. The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading. By virtue of each of the Individual Defendants' failure to exercise reasonable care, the Registration Statement contained misrepresentations of material facts and omissions of material facts necessary to make the statements therein not misleading. As such, each of the Individual Defendants is liable under Section 11 of the Securities Act to Lead Plaintiff and the Class.

346. Each of the Underwriter Defendants served as the underwriters for the IPO and qualify as such according to the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11). As such, they participated in the solicitation, offering, and sale of the securities to the investing public pursuant to the Offering Documents. Each of the Underwriter Defendants, as an underwriter of the securities offered in the IPO pursuant to the Registration Statement, had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading. By virtue of each of the Underwriter Defendants' failure to exercise reasonable care, the Registration Statement contained misrepresentations of material facts and omissions of material facts necessary to make the statements therein not misleading. As such, each of the Underwriter Defendants is liable under Section 11 of the Securities Act to Lead Plaintiff and the Class.

347. None of the untrue statements or omissions of material fact in the Registration Statement alleged herein was a forward-looking statement. Rather, each such statement concerned existing facts. Moreover, the Registration Statement did not properly identify any of

1   the untrue statements as forward-looking statements and did not disclose information that

2   undermined the putative validity of those statements.

3        348.    Each of the Defendants named in this Count issued, caused to be issued, and

4   participated in the issuance of materially untrue and misleading written statements to the

5   investing public that were contained in the Registration Statement, which misrepresented and

6   failed to disclose, *inter alia*, the facts set forth above. By reasons of the conduct herein alleged,

7   each such Defendant violated Section 11 of the Securities Act.

8        349.    Lead Plaintiff and the Class have sustained damages. The value of Uber common

9   stock has declined substantially subsequent to and due to violations by Defendants named in this

10  Count.

11       350.    At the time of their purchases of Uber common stock, Lead Plaintiff and other

12  members of the Class were without knowledge of the facts concerning the wrongful conduct

13  alleged herein and could not have reasonably discovered those facts prior to the disclosures

14  alleged herein. Less than one year has elapsed from the time that Lead Plaintiff discovered or

15  reasonably could have discovered the facts upon which this Complaint is based and the time that

16  this action was commenced. Less than three years has elapsed between the time that the

17  securities upon which this cause of action is brought were offered to the public and the time that

18  this action was commenced.

**COUNT II**
**FOR VIOLATION OF SECTION 12(a)(2) OF THE SECURITIES ACT**
**Against All Defendants**

21       351.    Lead Plaintiff repeats and realleges each and every allegation above as if fully set

22  forth herein.

23       352.    This cause of action is brought pursuant to Section 12(a)(2) of the Securities Act,

24  15 U.S.C. § 77l(a)(2), on behalf of the Class, against Uber, the Individual Defendants, and the

25  Underwriter Defendants.

26       353.    This cause of action does not sound in fraud. Lead Plaintiff does not allege that

27  any of the Defendants committed intentional or reckless misconduct or that any of the

28  Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2)

claim. This Count is based solely on negligence and/or strict liability. Lead Plaintiff expressly disclaims any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the IPO are alleged to have been materially misstated statements of opinion or belief when made.

354.    Each of the Defendants named in this Count were sellers, offerors, and/or solicitors of purchasers of the Company's common stock pursuant to the defective Prospectus. The actions of solicitation by the Defendants named in this Count included participating in the preparation of the false and misleading Prospectus, roadshow, and marketing of Uber common stock to investors, such as Lead Plaintiff and the other members of the Class.

355.    The Prospectus contained untrue statements of material fact, omitted to state other facts necessary to make statement made therein not misleading, and omitted to state material facts required to be stated therein.

356.    Each of Defendants named in this Count owed to the purchasers of Uber's common stock, including Lead Plaintiff and other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. By virtue of each of these Defendants' failure to exercise reasonable care, the Registration Statement contained misrepresentations of material facts and omissions of material facts necessary to make the statements therein not misleading.

357.    Lead Plaintiff did not know, nor in the exercise of reasonable diligence could Plaintiff have known, of the untruths and omissions contained in the Prospectus at the time Lead Plaintiff purchased Uber shares.

358.    By reason of the conduct alleged herein, the Defendants named in this Count violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violation, Lead Plaintiff and the other members of the Class who purchased Uber shares pursuant to the Registration Statement sustained substantial damages in connection with their share purchases. Accordingly, Lead Plaintiff and the other members of the Class who hold the shares issued

1    pursuant to the Registration Statement have the right to rescind and recover the consideration

2    paid for their shares with interest thereon or damages as allowed by law or in equity. Class

3    members who have sold their Uber shares seek damages to the extent permitted by law.

**COUNT III**
**FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT**
**Against the Individual Defendants**

6        359.    Lead Plaintiff repeats and realleges each and every allegation above as if fully set

7    forth herein.

8        360.    This cause of action is brought pursuant to Section 15 of the Securities Act, 15

9    U.S.C. § 77o, on behalf of the Class, against each of the Individual Defendants.

10       361.    This cause of action does not sound in fraud. Lead Plaintiff does not allege that

11   any of the Defendants committed intentional or reckless misconduct or that any of the

12   Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15

13   claim. This Count is based solely on negligence and/or strict liability. Lead Plaintiff expressly

14   disclaims any allegations of scienter or fraudulent intent in these non-fraud claims except that

15   any challenged statements of opinion or belief made in connection with the IPO are alleged to

16   have been materially misstated statements of opinion or belief when made.

17       362.    The Individual Defendants each were control persons of Uber by virtue of their

18   positions as directors and/or senior officers of Uber. The Individual Defendants each had a series

19   of direct and/or indirect business and/or personal relationships with other directors and/or

20   officers and/or major shareholders of Uber.

21       363.    Each of the Individual Defendants participated in the preparation and

22   dissemination of the Offering Documents, and otherwise participated in the process necessary to

23   conduct the IPO. Because of their positions of control and authority as senior officers and/or

24   directors each of the Individual Defendants were able to, and did, control the contents of the

25   Offering Documents, which contained materially untrue information and/or omitted material

26   information required to be disclosed to prevent the statements made therein from being

27   misleading.

28

364.    As control persons of Uber, each of the Individual Defendants is liable jointly and severally with and to the same extent as Uber for its violation of Sections 11 and 12(a)(2) of the Securities Act.

## VIII.   PRAYER FOR RELIEF

365.    WHEREFORE, Lead Plaintiff on behalf of itself and the other members of the Class, prays for relief and judgment as follows:

(a)    Determining that this action is a proper class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)    Awarding all damages and other remedies set forth in the Securities Act in favor of Lead Plaintiff and other Class members against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, accountants' fees, and expert fees, and other costs and disbursements; and

(d)    Awarding Lead Plaintiff and the Class such other relief as may be deemed just and proper by the Court.

## IX.     JURY TRIAL DEMANDED

366.    Lead Plaintiff demands a trial by jury.

Dated: May 14, 2021                          Respectfully submitted,

LABATON SUCHAROW LLP

*/s/ Alfred L. Fatale III*

Jonathan Gardner (admitted pro hac vice)
Alfred L. Fatale III (admitted *pro hac vice*)
Marco A. Dueñas (admitted *pro hac vice*)
Lisa Strejlau (admitted *pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
Email: jgardner@labaton.com
         afatale@labaton.com
         mduenas@labaton.com
         lstrejlau@labaton.com

*Lead Counsel for Lead Plaintiff Boston
   Retirement System*

LEVI & KORSINSKY LLP
Gregory M. Nespole (admitted pro hac vice)
55 Broadway, 10th Floor
New York, New York 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-1294
Email: gnespole@zlk.com

*-and-*

Adam M. Apton (SBN 316506)
388 Market Street, Suite 1300
San Francisco, California 94111
Telephone: (415) 373-1671
Facsimile: (415) 484-1294
Email: aapton@zlk.com

*Liaison Counsel for Lead Plaintiff Boston
   Retirement System*

SCOTT+SCOTT ATTORNEYS AT LAW LLP
John T. Jasnoch (SBN 281605)
600 W. Broadway, Suite 3300
San Diego, California 82101
Telephone: (619) 233-4565
Facsimile: (619) 233-0508
Email: jjasnoch@scott-scott.com

1

2          *-and-*

3          David R. Scott
           156 South Main Street
           P.O. Box 192
4          Colchester, Connecticut 06415
           Telephone: (860) 537-5537
5          Facsimile: (860) 537-4432
           Email: david.scott@scott-scott.com
6
           *-and-*
7
           William C. Fredericks
8          The Helmsley Building
           230 Park Avenue, 17th Floor
9          New York, New York 10169
           Telephone: (212) 223-6444
10         Facsimile: (212) 223-6334
           Email: wfredericks@scott-scott.com
11
           ROBBINS GELLER RUDMAN & DOWD LLP
12         Samuel H. Rudman
           58 South Service Road, Suite 200
13         Melville, New York 11747
           Telephone: (631) 367-7100
14         Facsimile: (631) 367-1173
           Email: srudman@rgrdlaw.com
15
           *-and-*
16
           James I. Jaconette
17         Henry Rosen
           665 West Broadway, Suite 1900
18         San Diego, California 92101
           Telephone: (619) 231-1058
19         Facsimile: (619) 231-7423
           Email: jamesj@rgrdlaw.com
20                  henryr@rgrdlaw.com

21         COTCHETT, PITRE & MCCARTHY, LLP
           Mark C. Molumphy (SBN 168009)
22         Tyson Redenbarger (SBN 294424)
           Noorjahan Rahman (SBN 330572)
23         Julia Peng (SBN 318396)
           San Francisco Airport Office Center
24         840 Malcolm Road, Suite 200
           Burlingame, California 94010
25         Telephone: (650) 697-6000
           Facsimile: (650) 697-0577
26         Email: mmolumphy@cpmlegal.com
                   tredenbarger@cpmlegal.com
27                 nrahman@cpmlegal.com
                   jpeng@cpmlegal.com
28
           *Counsel for Proposed Class Representatives David*

---

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Messinger, Ellie Marie Toronto ESA, Joseph Cianci, and Irving S. and Judith Braun*

1

**CERTIFICATE OF SERVICE**

2

      I HEREBY CERTIFY that on May 14, 2021, I was authorized to electronically file the

3

foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of

4

Electronic Filing to all counsel of record

5

6

7

                            */s/ Alfred L. Fatale III*

8

                            Alfred L. Fatale III

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28